**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

| | |
|---|---|
| UNITED STATES OF AMERICA, and STATE OF NEW MEXICO, *ex. rel.* ) ) ) | |
| SALLY HANSEN, Relator; ) ) | **FILED UNDER SEAL AND IN CAMERA** |
| Plaintiffs, ) ) | **FIRST AMENDED COMPLAINT** |
| v. ) ) | **No. 2:11-cv-566-WPL-CG** |
| DEMING HOSPITAL CORPORATION d/b/a ) MIMBRES MEMORIAL HOSPITAL, ) COMMUNITY HEALTH SYSTEMS, INC., ) COMMUNITY HEALTH SYSTEMS ) PROFESSIONAL SERVICES CORP., and ) JERRY BOSSELL, ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) | |

**FIRST AMENDED COMPLAINT**

The United States of America and the State of New Mexico, on relation of Sally Hansen

("Hansen" or "Relator"), complain against Defendants Deming Hospital Corporation d/b/a/

Mimbres Memorial Hospital ("Mimbres" or "MMH"), Community Health Systems, Inc.,

Community Health Systems Professional Services Corp. (together, "CHS"), and Jerry Bossell

("Bossell") (collectively, "Defendants") as follows:

I.      NATURE OF THE CASE

1.      This is a *qui tam* action pursuant to the federal False Claims Act, 31 U.S.C. §

3729, *et seq.*, the New Mexico Medicaid False Claims Act, New Mexico Statutes § 27-14-1, *et

seq.*, and the New Mexico Fraud Against Taxpayers Act, New Mexico Statutes § 44-9-1, *et seq.*

This action seeks to recover damages and penalties against Defendants for fraudulently obtaining

licensure and fraudulently submitting claims for payment to Medicare and the New Mexico

Medicaid program for laboratory tests conducted in violation of quality control procedures

required under federal and state laws. This action also seeks damages stemming from Defendants' retaliatory treatment of Relator for investigating and raising concerns about the violations discussed herein.

2. Defendants operate Mimbres Memorial Hospital, an acute care hospital in Southwest New Mexico. Mimbres has an in-house medical laboratory that provides comprehensive laboratory and transfusion services in support of the diagnosis and treatment of inpatients and outpatients.

3. Lab testing is performed on approximately 80% of hospital patients, and is used to diagnose everything from flu and strep throat, to syphilis, to E. coli 0157 and other potentially deadly pathogens. Typically, a patient comes to the hospital feeling sick; in order to figure out what is wrong, medical staff take a sample from them – such as mucus, saliva, or blood, depending on their symptoms – which is then analyzed in a laboratory to isolate and identify any pathogens. The lab results are used by physicians and other medical staff, to develop a diagnosis and treatment. Accurate and reliable lab testing is therefore crucial to patient safety.

4. Lab testing is often complicated, and even minor deviations from established procedures or small miscalibrations in equipment can alter the results. Depending on the illness, a single missed diagnosis, or false negative, can put a patient's life at risk. In addition, the broader population is put at risk from delays in identifying and containing outbreaks of deadly pathogens.

5. For all of these reasons, labs are required to meet strict quality control standards, which are set forth in the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"). CLIA requirements are set forth in federal regulations that govern all aspects of lab testing.

6.      Through CLIA, the Centers for Medicare and Medicaid Services ("CMS") regulates all lab testing performed on humans in the United States.  The objective of CLIA is to ensure the accuracy, reliability and safety of laboratory testing through the adoption of certain minimum testing standards across all laboratories.  It sets forth comprehensive quality requirements: laboratories must, *inter alia*, 1) use materials that provide accurate and reliable test results and act in accordance with performance specifications, 2) maintain a written procedures manual, 3) perform maintenance and function checks as specified by the manufacturer of equipment and instruments, 4) ensure equipment is calibrated and verified according to manufacturer instructions, and 5) employ personnel that meet certain educational and work experience standards.

7.      For years, Defendants have simply ignored substantial portions of the CLIA requirements.  In terms of general lab requirements, the lab's Procedure Manuals were woefully outdated – they included testing for procedures that had not been done in years and lacked instructions for procedures and equipment currently in use – and competency assessments to ensure that lab personnel were trained to properly perform lab testing were not done.  In terms of specific testing requirements, Defendants did not perform required quality control testing to ensure that specific lab procedures were being done using proper techniques and functioning equipment; and, in turn, to ensure that lab results were consistent and reliable.

8.      The failures were rampant, and well-known.  Indeed, since at least June 2009, Defendants knew that the Mimbres lab was not CLIA-compliant.  However, in order to bill Medicare and Medicaid for lab services, Mimbres had to obtain and retain CLIA certification. As a result, in order to continue billing Medicare and Medicaid, Defendants falsely represented that they were in CLIA compliance, and concealed known violations from CLIA inspectors,

going so far as to falsify documents to reflect quality control testing that had not been done.  By doing so, Defendants were able to obtain CLIA re-certification in October 2009, which was necessary for them to bill Medicare and Medicaid.  Defendants continued to ignore CLIA requirements.  In October 2011, Defendants again falsely represented that they were meeting CLIA requirements and concealed known violations in order to obtain CLIA re-certification.  Had Defendants made truthful representations and admitted to the numerous violations in its lab at any point since 2009, Defendants would have been denied CLIA re-certification and had their certification revoked.   All the while, Defendants continued submitting claims for payment to Medicare and Medicaid for improper lab testing.

9.      Immediately upon starting at Mimbres as a Medical Technologist in May 2010, Relator, an experienced lab technologist, observed that Mimbres was in blatant violation of the CLIA requirements.  Specifically, Mimbres failed to conduct routine quality control procedures on instruments and equipment, from complex microbiology analyzers to commonly-used testing media such as agar plates, and on processes used during laboratory testing.  Because of these violations, the accuracy of lab results produced in Mimbres' lab could not be validated or verified.  Mimbres knew that these results would form the basis of diagnosis and treatment decisions by physicians and other practitioners, but ignored the risks to patient health and safety from this conduct.

10.      Relator brought her concerns about CLIA violations to the Lab Director and other Mimbres officials, and then to the Chief Executive Officer.  No actions were taken to bring lab procedures into compliance with CLIA.  Rather, the Lab Director and another Medical Technologist threatened and harassed Relator, and pressured her to quit.  When she did not, she was placed on administrative leave in retaliation for raising her concerns.

11.     Because of Relator's persistent concerns, Defendants could no longer ignore the rampant non-compliance in the lab. A CHS corporate official finally conducted an investigation into her allegations of CLIA violations in Mimbres' lab and, upon confirming that she was right, shut down the microbiology department within the lab.  However, the lab continued to perform testing and submit claims for payment for testing in other parts of the lab that it knew were also not CLIA-compliant.  Accordingly, Defendants have placed, and continue to place, patients at great risk.

12.     In addition to threatening patient safety, Defendants' conduct violates the False Claims Act and similar state laws.  In order to obtain reimbursements from Medicare and Medicaid for lab services, a medical lab must maintain CLIA certification and perform lab testing in accordance with CLIA requirements.  A lab that does not obtain and retain CLIA certification may not seek reimbursement for lab services from Medicare and Medicaid; and lab services that are performed in violation of CLIA are ineligible for reimbursement.  Despite the knowledge that Mimbres' lab was operating in blatant violation of CLIA, Defendants nevertheless billed Medicare and Medicaid for ineligible lab services provided in support of the treatment of Medicare and Medicaid patients, which amounted to millions of dollars annually.

13.     Relator also brings a claim for retaliation in that she was threatened, harassed, and ultimately placed on administrative leave because she raised concerns about, and refused to participate in, Defendants' fraudulent conduct.

14.     Relator brings this action to recover damages suffered by the United States and New Mexico and to prevent future misconduct by Defendants.

## II.    PARTIES

15.    Relator Sally Hansen is a citizen and resident of New Mexico.  Relator began working for defendants on or about May 24, 2010 as a Medical Technologist.  She received her Bachelor of Science degree in Medical Technology from Oregon Health Sciences University in 1997.  She has worked as a Medical Technologist for 14 years, including three years in the specialty of Microbiology.

16.    Defendant Community Health Systems, Inc. is the largest publicly-traded operator of hospitals in the United States.  As of December 31, 2010, it owned, operated or leased 130 hospitals in 29 states, with an aggregate of approximately 19,400 licensed beds.  For the fiscal year that ended December 31, 2010, CHS generated almost $13 billion in revenues.

17.    Community Health Systems, Inc. is a publicly-traded company, incorporated under the laws of the State of Delaware, headquartered at 4000 Meridian Boulevard, Brentwood, Tennessee 37067.  It trades on the New York Stock Exchange under the symbol "CYH."  It is a parent company of Defendant Deming Hospital Corporation, through which it owns and operates Mimbres Memorial Hospital.

18.    Defendant Community Health Systems Professional Services Corporation is a Delaware corporation also located at 4000 Meridian Boulevard, Brentwood, Tennessee 37067, and is an affiliate of Defendant Community Health Systems, Inc.  It provides management services for Mimbres Memorial Hospital.

19.    Defendant Deming Hospital Corporation d/b/a Mimbres Memorial Hospital is a CHS-affiliated acute care hospital located at 900 West Ash Street, Deming, New Mexico 88030.  Mimbres provides a full range of medical services to patients including Medicare and Medicaid enrollees.

6

20.     Defendant Jerry Bossell was, at all relevant times herein, the Lab Director for the Mimbres medical laboratory.  He signed off on the laboratory Procedure Manuals and was made responsible for ensuring the laboratory procedures and practices conformed to CLIA requirements.

### III.     JURISDICTION AND VENUE

21.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under a federal statute, 31 U.S.C. § 3729, *et seq.*

22.     This Court has jurisdiction over Relator's state claims pursuant to 28 U.S.C. § 1367 and 31 U.S.C. § 3732(b).

23.     Venue is proper because Defendants transact business in this District.  31 U.S.C. § 3732(a).

24.     There has been no public disclosure of the fraud alleged herein.  Moreover, Relator is an original source of the information.  Relator voluntarily disclosed the information on which her allegations are based to the government; and she has independent knowledge of the fraud through her work at Mimbres that materially adds to any publicly disclosed allegations, and she voluntarily provided the information to the government before filing this action.

### IV.     BACKGROUND

A.  CLIA Overview

25.     CLIA was enacted in 1988 in response to public health concerns over largely unregulated laboratory services.  CLIA sought to address concerns about the unreliability of lab test results, and in particular about false and negative Pap smears that caused cervical cancer to go undiagnosed in many women.  CLIA required the implementation of adequate standards across all laboratories to eliminate missed diagnoses and to reduce health care costs associated with such errors.

26.     The Division of Laboratory Services, within the Survey and Certification Group, under the Center for Medicaid and State Operations, has the responsibility for implementing CLIA.

27.     All clinical laboratories must be CLIA certified to receive Medicare or Medicaid payments, a process which includes sworn representations from hospital officials that the lab is operating in accordance with CLIA rules and regulations. *See, e.g.,* 42 C.F.R. §§ 493.25, 493.55, 493.61, *et seq.* (Subpart D).

28.     CLIA certification is required for each specialty for which a lab conducts testing and seeks reimbursement.  CLIA sets forth specific rules for lab procedures performed in each specialty for which a lab performs testing.  A lab may not conduct lab testing and seek payments from Medicare or Medicaid for lab testing for which it is not CLIA certified. *See, e.g.*, 42 C.F.R. §§ 493.63, 493.1807.

29.     Mimbres' laboratory is certified under CLIA to conduct lab testing in the specialties of Microbiology, Hematology, Chemistry, Serology, Coagulation Studies, Urinalysis, and Blood Bank/Transfusion Services.  Some specialties contain sub-specialties, each of which can be subject to additional CLIA regulations.  For example, the specialty of Microbiology, which is focused on identifying pathogenic microorganisms in the human body (such as bacteria and fungi) for diagnosis and treatment, includes the subspecialties of Bacteriology, Mycobacteriology, Mycology, Parasitology, and Virology.

30.     Under Medicare and Medicaid rules, even a certified lab may not bill for particular tests if those tests were not performed consistent with CLIA requirements.  The Lab Director, for example, must ensure that lab results are reported only when quality control system

8

is being done properly and accurate and reliable results are being created. *See, e.g.*, 42 C.F.R. §§ 493.1407.

31.     Even after certification, CMS retains authority to conduct inspections and review lab performance at any time in order to assess whether a lab is maintaining CLIA compliance. Lack of compliance can trigger a complete re-audit to determine whether CLIA certification should be retained. *See, e.g.*, 42 C.F.R. §§ 1771, 1780, *et seq.* (Subpart Q).

32.     CMS may cancel a laboratory's approval to receive Medicare payments if the lab "is out of compliance with a condition level requirement." 42 C.F.R. § 493.1842.[1]  In fact, the "principal sanction" for laboratories that participate in Medicare that are "out of compliance with one or more CLIA conditions" is "[c]ancellation of the laboratory's approval to receive Medicare payments for its services." 42 C.F.R. § 493.1807.

33.     In addition, the regulations further state that CMS has authority to seek the revocation or suspension of a laboratory's CLIA certificate if it is "guilty of misrepresentation in obtaining a CLIA certificate," "[f]ailed to comply with the certificate requirements and performance standards," or "violated or aided and abetted in the violation of any provisions of CLIA and its implementing regulations," 42 C.F.R. § 493.1840(a).

34.     Under CMS rules, it "always cancels a laboratory's approval to receive Medicare payment for its services if CMS suspends or revokes the laboratory's CLIA certificate." 42 C.F.R. § 493.1842

---

[1]  Condition level requirements are defined in the CLIA regulations as any of the requirements identified as "conditions" in Subparts G through Q of the regulations. *See* 42 C.F.R. § 493.2. Those parts include "Condition: Bacteriology" (493.1201), "Condition: Hematology" (493.1215) and "Condition: Syphilis Serology," which together include all of the testing requirements set forth below.

35.     CLIA certification inspections occur every two years.  Certification inspectors may tour lab facilities, observe testing, interview lab employees, and review records to evaluate, among other things, lab compliance with quality control requirements for maintaining instruments and equipment and conducting and validating analytical testing.

36.     CMS regularly conducts CLIA certification inspections.  Under CLIA, a medical provider can seek accreditation to have its CLIA certification performed by inspectors from agencies trained by CMS, or by approved accrediting organizations, such as the Joint Commission ("TJC," formerly the Joint Commission on Accreditation of Healthcare Organizations).  42 C.F.R. § 493.551, *et seq.* (Subpart E).

37.     Certification through an accredited organization rather than from CMS directly in no way reduces a provider's obligation to meet CLIA requirements.  Rather, the accredited organization's certification requirements must be "equal to, or more stringent than," the CLIA requirements. 42 C.F.R. § 493.551.

38.     In 2004, Mimbres applied to have its biannual accreditation conducted by the Joint Commission rather than by inspectors from CMS.  The application requires a signed certification attesting to the "accuracy and veracity" of all information provided to the Joint Commission.  In their 2004 application, Defendants further certified that they would grant the Joint Commission access to the Mimbres lab to conduct inspections, and that they would inform the Joint Commission if any information provided to it was later found to be false or inaccurate. The Joint Commission relies on labs such as Mimbres to provide complete and accurate self-disclosures as part of the certification process.

39.     The Joint Commission's certification process involves a biannual on-site inspection.  The Joint Commission requires Mimbres and other providers to submit an

10

application for accreditation, in which Mimbres represents that it is in compliance, and will remain in compliance with the Joint Commission's certification standards; those standards, in turn, incorporate the CLIA requirements, as required by 42 C.F.R. § 493.551.

40.     The Joint Commission standards also set forth specific Accreditation Participation Requirements.  Among them, Mimbres represents that it will provide accurate and truthful information to the Joint Commission throughout the accreditation process.  Under its accreditation rules, "[a]ny hospital that fails to participate in good faith by falsifying information or by failing to exercise due care and diligence to ensure the accuracy of such information may have its accreditation denied or removed by The Joint Commission."

41.     After the biannual on-site inspection, the Joint Commission issues a report identifying any CLIA violations it found.  Depending on the severity of the violation, the lab has 45 or 60 days to submit to the Joint Commission an Evidence of Standards Compliance" ("ESC"), followed by a "Measure of Success" ("MOS"), to demonstrate that the violation has been fixed and that compliance is consistent going forward.  If the representations in the ESC and MOS are satisfactory, the Joint Commission will take no further action and CLIA certification is retained.  If not, the Joint Commission can issue a Preliminary or Final Denial of Certification.

42.     The Joint Commission also conducts periodic evaluations between the bi-annual on-site inspections to ensure continued compliance with CLIA, called "Periodic Performance Reviews" ("PPR").  A lab is required to self-disclose violations through the PPR, along with a "Plan of Action" ("POA") for fixing the problem, followed by a MOS to demonstrate that the problem has in fact been resolved going forward.  Depending on the nature and severity of the

11

PPR, and/or the effectiveness of the POA, the Joint Commission may conduct an interim on-site inspection, and can revoke CLIA certification.

43. The regulations therefore make clear that under Medicare and Medicaid, CLIA certification is required, and that a provider must maintain CLIA compliance in order to obtain reimbursements for lab testing. Medical providers such as Mimbres further certify that they will comply with CLIA requirements in various other forms.

44. Upon applying for and agreeing to participate in the Medicare program, Mimbres made the following certification:

> I agree to abide by all Medicare regulations, program instructions and Title XVIII of the Social Security Act. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions . . . and on my compliance with all applicable conditions of participation in Medicare.

45. Mimbres' participation in the Medicare program required that it also certify as follows:

> I understand that any deliberate omission, misrepresentation or falsification of any information contained in this application or contained in any communication supplying information to Medicare . . . may be punished by criminal, civil and/ or administrative penalties including, but not limited to the imposition of fines, civil damages and/or imprisonment.
>
> I will not knowingly order and/or refer an item and/or service that allows a false or fraudulent claim to be presented for payment by Medicare.

46. Likewise, Mimbres's participation in the New Mexico Medicaid program required it to certify, among other things, that it shall:

> Abide by all federal, state, and local laws, rules and regulations, including but not limited to, those laws, regulations, and rules applicable to providers of services under Title XIX (Medicaid) and Title XXI (SCHIP) of the Social Security Act and other health care programs.
>
> Comply with all federal, state, and local laws and regulations regarding licensure.

12

47.     In submitting claims for reimbursement to the Government Insurers, providers, including Defendants, utilize Current Procedural Terminology ("CPT") codes developed by the American Medical Association.  The CPT coding system was developed to simplify reporting and to identify accurately the service provided.  Each test consists of a five-digit code used to report medical services and procedures performed by physicians to payers including the Government Insurers.

48.     To participate in these government-funded programs and to claim payment and/or reimbursement for services provided, providers submit CMS Form 1500 to the Government Insurers.  Indeed, CMS Form 1500, and the representations contained therein, is required for claims submitted to Medicare and Medicaid.  The Form states in pertinent part:

> This is to certify that the foregoing information is true, accurate and complete.  I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

## V.     FACTS

49.     Approximately 50% of Defendants' revenues generated at Mimbres are from Medicare and Medicaid.  The percentage of Medicare and Medicaid patients is significantly greater.

50.     For lab services in particular, Mimbres billed Medicare for lab services in the amount of $274,571 in 2009, $260,105 in 2010 and $351,128 in 2011, for a total of $885,804.  Mimbres billed Medicaid in the amount of $282,147 in 2008, $346,617 in 2009, $355,769 in 2010 and $279,612 in 2011, for a total of $1,264,145.

51.     When Relator joined Mimbres in May 2010, she immediately observed numerous CLIA violations in the microbiology lab.  She soon learned of numerous additional CLIA

13

violations throughout the lab, including in lab testing involving blood samples used in Serology, Hematology, and Coagulation Studies. The violations Relator observed spanned from general lab requirements regarding personnel and policies to specific testing requirements regarding quality controls for particular procedures and equipment.

A.  General Violations in Lab

52.  The CLIA regulations include general requirements concerning personnel and policies, including the requirement that a laboratory employ a lab director responsible for overseeing all lab testing, and lab personnel that meet certain educational and work experience standards. *See* 42 C.F.R. §§ 493.1403-1495.

53.  CLIA rules require that a lab have a Director responsible for providing overall management and direction of the lab and ensure that testing systems are developed for each type of lab test performed to ensure accurate and reliable test results, including preanalytic, analytic, and postanalytic phases of testing. This includes reviewing and signing off on procedure manuals that set forth lab procedures and quality control testing. In a lab conducting complex testing such as Mimbres, the Director overseeing the lab must be a medical doctor and have certification in pathology or experience in a clinical laboratory. *See e.g.*, 42 C.F.R. §§ 493.1405, 1407, 1443.

54.  Defendants allowed Bossell to oversee the lab, in effect performing the role of the Director. However, Bossell, was not a medical doctor and had no training in medicine whatsoever, and therefore clearly failed to meet the requirements for overseeing the lab. Defendants therefore put someone in charge of Mimbres' lab who was unqualified and incapable of managing and developing policies for a lab performing complex testing.

14

55.     The Director is also responsible for establishing and following written policies and procedures set forth in a procedure manual to ensure accurate and reliable results.  For each test procedure, the procedure manual must include requirements for patient preparation, specimen collection, storage, preservation, transportation, and processing, as well as step-by-step instructions for performing the procedure and interpreting the results.  *See* 42 C.F.R. § 493.1251. Under CLIA, the laboratory director is responsible for maintaining the procedure manual, as well as ensuring the overall operation and administration of the laboratory. *See e.g.*, 42 C.F.R. §§ 493.1105, 1239, 1407, 1251, and 1359.

56.     Mimbres' Procedure Manuals were woefully inadequate.  Mimbres has different Procedure Manuals for each area of testing, such as Microbiology, Serology, Hematology and Coagulation Studies, among others.  Relator reviewed the Procedure Manuals for all of the listed areas, each of which were available to her.  Mimbres' Procedure Manuals all included instructions for equipment and procedures that were no longer in use, and did not include instructions for newer equipment and procedures used regularly.  For example, the Procedure Manual for microbiology included instructions for use of a blood culture analyzer and culture media that were no longer in use but not for a newer analyzer and media in use at the time.  In addition, Mimbres did not have controls in place, such as monitoring and periodic internal reviews, to ensure that aspects of the Procedure Manuals that were still relevant and applicable were actually followed and that such testing was documented.

57.     Relator took contemporaneous notes of various inadequacies in the Procedure Manual for Microbiology.  Among them, Relator noted that 1) it contained a copy of a manufacturer's package insert instead of a written, step-by-step procedure ("Shiga Toxin procedure is package insert…"); 2) it contained procedures for tests that were no longer

15

performed, demonstrating that it was outdated (e.g., "Don't do Clo Test anymore"); and 3) it did not provide procedures for tests actually performed in the lab (e.g., "Blood culture procedure on last instrument" and "strep typing procedure is not the one in use").  She observed inapplicable and missing procedures in the Procedure Manuals for Serology, Hematology and Coagulation Studies as well.

58.     CLIA rules also set forth minimum qualifications for lab personnel performing the testing, including documentation of their qualifications, training, and competence for specific types of lab testing. *See, e.g.*, 42 C.F.R. § 1423, 1489.

59.     Defendants failed to keep documentation of Mimbres lab personnel's qualifications to satisfy CLIA.  More importantly, Defendants failed to train lab personnel to ensure that they had the skills to perform each lab procedure and knowledge of all of the quality control testing associated with each lab procedure they performed; and further failed to maintain documentation of such competency training.

60.     The failure to train lab personnel at Mimbres is particularly egregious because the Procedure Manuals were of no use as a reference.

61.     In Relator's case, she was not given training when she joined Mimbres to ensure that she could perform each type of lab test for which she was responsible, and to teach her the quality control procedures applicable to the lab.  Nonetheless, Bossell and Rivero filled out a competency assessment for Relator, shortly after she had raised concerns about CLIA violations, falsely stating that she had been trained on various lab procedures that she had not been trained on.[2]

---

[2]  That Relator was an experienced lab technologist who knew how to properly perform many of the test procedures she was not trained on does not absolve Defendants of their obligations under CLIA to ensure that she is trained.

16

62.     Defendants knew about the lack of competency assessments and training for lab personnel in June 2009, at the latest, and the issue continued to be raised in internal and outside audits each year through 2012.

B.  Specific Violations in Lab

63.     In conjunction with the general deficiencies in procedures, personnel and training, Relator observed numerous errors in specific lab testing procedures.  Relator observed that Mimbres routinely failed to perform required quality control testing on instruments, equipment and procedures in Mimbres' lab; such quality control testing was necessary to ensure that instruments, equipment, and procedures were consistently producing accurate and verifiable results.

64.     CLIA regulations mandate the performance of specific types of quality control testing, and set forth detailed requirements for each type of quality control testing for each specialty or subspecialty of lab testing performed in the lab.  The following types of testing are required: 1) checks and processes to ensure that test systems, equipment, instruments, materials and supplies are maintained and stored properly; 2) establishment and verification studies to ensure that new equipment is non-defective and meets specifications; 3) maintenance, function and calibration checks to ensure the test system's continued accuracy and reliability; and 4) control procedures to monitor the accuracy and precision of the complete analytical process for each lab test procedure. *See e.g.*, 42 C.F.R. §§ 493.1250-1256.  CLIA regulations further define the frequency and scope of such testing for each specialty or subspecialty. *See e.g.*, 42 C.F.R. §§ 493.1261-1276.  Furthermore, under CLIA a lab must maintain documentation of all quality control testing performed in the lab. *See e.g.*, 42 C.F.R. § 493.1105, 1239, 1253(c), 1255(a), 1256(g).

17

65.     In some cases, the frequency and scope of quality control testing is expressly set forth expressly in the regulation.  Many tests must be conducted daily or weekly, or when a new lot of a commercial batch of a product or material is first used. *See, e.g.,* 42 C.F.R. §§ 493.1261-1263.  In other cases, the regulations require that a lab follow quality control procedures and meet performance specifications set forth by the manufacturer of the instruments, equipment or materials being used. *See e.g.*, 42 C.F.R. §§ 493.1251-1256.  The procedures and performance capabilities specified by manufacturers, in turn, often incorporate standards set forth by the Clinical and Laboratory Standards Institute ("CLSI") (formerly known as the National Committee for Clinical Laboratory Standards), a global standards-developing organization that develops consensus standards and guidelines within the health care community.  For most lab tests performed within a specialty or subspecialty, CLSI provides detailed testing procedures and standards for the frequency and scope of quality control testing.

66.     The violations Relator observed included lab testing on saliva, sputum and other samples in the area of microbiology, and on blood samples in the areas of microbiology, serology, hematology and coagulation studies.

67.     Illustrative instances of Mimbres' failure to conduct required quality control testing in its lab are set forth below.

*Microbiology Testing*

1.  Vitek 2 Microbial Identifier

68.     The Vitek 2 Compact System for Microbial Identification and Susceptibility Testing ("Vitek 2"), manufactured by bioMerieux, is a complex diagnostic device used in microbiology labs for identifying pathogenic microorganisms that cause disease in humans, and

18

testing the susceptibility of the identified microorganism to various antibiotics.  Results from the Vitek 2 are used to form a diagnosis and develop a proper treatment plan.

      a.   <u>Verification Study</u>

69.     When Mimbres installed the Vitek 2 system in its microbiology lab in early 2008, it did not conduct required quality control testing – called a verification study – to ensure that the installed system functioned properly and was able to correctly identify the full range of microorganisms and antibiotic resistances within its reportable range.  In addition, after its installation, Mimbres did not conduct ongoing quality control testing that was required to ensure that the Vitek 2 system continued to provide accurate and reliable results.

70.     Under CLIA, when a lab installs a new FDA-approved test system such as Vitek 2, it must demonstrate that it can obtain results with the same level of accuracy and precision as set forth in the manufacturer's performance specifications for all microorganisms for which the test system will be used to report results.  The laboratory is further required to document its performance of these initial quality control verification steps. *See* 42 C.F.R. §§ 493.1252, 1253.

71.     BioMerieux's Operating Manual for the Vitek 2 sets forth a performance specification of 96.5% accuracy, and references the "most stringent inspecting agency's guidelines for frequency of identification product testing."  Those standards are set forth by the Clinical and Laboratory Standards Institute ("CLSI") (formerly known as the National Committee for Clinical Laboratory Standards, or NCCLS) under standards M7-A6 ("Methods for Dilution Antimicrobial Susceptibility Tests for Bacteria That Grow Aerobically; Approved Standard") and M50-A ("Quality Control for Commercial Microbial Identification Systems; Approved Guidelines").

72.     Under those standards, before reporting any patient results from the Vitek 2, Mimbres was required to verify the manufacturer's performance specifications by testing the new Vitek 2 in parallel with an established method of identification and susceptibility testing already in use in the microbiology lab and comparing the results to the performance specifications published by bioMerieux.

73.     When Mimbres installed the Vitek 2 system, it did not document the completion of a verification study.  Despite failing to verify the system's accuracy and reliability, Defendants put the system into regular use on patient specimens, greatly increasing the danger to patients of incorrect diagnoses and treatment.

b.   Antimicrobial Susceptibility Testing Cards

74.     The Vitek 2 is also used for antimicrobial susceptibility testing, which is done to determine which antibiotics are effective for the treatment of pathogenic organisms from a patient specimen.  For antimicrobial susceptibility tests, manufacturer specification and CLSI guidance require laboratories to check each batch, lot number, and shipment of Vitek 2 Antimicrobial Susceptibility Testing Cards before, or concurrent with, initial use, using approved "control" organisms.  Control organisms are known, isolated organisms used to ensure that the system can properly identify them.  The Vitek 2 Antimicrobial Susceptibility Testing cards are a panel of antibiotics that the organisms are tested against to assess their level of resistance to various antibiotics.  Quality control testing on Antimicrobial Susceptibility Testing Cards is done to ensure that the Vitek 2, and its panel of antibiotics against which organisms are tested, function properly.

75.     Quality control testing must also be performed each day of use unless the laboratory has demonstrated satisfactory quality control performance for conversion from daily

(each day of use) to weekly quality control testing. *See* 42 C.F.R.§ 493.1261(b).  In order to convert to weekly antimicrobial susceptibility quality control testing, the microbiology lab must test all applicable control strains for 20 or 30 consecutive test days and document results.  No more than 1 out of 20 or 3 out of 30 results for each antimicrobial agent/organism combination may be outside the acceptable limits set forth in the manufacturer's documentation.

76.     Mimbres did not conduct antimicrobial susceptibility quality control testing each day of use or verify that the control results were within established limits before reporting patient results.  Mimbres did not qualify for streamlined weekly testing because it did not complete the 20 or 30-day required quality control process.  Instead, the quality control logs within the Vitek 2 show that the control organisms were only tested for 14 days shortly after it was installed in early 2008, that out-of-control results occurred several times during that period, and that no further attempt to qualify for weekly quality control testing was done on the system.  Nevertheless, Mimbres did not conduct daily testing.  Indeed, when Relator began working at Mimbres, she was not instructed to perform daily testing, and she could not find any documentation demonstrating that someone in the laboratory was or had been conducting such ongoing quality control testing.

c.   Identification Cards

77.     CLIA also requires laboratories to substantiate the continued accuracy of the test system by checking each new batch, lot number and/or shipment of Identification Cards, which contain a panel of reagents, for positive and negative reactivity using control organisms. See 42 C.F.R. § 493.1261(a).  Reagents contained in the Identification Cards are biochemicals that cause certain reactions when they interact with specific pathogenic microorganisms, allowing for the identification of pathogens contained in patient specimens.  Quality control testing on the

21

Identification Cards is done to ensure that the reagents are non-defective and can properly identify each pathogenic microorganism. The Vitek 2 uses Gram positive and Gram negative Identification Cards to identify various pathogenic microorganisms. The CLIA and CLSI standards referenced by the Vitek 2 Operating Manual require testing on each new batch, lot number and/or shipment of Identification Cards with multiple control organisms to demonstrate a positive and negative reaction for each biochemical test on the Identification Cards.

78. Mimbres did not conduct quality control testing on the Vitek 2 Identification Cards in accordance with manufacturer's instructions and CLIA requirements. Specifically, quality control testing on new lots of Vitek 2 Gram negative Identification Cards requires the testing of seven control organisms specified by BioMerieux, the Vitek 2 manufacturer; new lots of Gram positive Identification Cards require the testing of eight specified control organisms. Mimbres often tested only one control organism for each new lot or shipment of Gram positive and Gram negative Identification Cards. In addition, testing on those organisms sometimes produced errors.

79. Mimbres did not stop reporting results until the problem was resolved and verified through additional testing; rather, Mimbres simply disregarded the errors and continued to report patient results on the unverified lot number of Identification Cards and bill for such services.

80. Under streamlined quality control testing procedures, a lab could test only two bugs each for the Gram negative and Gram positive Identification Cards. Mimbres did not meet the manufacturer's requirements to conduct such testing, which require a lab to perform quality control testing on three consecutive lot numbers of Identification Cards from three different shipments that span three consecutive seasons, to assess seasonal variations in shipping conditions that could damage the reagents on the Identification Cards. Mimbres did not conduct

22

such testing.  In any event, even if Mimbres had qualified for streamlined testing, it did not conduct testing on the two control organisms specified for each Identification Card; instead, it tested on the few organisms it was able to grow and keep healthy for testing purposes.

81.    Mimbres laboratory's failure to conduct a verification study on the Vitek 2 analyzer when it was first installed, and the failure to conduct ongoing quality control testing, each violated CLIA.  Indeed, the Procedure Manual did not contain quality control procedures for, or even make mention of, the Vitek 2.  Relator searched for the verification study on the Vitek 2 and could not find one; when she asked Bossell for it, he could not produce it.  In addition, Relator reviewed the internal quality control log automatically generated by the analyzer; it showed that the antimicrobial susceptibility quality control testing had been stopped prematurely when it showed errors; and that quality control testing on the identification cards was almost never done.  By way of example, in the case of the identification cards, quality control testing was done so rarely that when Relator found an instance (on February 14, 2010) in the internal quality control log when it had actually been done, she made special note of it.

82.    All lab results produced by the Vitek 2 since its installation in early 2008 were not performed in accordance with required standards and are thus unverified and unreliable for use in patient diagnoses.

83.    CPT codes used to bill for lab tests performed using the Vitek 2 include, among others, 87186, 87187, 87077 and 87153.  For these CPT codes, Mimbres billed Medicare 380 times from 2009 through 2011; and billed Medicaid 414 times from 2008 through 2011.  Merely by way of example, in June 2010, for CPT code 87186 alone, Mimbres billed (sometimes multiple times per day) Medicare on June 4, 10, 15, 16, 17, 18, 20, 22, 23, 25, 27, 28, 29 and 30; and billed Medicaid on June 1, 4, 7, 11, 12, 14, 18, 19, 22, 27 and 30.

2.  Culture Media and Reagents

84.     Culture media, such as petri dishes containing agar (a solution usually consisting of sugar and other ingredients that provide "food" to microorganisms), are used to support the growth of pathogens.  Culture media play a pivotal role in a microbiology laboratory. They are widely employed for isolation, identification and sensitivity testing of different pathogenic microorganisms.  For example, a human specimen such as sputum (taken from the lungs) may be placed on a culture media in order to allow the microorganism contained in the sputum to grow; the characteristics of the larger sample grown on the culture media are then analyzed to identify the microorganism harming the patient.  Quality of media directly affects the observations and inferences that can be drawn from the cultural characteristics of microorganisms.  The meticulous performance of quality control procedures on culture media is necessary to ensure precision in reporting lab test results from such media.

85.     The same is true of reagents, which, as discussed above, are biochemicals used to identify microorganisms.  Defective or expired batches of reagents will not produce the chemical reaction expected to occur in the presence of a particular pathogen, and thereby result in misdiagnoses.

86.     In violation of CLIA requirements, Mimbres did not conduct quality control testing on new lots of commercially purchased culture media and reagents used in identifying microorganisms for diagnosis and treatment.

87.     Among the various media Mimbres used that require quality control testing are SSA, for the isolation of Group A Streptococcus in throat cultures to detect "strep throat"; Todd Hewitt Broth, used to isolate Group B Streptococcus in pregnant women (the most common etiologic agent of neonatal sepsis and meningitis if not detected in the mothers vaginal/rectal

24

specimen); MacConkey/Sorbitol, used on stool cultures to detect E. Coli 0157 (a deadly strain of E. Coli that has been responsible for fatal outbreaks around the country); and CHROMagar, used to detect MRSA, or Methicillin Resistant Staph Aureus, a highly resistant strain of Staphylococcus.

88.     Mimbres usually purchased 5 to 10 boxes of each media at a time.  The boxes in a shipment usually had the same lot number.  Each box usually contained approximately 20 plates of the media.

89.     Reagents used in Mimbres' lab that require quality control testing include Indole, Oxidase, Staph Aureus/Latex and Strep Grouping.

90.     Under CLIA, a laboratory must conduct quality control testing on new lots of commercially purchased culture media and reagents to ensure their sterility and ability to support the growth of microorganisms and produce desired reactions. *See* 42 C.F.R. § 493.1256(e).  In addition, CLIA requires laboratories to ensure that quality control testing on such products meet the manufacturer's performance specifications before reporting test results. *See* 42 C.F.R. § 493.1256(f).  The manufacturer's performance specifications commonly incorporate CLSI guidance set forth in M22-A3 ("Quality Control for Commercially Prepared Microbiological Culture Media; Approved Standard").

91.     For example, under the manufacturer's specifications for Beckton Dickinson's CHROMagar, one of the culture media used in the Mimbres microbiology lab, and under the CLSI guidance set forth in M22-A2, the media's performance in supporting growth must be checked by visually inspecting the culture media for signs of deterioration, and by inoculating a representative sample of the media with pure cultures of microorganisms that produce known, desired reactions.

25

92.     Mimbres did not conduct quality control testing on culture media and reagents that required it, including those identified above, and maintained no documentation of such testing.  That failure calls into doubt the results of every lab result generated from culture media and reagents in those lots.

93.     For example, as of July 2010, Mimbres' quality control logs for four reagents, Indole, Oxidase, Staph Aureus/Latex and Strep Grouping, show that the last entries reflecting quality control testing on those reagents were made in April 2009, November 2008, June 2009, and November 2008, respectively.  Given the frequency with which these reagents are used, numerous lots of each would have been used in the period since Rivero's last entries in 2008 or 2009; indeed, in each of the logs, the expiration date of the last lot entered by Rivero passed before Relator joined Mimbres (in some cases by more than a year).

94.     Likewise, Relator observed that Defendants did not grow and maintain the control organisms necessary to even perform quality control testing on the culture media.  At one point, Relator wrote out the positive and negative control organisms needed to test each of the culture media and gave it to Defendant Bossell to order, which he never did.  The list was as follows:

CHROMagar:  S. Aureus 43300
                     S. Aureus 25923

MacSorb:      E. coli 0157 35150

SSA:             S. pyogenes 19615

Todd Hewitt:  S. agalactiae

95.     The failure to conduct quality control testing on media and reagents continued long after Relator raised concerns in mid-2010, into early 2012.

96.     Mimbres' failure to conduct required quality control testing on new lots of culture media and reagents impacts the results of nearly every patient result reported out of the lab.

Culture media, in particular, are used as part of nearly every test performed in the lab.  Patient specimens are placed on various culture media to help in their identification.  Where observation of the culture media suggests pathogens, other testing such as use of the Vitek 2 is often performed.  However, where observation of the culture media suggests no pathogenic growth, lab results reflecting normal flora – harmless, non-pathogenic microorganisms – will be reported back to the physician and no additional testing will be done.  So, for example, a bad lot of culture media would not foster the proper growth of a pathogen; the lab would then report normal flora when, in fact, the patient may suffer from streptococcus, E. coli 1057 or other life-threatening pathogens.

97.     CPT codes used to bill for lab tests performed using these media and reagents include, among others, 87070, 87081, 87045, 87046, 87427, and 87653.  For these CPT codes, Mimbres billed Medicare 722 times from 2009 through 2011; and billed Medicaid 2,721 times from 2008 through 2011.  Merely by way of example, in June 2010, for CPT code 87186 alone, Mimbres billed (sometimes multiple times per day) Medicare on June 2, 8, 9, 10, 11, 17, 21, 25, and 26; and billed Medicaid on June 1, 2, 4, 9, 12, 14, 17, 21, 23, 25, 26, 27 and 30.

3.  Commercial Kit Tests

98.     Medical laboratories commonly use commercially-prepared immunoassay tests, known as "kits," to identify specific pathogens or disorders.  An immunoassay is a biochemical test that measures the presence or concentration of a substance in solutions that frequently contain a complex mixture of substances.  They are commonly used to analyze biological liquids such as serum, stool, or urine for specific pathogens.  Mimbres used immunoassay kit tests to identify the following pathogens: Clostridium difficile A and B toxin, Shiga Toxin, H. pylori, Campylobacter, and Rotavirus.

99.     Consistent with the requirements for culture media, laboratories must conduct quality control testing on each new lot and/or shipment of commercial kits, using the external quality control testing material provided with the kit to ensure that the tests in that lot are capable of producing accurate results.  *See* 42 C.F.R. §  493.1256.  As with all quality control testing, documentation of such testing is required.

100.     Mimbres routinely failed to conduct required quality control testing on new lots of commercial kits.  Indeed, when Relator began working at Mimbres, she observed that the quality control log for commercial kit tests did not contain documentation reflecting that such testing had been performed for any of the lots of commercial kits in use at the time.  Moreover, the Procedure Manuals did not contain instructions for performing testing on some of the commercial kit tests, including Campylobacter.

101.     Again, Mimbres' quality control logs show clearly that Defendants failed to conduct quality control testing on commercial kit tests.  As of July 2010, the quality control log for H. pylori, for example, showed that no quality control testing had been done since November 21, 2009.  Given the frequency with which such testing was done, the quality control log should contain entries for different lots every several months.

102.     Relator informed Bossell and Johanna Gramer ("Gramer"), a Human Resources Director, about the failure to conduct such testing as soon as she learned about it, and began performing some of the testing herself.  In addition, in early June 2010 she provided Gramer with the lot numbers of the commercial kits in use at the time and a copy of the quality control log that did not contain documentation of quality control testing for those lot numbers.  Neither Bossell nor Gramer took steps to resolve the issue.

103.    In fact, the lack of quality control on commercial kit tests had been known to Mimbres and corporate compliance officials since at least June 2009, but was not addressed and went unresolved.

104.    CPT codes used to bill for lab tests performed using these commercial kit tests include, among others, 87324, 87425, 87338, 87899, and 87427.  For these CPT codes alone, Mimbres billed Medicare 82 times from 2009 through 2011; and billed Medicaid 153 times from 2008 through 2011.  Merely by way of example, in August 2010, for CPT code 87427 alone, Mimbres billed (sometimes multiple times per day) Medicare on August 2, 3, 12, 20 and 23; and billed Medicaid on August  4, 10, 12, 19, 23, 30, and 31.

   4.   Gram Stains

105.    Gram staining, the most useful test in a lab's microbiology department, is a form of microscopic testing used in labs to help determine the identity of bacteria before other lab tests – that can often take several days – are completed.  It is a differential staining procedure most commonly used for direct microscopic examination of specimens and bacterial colonies.  Gram staining is used to divide bacteria into two main groups - Gram negative and Gram positive – in order to determine the antimicrobial drug treatment to be used.

106.    Gram staining is done on a direct specimen such as sputum, which is smeared on a slide.  The slide is then flooded with Crystal Violet, a stain that Gram positive bacteria retain and that appears deep blue or purple.  The slide is then washed and flooded with a chemical so that any Gram positive bacteria do not lose the deep blue or purple colorization, and then washed and flooded with Safranin, a stain that is retained by Gram negative bacteria and appears pink. The slide is then placed under microscopic examination, where the Gram positive organisms will appear as blue cocci (round) or rods, and the Gram negative organisms will appear as pink cocci

or rods.  This gives the clinician an immediate idea of what the microorganism might be while it is growing on culture media, which often require several days to produce results.  For example, Staphs are Gram positive cocci, and E. coli is a Gram negative rod; if you saw Gram positive lancet-shaped cocci in pairs, it is most likely Streptococcus Pneumoniae a common cause of pneumonia, septicemia and meningitis.  These initial results from Gram staining allow physicians to begin a course of treatment before other testing is completed.

107.    Mimbres routinely failed to conduct required quality control testing on the staining reagents used in the procedure, including Crystal Violet and Safranin, or on the Gram staining process itself as performed by lab personnel.

108.    For Gram testing, a quality control slide is one with known Gram negative and Gram positive microorganisms on it, usually Staph Aureus and E. coli.  Under CLIA, a laboratory must conduct quality control testing on Gram stains once a week. *See* 42 C.F.R. § 493.1261.

109.    Mimbres' laboratory did not conduct weekly control testing on Gram stains, and did not have documentation reflecting the performance of such testing.  Moreover, the stains used at Mimbres were expired, a violation of CLIA requirements. *See* 42 C.F.R. § 493.1252(d).

110.    In particular, the quality control log for Gram stains did not have weekly entries, as required, from October 2009 until June 2010, when Relator conducted the quality control testing herself.  In addition, as discussed in more detail below, the October 2009 entry, and the entries leading up to it, were false.  They did not reflect the contemporaneous recording of quality control testing; instead, the entries were all made at one time, right before the CLIA re-certification process in October 2009.

30

111.    Although Gram stains are often performed as part of other tests and billed using the CPT codes for those other tests, Gram stains are sometimes billed independently using CPT Code 87205.  For this CPT code alone, Mimbres billed Medicare 199 times from 2009 through 2011; and billed Medicaid 321 times from 2008 through 2011.  Merely by way of example, in July 2010, for CPT code 87205, Mimbres billed Medicare on July, 7, 9, 13, 14, 15, 16, 26, 27, and 31; and billed Medicaid on July 1, 6 15, 19, and 22.

*Blood Testing*

112.    Relator also found numerous violations in Defendants' lab testing on blood samples.  Testing done on blood samples involves the diagnosis and treatment of some of the most dangerous diseases, and missed or improper diagnoses resulting from unreliable lab testing can be fatal.

113.    Mimbres conducted lab testing on blood samples in various parts of its lab facility, including Microbiology, Hematology, Serology and Coagulation Studies.  Although Relator worked primarily in the area of Microbiology, she performed lab testing on blood samples in other areas of Mimbres' lab.  In doing so, she observed many of the same CLIA violations.

5.  Blood Culture Analyzer

114.    The BacT/Alert 3D, manufactured by bioMerieux, is an automated microbial detection system and blood culture analyzer used to detect microorganisms in blood.  Blood from patients is placed into bottles containing nutrient media and placed in the BacT/Alert 3D for analysis.

115.    The quantity of blood in the bottles is the single most important factor in the isolation of pathogens from blood.  Under CLIA, based on the manufacturer's specifications and

31

CLSI guidance set forth in M47-A ("Principles and Procedures for Blood Cultures; Approved Guideline"), for adults 20 mls of blood should be drawn and 10 mls should be placed into each of two bottles, for aerobic and anaerobic testing.  For children up to six years old, a single pediatric bottle is used and one ml of blood must be drawn for each year of age.  Failure to use these required quantities of blood for blood culture analysis in the BacT/Alert 3D can dramatically reduce the chances of recognizing and identifying pathogens contained in blood.

116.    During Relator's employment, Mimbres' laboratory routinely drew inadequate amounts of blood from adult patients.  While analyzing results from the BacT/Alert 3D during her second week at Mimbres, Relator noticed that the Bac T/Alert 3D contained an unusually large number of pediatric bottles, which each hold approximately 3 mls of blood.  She checked the demographics of each patient and found that 17 out of 18 pediatric bottles were being used for adult patients.  The small amounts of blood in the pediatric bottles – in some instances as little as 1 or 2 mls – made it extremely unlikely that pathogens in the adult patients' blood would be detected, creating a significant possibility of harm to the patient, including death.  For example, Septicemia, a disease process involving the growth of bacteria in the bloodstream, can cause death if not treated immediately.

117.    Relator printed results from the BacT/Alert 3D demonstrating the inadequate blood samples and showed them to Bossell.  Because of the grave implications of the violation, a memo was written to all lab personnel involved in drawing blood cultures and the violation stopped.  However, Defendants did not notify physicians and affected patients of the improper testing, or relevant state officials, and did not return reimbursements from Medicare, Medicaid and other providers for such services.

118.    The failure to draw adequate blood and to identify the problem as soon as it occurred reflects Mimbres' inadequate quality control procedures.  Detailed instructions for performing blood culture analysis using the BacT/Alert 3D should have been included in the Microbiology Procedure Manual and followed, but were not.

119.    CPT codes used to bill for lab tests performed using the BacT/Alert 3D include, among others, 87040.  For this CPT code alone, Mimbres billed Medicare 675 times from 2009 through 2011; and billed Medicaid 946 times from 2008 through 2011.  Merely by way of example, in June 2010, for CPT code 87040 alone, Mimbres billed (sometimes multiple times per day) Medicare on June 8, 13, 15, 20, 21, 22, 25, 27, 28 and 30; and billed Medicaid on June 1, 2, 4, 5, 8, 10, 12, 14, 15, 17, and 30.

6.  ACL Elite

120.    The ACL Elite, manufactured by Beckman Coulter, is an automated system used in Coagulation Studies, which are generally categorized as blood tests done to determine the body's ability to perform the process of blood coagulation, or clotting.  Doctors use the results of these tests to determine if anti-coagulants should be given to patients who have suffered heart attacks or are going through surgery, and the improper use of anticoagulants can cause a patient to bleed to death or have an abnormal clotting event such as a stroke or heart attack.

121.    The most common Coagulation Studies at Mimbres are Prothrombin Time/International Normalized Ration (also known as Protime, PT/INR and PT; hereinafter "PT") and the Activated Partial Thromboplastin Time (also known as APTT and PTT; hereinafter "PTT").  Coagulation Studies are done prior to surgery to ensure that the patient does not have a bleeding or clotting disorder and to monitor oral anticoagulation therapy.  PTs are used to measure the extrinsic system of coagulation and will detect low levels of certain clotting

33

factors. PTs are most often used to monitor the effects of the oral coagulation therapy Warfarin (Coumadin).  PTTs are used to monitor the intrinsic system of coagulation and the activity of the other coagulation factors not covered by PTs.  PTTs are commonly used to monitor Heparin therapy.  Fibrinogen testing is also performed using the ACL Elite analyzer if further investigation into coagulation disorders is needed.

122.    The ACL Elite, like the Vitek 2, is an FDA-approved test system.  Under CLIA, Mimbres must demonstrate that it can obtain results with the same level of accuracy and precision as set forth in the manufacturer's performance specifications and to document its performance of these initial quality control verification steps. *See* 42 C.F.R. §§ 493.1253.

123.    Mimbres did not perform a verification study on the ACL Elite, and Defendants had no documentation reflecting any effort to do so.  Relator conducted a thorough search for the verification study for the ACL Elite and found that no verification study had been done.  As a result, all lab results reported from the ACL Elite, including PTs, PTTs and fibrinogen testing, were unreliable and posed serious risks to patient safety.

124.    Mimbres has used the ACL Elite analyzer since March 4, 2008.

125.    In addition to a preanalytic verification study, daily quality control testing is also required to ensure that the system is consistently producing reliable results.  Daily quality control testing, when it was done, often produced results that were out of the acceptable range, placing into question any patient results from that analyzer.  Rather than re-run the quality control testing until the accuracy of the results could be verified, Defendants reported lab results for patients to physicians.  This issue was raised with Mimbres' managers, including interim Lab Director Leslie Keyes, but the physicians were not notified of the errors and the problem continued.

126.    In addition to improper quality control testing on the ACL Elite, the specimens used in Coagulation Studies (*i.e.*, placed in the ACL Elite) must be prepared in a specific way; and variations in specimens can have a profound effect on coagulation results.  As a result, the process and equipment used in preparing specimens for use in Coagulation Studies are subject to stringent quality control requirements.

127.    The Coagulation Studies performed in the ACL Elite require the use of Platelet Poor Plasma, or PPP.  This requires spinning a blood sample in a centrifuge to separate platelets from the plasma, so that the testing can be done on plasma that is not "platelet-rich."  The platelets are removed because they are naturally clot-forming, and therefore interfere with testing on the clotting ability of the rest of the blood.

128.    Under CLIA, manufacturer's specifications call for application of CLSI guidance set forth in H21-A5.  The CLSI guidance requires that each lab determine a speed and duration that all blood samples will be spun in the centrifuge to ensure that the process consistently produces a platelet count of less than 10,000 per microliter.  Quality control testing to validate that the process can continue to consistently produce PPP must be done every six months. *See* 42 C.F.R. §§ 493.1253.

129.    Mimbres used a centrifuge called the StatSpinExpress to produce PPP.  Under CLIA, functional checks on the centrifuge must be done routinely to ensure that the equipment functions in accordance with the requirements for the procedure being performed. *See* 42 C.F.R. §§ 493.1253.

130.    In the case of the StatSpinExpress 3, lab personnel conducting PT tests typically set the centrifuge to a setting intended to generate a speed of 5,600 rpm for 5 minutes.  The required functional testing, therefore, had to ensure that the centrifuge achieved a rate of

revolution of 5,600. Mimbres' quality records showed that functional tests actually were done; however, those tests were done at a different setting intended to generate a speed of 7,200 rpm for minute. The testing was therefore inapplicable to the testing Mimbres actually performed.

131.   In sum, Defendants failed to properly perform quality control testing to ensure that its procedures were consistently producing Platelet Poor Plasma and, as a result, Mimbres regularly failed to produce plasma with the required platelet count of less than 10,000 per microliter. In fact, Defendants had no documentation since 2008 to show that they could produce PPP.

132.   As a result, Defendants routinely used blood that contained too many platelets and therefore did not meet the specifications for producing Platelet Poor Plasma for Coagulation Studies, putting patients at risk.

133.   The ACL Elite was in use at Mimbres since March 4, 2008. Based on the failure to conduct any verification study, or other required quality testing including ensuring the use of valid specimens, all lab testing performed using the ACL Elite and billed to Medicare or Medicaid was clearly improper and ineligible for reimbursement.

134.   CPT codes used to bill for lab tests performed using the ACL Elite include, among others, 85610, (PT/INR), 85730 (PTT), and 85384 (Fibrinogen). For these CPT codes alone, Mimbres billed Medicare 5,953 times from 2009 through 2011; and billed Medicaid 3,211 times from 2008 through 2011. Merely by way of example, in June 2010, for CPT code 85610 alone, Mimbres billed (sometimes multiple times per day) Medicare every single day in June except June 6; and billed Medicaid every day in June except June 3, 5, 6, 15, 19, and 28.

7.   Rapid Plasma Reagin Testing

135.   Rapid Plasma Reagin ("RPR") testing is done on blood samples to determine whether a patient has syphilis.  RPR testing is done routinely on pregnant women, in particular because of the risk to the fetus from untreated syphilis.

136.   RPR testing requires the use of a commercially-purchased antigen.  If a patient's blood sample is infected with syphilis, the antigen and an antibody associated with the presence of syphilis will cause a visible reaction.  A carefully calibrated needle is required to ensure that the proper amount of antigen is used for each test.

137.   Under CLIA, testing must be performed in accordance with the manufacturer's instructions. *See* 42 C.F.R. §§ 493.1252.  In the case of RPRs, manufacturer instructions require that the accuracy of the needle be confirmed before patient testing.  To do so, a sample of 30 drops must be delivered from the needle; if the number of drops produced by the needle is between 29 and 31, the needle is sufficiently calibrated for use in lab testing.  If not, the needle cannot be used.  CLIA rules further require that the results of this quality control testing be documented.

138.   Defendants did not conduct the required quality control testing on the needles used in RPR testing.  In some instances, partial quality control testing was done, but the number of drops that resulted from the testing was not documented as required under CLIA.

139.   Failures in RPR testing were found as early as June 2009; however, in internal and outside reviews, the problem was not resolved but instead persisted into 2012.

140.   CPT codes used to bill for RPR tests include, among others, 86592.  For this CPT code alone, Mimbres billed Medicare 34 times from 2009 through 2011; and billed Medicaid 463

37

times from 2008 through 2011.  Merely by way of example, in June 2010, for CPT code 86592, Mimbres billed Medicare on June 22; and billed Medicaid on June 4, 16, and 28.

C.   Defendants Knowingly Concealed Violations In Order to Obtain CLIA Recertification and Continue Billing For Non-Compliant Lab Testing

141.   Defendants knew about the plethora of quality violations in the Mimbres lab since at least June 2009, and continuously into 2012.  Rather than fix the problems, Defendants ignored the problems and concealed them from the Joint Commission and CMS.  In this way, Defendants were able to retain CLIA certification and avoid having their Medicare and Medicaid payments suspended.

142.   In June 2009, Diane Blankenship, a Laboratory Services Manager employed by Defendant Community Health Systems Professional Services Corporation, and Bill McRae, another CHS corporate representative, conducted an on-site survey of the Mimbres lab.  The survey was ostensibly to make sure the lab was in compliance with CLIA requirements in advance of the Joint Commission's on-site audit three months later, in October 2009.  That October 2009 audit was the Joint Commission's biannual audit to determine whether Mimbres could retain its CLIA certification.

143.   The self-survey revealed numerous CLIA violations in Mimbres' lab, including nearly all of the general and specific problems discussed above.  Examples include the following:

a.   The lab's Procedure Manuals were inadequate.  Many of the policies for lab testing were missing, outdated, or had not been reviewed in years (in some cases since 2003).

b.   Medical and lab personnel did not have sufficient competency or training, nor was there any process to ensure competency of lab personnel, or documentation thereof.

c.   The lab was in substantial noncompliance in its distribution, handling and monitoring of blood usage.

d.   The lab was in violation of quality control requirements in numerous areas, including Microbiology, Serology, Hematology, and Coagulation Studies, among others. Simply, required quality control testing was not being done in a whole host of areas: many quality control logs were missing or did not exist; materials were not stored in accordance with manufacturer specifications; RPRs and other testing procedures were not done in accordance with CLIA requirements; and several calibration and verification studies were not done or were done improperly.

144.   Defendants did not report these problems to the Joint Commission or CMS.  It also did not cease testing for any period of time to update its Procedure Manuals, ensure the competency of its lab personnel, and ensure the reliability of lab procedures and results for which quality control testing had not been done or was missing.

145.   Nor did Defendants take steps to ensure that the problems would be fixed.  And, in at least one instance, Defendants created falsified quality control records in advance of the Joint Commission's October 2009 on-site audit to determine CLIA certification.  Specifically, Rene Rivero ("Rivero"), a Medical Technologist whom Defendant Bossell placed in charge of the Microbiology lab, created false entries in quality control logs to make it appear as though he had performed microbiology testing that had not been done.  The quality control log for gram stains is particularly revealing: it had entries for every week – all made by Rivero – and then abruptly stopped on October 19, 2009 (until Relator was hired and made the next entry on June 16, 2010).  The Joint Commission conducted its on-site certification audit on October 21, 2009.

146.    When the Joint Commission conducted its on-site certification audit in October 2009, Defendants did not disclose the results of their self-survey or reveal the falsified quality logs.  Rather, it falsely represented, including in its application for accreditation, that it was in compliance with CLIA requirements.  If Defendants had truthfully disclosed the depth and breadth of violations in Mimbres' lab, it would not have received certification.

147.    Despite Defendants' lack of disclosure and falsification of records, the Joint Commission nevertheless found numerous CLIA violations in the Mimbres lab.  Again, the violations spanned Microbiology, Serology, and Hematology, and included the failure to conduct calibration and verification studies, and testing on culture media and lab procedures.

148.    To retain CLIA certification, Mimbres was required to complete Evidence of Standards Compliance in each of the areas of noncompliance, to be submitted within 45 or 60 days, depending on the violation.  As part of this ESC process, for each violation Mimbres represented to the Joint Commission that it had a plan to resolve the problem, that it followed it, and that it had achieved demonstrable and sustained compliance.

149.    Defendants falsely represented in their ESC to the Joint Commission that CLIA violations had been fixed.  These representations were knowingly false; Defendants knew that it had not fixed the problems and that the CLIA violations continued.  If Defendants had revealed to the Joint Commission that it had not resolved the violations it would have been denied CLIA certification.

150.    Despite Defendants' representations in the Joint Commission's accreditation process, Relator found the same problems and more when she joined Mimbres in May 2010.  As set forth above, those violations spanned the areas of Microbiology, Hematology, Serology and Coagulation Studies.  They included outdated Procedure Manuals, and the failure conduct

40

sufficient training and competency assessments; as well as numerous specific quality control violations such as a failure to conduct calibration and verification studies for several analyzers, a lack of quality control testing on culture media and other materials, and inadequate and improper testing procedures.

151.     As discussed below, Relator made numerous and repeated complaints to Mimbres management about the CLIA violations she observed, both in the areas of microbiology and blood testing. As a result, Defendants finally sent Diane Blankenship to review the lab in August 2010. Blankenship substantiated many of Relator's allegations – among them, that there was virtually no quality control testing done and that the Procedure Manual was woefully inadequate – and shut down the Microbiology lab, except Gram stain testing. However, Mimbres continued to conduct, and seek payments for, lab testing in the areas of Hematology, Serology and Coagulation Studies, despite the numerous ongoing violations.

152.     During her on-site visit in August 2010, Blankenship also concluded that Rivero had falsified quality control logs. However, Defendants did not immediately report this falsification to the Joint Commission, despite the obligation to do so.

153.     In addition, the Joint Commission's rules required Mimbres to notify it within 30 days that it had stopped performing lab testing in Microbiology. According to the Joint Commission's Accreditation Participation Requirements, this disclosure is required because "it may be necessary for the Joint Commission to survey the laboratory again." Defendants did not make this disclosure to the Joint Commission.

154.     Blankenship, along with Mark Norman, another CHS corporate representative, returned to Mimbres on September 16, 2010 to conduct another mock survey. They again found, among other things, outdated Procedure Manuals, a lack of qualified personnel working in the

41

lab, reagents and other materials stored at the wrong temperature, failure to conduct calibration and verification studies, and missing quality control logs.

155.   In October and November 2010, Mimbres was required to make self disclosures to the Joint Commission under its PPR process.  The numerous violations Relator had found and which Blankenship had verified, both in her August and September visits, should have also been self-disclosed in the PPR process, but were not.  Instead, Mimbres falsely represented that it was still performing lab testing in all areas of the lab and concealed the ongoing CLIA violations.  In addition, it continued to collect reimbursements from Medicare and Medicaid for lab testing (except for Microbiology).

156.   Next, Mimbres conducted another mock survey in June 2011, a few months before the Joint Commission's next on-site audit to determine whether Mimbres would remain CLIA certified.  The June 2011 self-survey was conducted by Carolyn Spears, another Laboratory Services Manager based out of CHS's Tennessee headquarters.  The survey identified many of the same problems found previously.  It categorized violations by area of the lab and found numerous violations in each, including Microbiology, Serology, Hematology and Coagulation Studies.  In Hematology and Coagulation Studies, for example, the mock survey found that Defendants still had not conducted verification studies on the ACL Elite and other instruments, and that quality control testing procedures  and logs were still absent for many lab procedures.  In the area of Coagulation Studies, as an example, verification studies had not been established for PT and PTT testing, and quality control testing on new lots of RecombiPlastin 2G were not being done.

157.    Defendants did not disclose violations found in the June 2011 mock survey to the Joint Commission.  Instead, like 2009, Defendants concealed the violations and subsequently applied for and obtained CLIA recertification in October 2011.

158.    Again, Defendants falsely represented to the Joint Commission that they were in compliance with CLIA requirements when they knew that there were numerous ongoing CLIA violations that had not been resolved.  Had they revealed the magnitude of problems, they would not have received CLIA certification and had their certification revoked.

159.    Finally, in addition to concealing violations from the Joint Commission and CMS, Defendants did not inform doctors and patients of any of the violations, including those that had resulted in shutting down a portion of the lab, despite the certainty of misdiagnoses and the potentially grave implications of such errors.  In fact, CLIA regulations require that when errors occur, the lab must promptly inform the requesting physicians. See 42 C.F.R. § 493.1291(k).

160.    Similarly, Defendants did not inform state and federal authorities or the Joint Commission of the violations, preventing inspectors from investigating and re-assessing the lab's qualification for a CLIA certificate.  Finally, Defendants did not inform Medicare or Medicaid officials, or return reimbursements received for billing associated with lab services performed in blatant violation of CLIA requirements.

D.  Mimbres Officials Ignored Relator's Concerns and Retaliated Against Her

161.    Defendants' treatment of Relator was consistent with their ongoing and brazen disregard for CLIA violations in the Mimbres lab.  Relator raised concerns about CLIA violations promptly and repeatedly to Mimbres management with the hope and expectation that the issues would be corrected.  However, because Defendants intended to continue ignoring problems so long as they could get away with it, as they had done in the past, rather than

permanently fix the problems they decided to get rid of Relator.  As a result, despite substantiating her allegations, Defendants harassed her and successfully pressured her to quit.

162.   As Relator observed the CLIA violations discussed above, she immediately raised concerns to Bossell, the Lab Director at Mimbres.  He told Relator to try to fix it; however, as discussed below, he undermined her efforts to do so.

163.   Relator also presented her concerns to Rivero, the other full-time Medical Technologist in the microbiology department at Mimbres and had worked at Mimbres.  He had worked at Mimbres since approximately January 2008.

164.   Relator informed Bossell about Rivero's lack of cooperation and reiterated her concerns about the numerous CLIA violations in Mimbres' laboratory.  Bossell did not take any actions to resolve the problems.  Relator tried to present him with evidence of the lab's inadequate procedures and lack of documentation, but he refused to review it.  Rather, he became irritated with Relator and told her that she was being disruptive by continuously raising issues to him.

165.   In or around early June 2010, Relator spoke to Gramer, the Human Resources Director.  Relator told Gramer about the violations she had found, as well as Bossell and Rivero's refusal to address the serious health and safety issues she had raised.  Gramer said she would provide the information to Susan Noltie ("Noltie"), Mimbres' Corporate Compliance Officer.  Two days later, Relator provided Gramer with whatever documentation she could about the violations, including copies of sections of the Procedures Manual and quality control logs that were incomplete and that did not include documentation of many of the tests that should have been performed in the lab.  Relator did not hear back from Gramer or Noltie.

166.    Several weeks after raising her concerns, Relator saw Noltie at a restaurant and told her that, in her opinion, the microbiology lab in particular needed to be shut down because of all of the violations in that department.

167.    Rivero later falsified documents to make it appear that Defendants had conducted quality control testing that had not been done.  For example, Rivero forged at least one and a half years of testing in the quality control log for Gram staining.  Relator informed Bossell, Gramer and others of Rivero's actions.

168.    At the time Rivero falsified documents, a lab employee from a hospital in Artesia, New Mexico conducted a purported "inspection" of the lab; she reported that she found no issues.  The inspection, deliberately conducted on a day when Relator was not working, was bogus: the Artesia employee was a friend of Bossell's, she was not a certified inspector, and she had no authority or responsibility to conduct lab inspections.

169.    On June 27, 2010, Relator wrote a letter to William Quitmeyer ("Quitmeyer"), Mimbres' Chief Executive Officer, and provided copies to Bossell and Gramer.  In her letter, she again cited the inadequate Procedures Manual and lack of quality control testing, as well as Bossell's failure to address the problems.  In addition, she informed them that she had contacted the New Mexico Department of Health about testing procedures that were not being done properly, and made repeated reference to Joint Commission's requirements.  Relator did not receive any response from Quitmeyer or from anyone at his direction.

170.    Throughout this period, Defendants continued to report test results from the Mimbres lab for patient diagnosis and treatment, and bill Medicare and Medicaid for such services.

171. After Relator's letter to Quitmeyer, Bossell and Rivero began to threaten and harass Relator. Bossell told Relator on a daily basis that if she did not quit, he would fire her. On one occasion, when Relator told Bossell that she could not find documentation reflecting that a verification study had been done on the Vitek 2 when it was installed, he became angry, stood inches from her face, and yelled that she had no business looking at past quality control and that she should stay out of it.

172. Rivero came in on one of his days off to further intimidate and harass Relator. He warned her about continuing to raise concerns with management. Relator went to Bossell while Rivero was yelling at her because she was frightened, but Bossell did nothing to stop the harassment. Relator filed a harassment complaint concerning the treatment to which she was being subjected.

173. On or about July 22, 2010, Relator was placed on paid administrative leave.

174. Shortly thereafter, a corporate compliance investigator from Defendant CHS conducted an inspection of the lab based on Relator's complaints that verified her allegations. Based on the investigation, the microbiology lab was shut down, but not other areas. However, despite substantiating Relator's allegations, she was not allowed to return to work.

175. In fact, Defendants had no intention of allowing Relator to return to her job, where she might continue to raise concerns about CLIA violations throughout the lab. So, she was kept on leave for many more months, until February 2011. Then, although Defendants were in need of experienced lab personnel, they told Relator that she would have to work a different, less desirable, shift. She was not told why she had been kept out of the lab for over six months, or why she could not return to her normal schedule.

176. Defendants' actions were intended solely to pressure Relator to quit. Defendants' strategy was successful. In light of the onerous schedule change, and the treatment to which she had been subjected, Relator had no choice but to quit.

## VI.   THE FALSE CLAIMS

177. CLIA's comprehensive quality requirements are intended to ensure safe and reliable lab testing in medical laboratories across the United States. Medical providers are prohibited from seeking payments from Medicare and Medicaid for laboratory services that are provided in violation of those quality requirements. When medical providers perform laboratory testing in knowing violation of CLIA but nevertheless seek payments from Medicare or Medicaid for those lab tests, as Defendants did, they are liable under the False Claims Act.

178. As a result of the gross violations of CLIA in the Mimbres lab, described above, Defendants received millions of dollars in payments for laboratory services that placed patients' lives at risk by failing to meet minimum quality standards. Defendants knew of the violations, but nevertheless submitted false claims to Medicare and Medicaid for lab tests performed in violation of CLIA, which resulted in the payment by Medicare and Medicaid of reimbursements for ineligible lab services.

179. First, Defendants' lab was required to submit to periodic inspections and re-certifications under CLIA, including the re-certification processes that occurred in October 2009 and October 2011. Obtaining CLIA certification was necessary to perform lab testing and bill for such services. Defendants falsely certified in their application for accreditation that they were in compliance with the Joint Commission's standards and CLIA requirements, and that they were providing complete and accurate information as part of the certification process. In addition, during the audit and inspection process, Defendants misled the Joint Commission

through the use of false information, including doctored records and material omissions, thereby causing the inspectors to grant CLIA certification to the Mimbres lab when, in fact, it was materially non-compliant. If Mimbres had submitted truthful information, it would have been denied CLIA certification and had its certification revoked. As a result, Mimbres' CLIA certification was fraudulently induced, and the subsequent Medicare and Medicaid bills constitute false claims in violation of 31 U.S.C. § 3729 (a)(1)(A-B).

180.    Second, Defendants were required to make representations to the Joint Commission that it had fixed any CLIA violations found by its inspectors (ESCs, POAs, MOSs), and to truthfully self-disclose CLIA violations in between biannual certifications (PPRs). Defendants submitted follow-up reports falsely stating that they had fixed problems and submitted interim reports that falsely concealed known violations; they made these false statements in order to retain CLIA certification. If Mimbres had submitted truthful information, it would have been denied CLIA certification and had its certification revoked. In addition, the reporting of false information to the Joint Commission can, in itself, result in denial or revocation of CLIA certification. As a result, Mimbres' CLIA certification, retained through the use of false records and statements, was fraudulently induced, and the subsequent Medicare and Medicaid bills constitute false claims in violation of 31 U.S.C. § 3729 (a)(1)(A-B).

181.    Third, Defendants caused to be submitted false claims for payment to Medicare and Medicaid for lab services performed and billed based on a fraudulently-obtained CLIA certification. Defendants were able to continue to bill Medicare and Medicaid for lab services only as a result of these same frauds. In each reimbursement request for lab testing at Mimbres that Defendants submitted to Medicare and Medicaid, they expressly and implicitly certified

compliance with CLIA requirements.  Accordingly, the subsequent Medicare and Medicaid bills are also false claims in violation of 31 U.S.C. § 3729 (a)(1)(A-B).

### COUNT I – Federal False Claims Act
### 31 U.S.C. §§ 3729 (a)(1)(A-B,G)

182.    Relator Hansen incorporates each paragraph of this Complaint as if fully set forth herein.

183.    Through the above-described conduct, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729.

184.    Through the above-described conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement material to a false claim, and to get false or fraudulent claims paid or approved, in violation of 31 U.S.C. § 3729.

185.    Through the above-described conduct, Defendants knowingly made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money to the United States in violation of 31 U.S.C. § 3729.

WHEREFORE, Relator Sally Hansen respectfully demands:

A.    Judgment in favor of herself and the United States of America and against Defendants in the amount of $11,000 for each false claim and false statement that Defendants submitted to Medicare together with treble the amount of payment received and/or costs avoided;

B.    Judgment awarding Relator 30% of any recovery;

C.    Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action; and

D.    Any other relief to which she may appear entitled.

**COUNT II – New Mexico Medicaid False Claims Act and Fraud Against Taxpayers Act
NMSA 1978, §§ 27-14-3 and 44-9-3**

186.    Relator Hansen incorporates each paragraph of this Complaint as if fully set forth herein.

187.    Through the above-described conduct, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment or approval, and/or made, used, or caused to be made or used, a false record or statement to obtain payment or approval on false or fraudulent claims, and/or made, used, or caused to be made or used, a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money to the state, in violation of NMSA 1978, § 27-14-4 and § 44-9-3.

WHEREFORE, Relator Sally Hansen respectfully demands:

A.    Judgment in favor of herself and the State of New Mexico and against Defendants in the amount of $10,000 for each false claim and false statement that Defendants submitted to Medicaid together with treble the amount of payment received and/or costs avoided;

B.    Judgment awarding Relator 30% of any recovery;

C.    Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action; and

D.    Any other relief to which she may appear entitled.

**COUNT III – Retaliation Under Federal False Claims Act
31 U.S.C. §§ 3729 (h)**

188.    Relator Hansen incorporates each paragraph of this Complaint as if fully set forth herein.

189.    Because of her lawful acts to stop Defendants from defrauding the government as alleged herein, Defendants retaliated against Relator Hansen in the terms and conditions of her

50

employment by placing her on administrative leave and constructively discharging her by changing her schedule.

190.    Under 31 U.S.C. § 3730(h), Defendants are liable to Hansen for two (2) times her back pay plus interest and special damages, including but not limited to attorneys' fees and litigation costs.

WHEREFORE, Relator Hansen respectfully demands:

A.    Judgment in favor of herself and against Defendants, awarding two times her back pay, plus special damages;

B.    Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action; and

C.    Any other relief to which she may appear entitled.

### COUNT IV – Retaliation Under New Mexico Medicaid False Claims Act and Fraud Against Taxpayers Act
### NMSA 1978, §§ 27-14-12 and 44-9-11

191.    Relator Hansen incorporates each paragraph of this Complaint as if fully set forth herein.

192.    Because of her lawful acts to stop Defendants from defrauding the government and in furthering a false claims action, as alleged herein, Defendants retaliated against Relator Hansen in the terms and conditions of her employment by placing her on administrative leave and constructively discharging her by changing her schedule.

193.    Under NMSA 1978, §§ 27-14-12 and 44-9-11, Defendants are liable to Hansen for two (2) times her back pay plus interest and special damages, including but not limited to attorneys' fees and litigation costs.

WHEREFORE, Relator Hansen respectfully demands:

51

A.      Judgment in favor of herself and against Defendants, awarding two times her back pay, plus punitive and special damages;

B.      Judgment awarding the costs and reasonable attorneys fees incurred in prosecuting this action; and

C.      Any other relief to which she may appear entitled.

**JURY DEMAND**

The United States of America and the State of New Mexico, on relation of Ms. Hansen, hereby demand trial by jury on all issues so triable.


Respectfully submitted,

LOEVY & LOEVY

By:     Electronically Signed 2/1/12
        ARTHUR LOEVY
        MICHAEL KANOVITZ
        JON LOEVY
        ANAND SWAMINATHAN
        312 North May Street, Suite 100
        Chicago, IL 60607
        Phone: (312) 243-5900
        Fax: (312) 243-5902


ROTHSTEIN, DONATELLI, HUGHES,
DAHLSTROM, SCHOENBURG & BIENVENU, LLP

By:     Electronically Signed 2/1/12
        ROBERT R. ROTHSTEIN
        CAMMIE NICHOLS
        BRENDAN K. EGAN
        500 4th Street NW, Suite 400
        Albuquerque, New Mexico 87102
        Phone: (505) 243-1443
        Fax: (505) 242-7845


*Attorneys for Plaintiffs*