# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, and )
STATE OF NEW MEXICO, *ex. rel.* )
  )
SALLY HANSEN, )
  )
  Plaintiff-Relator, ) No. 11-CV-00566 WPL/CEG
  )
v. )
  )
DEMING HOSPITAL CORPORATION )
d/b/a MIMBRES MEMORIAL )
HOSPITAL, COMMUNITY HEALTH )
SYSTEMS PROFESSIONAL SERVICES )
CORP., and JERRY BOSSELL, )
  )
  Defendants. )

## RELATOR SALLY HANSEN'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT [DOCS. 62 & 63]

### INTRODUCTION

Relator's First Amended Complaint recites in detail facts demonstrating that Defendants knowingly violated the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), which set forth federally mandated quality control requirements necessary to ensure the reliability of lab testing used in patient treatment and diagnosis. CLIA compliance is of paramount importance: lab testing is performed on approximately 80% of all hospital patients, and is used to diagnose everything from flu to E. coli 0157 and other potentially deadly pathogens. CLIA compliance is required before Medicare and Medicare can be billed for lab tests. But Defendants completely disregarded CLIA requirements, all the while billing Medicare and Medicaid for their non-compliant lab tests.

Relator learned of these violations while working for Defendants as a Laboratory Medical Technologist. Her efforts to report violations internally were ignored and actively thwarted. Due to Relator's tireless effort, Defendants eventually investigated and substantiated her allegations, but they

1

did not disclose the violations to the government or return monies they billed for ineligible lab tests. Instead, in obvious retaliation, they placed Relator on administrative leave, and pushed her out.

Defendants had known about the violations for years. They used false information, including falsified records and concealed violations, to obtain CLIA certification in October 2009 and October 2011, and they provided false information in periodic reports necessary to retain CLIA certification. That certification is an absolute prerequisite to billing Medicare and Medicaid for lab tests; without it, Defendants would have been ineligible to receive reimbursements.

Defendants properly concede that Relator has pled detailed claims that meet the particularity requirements of Rule 9(b), abandoning a nearly routine challenge to False Claims Act ("FCA") cases at the motion-to-dismiss stage. This concession is remarkable for its acknowledgement that Relator has pleaded detailed allegations of CLIA violations and fraudulent conduct that satisfy Rule 9(b)'s stringent requirements. Instead, Defendants frame their attack by sounding the alarm that Relator is trying to use minor violations of complex administrative rules to subject Defendants to substantial liability under the FCA. This argument is belied by the facts alleged: these were not minor, one-off violations; rather, Relator's properly pleaded allegations detail deliberate, widespread violations of critical CLIA requirements across multiple departments and testing procedures, which were known since at least 2009 and continued into 2012. In addition, Defendants' argument is a strawman because inadvertent violations of minor regulatory provisions can never support FCA liability. This is because the FCA plainly requires relators and the government to prove that any regulatory or other violations on which they rely were *material* and that those violations resulted in the *knowing* submission of false claims. Unlike the particularly pleaded violations here, inadvertent violations of minor components of complex regulations could never surpass this hurdle.

Defendants' argument on this point has extraordinary ramifications: they ask this Court to adopt a view that they (and all medical providers) are immune from FCA liability for violations of

CLIA, in all circumstances and no matter what. Defendants' request finds no support in the law. Their single argument in support of this blanket immunity is that no FCA liability can attach because CLIA compliance is a condition of participation in federal programs, not a condition of payment under those programs. But this argument is a complete misfit as to Relator's claims under a fraudulent inducement theory and the worthless services doctrine, and is at best a fact-bound question regarding Relator's false certification theory that cannot be resolved on a motion to dismiss. Indeed, contrary to the Defendants' arguments otherwise, Relator has provided detailed factual allegations in support of at these three independent theories of liability.

First, Relator's allegations state a clear fraudulent inducement theory satisfying all of the elements of an FCA claim. Defendants barely challenge this point, as their single argument that CLIA compliance is a condition of participation and not payment is irrelevant to Relator's fraudulent inducement theory. Fraudulent inducement claims often focus on fraud in obtaining a contract or in gaining eligibility for a government benefit. CLIA certification falls squarely within the latter category: medical providers are required to obtain certification every two years that they are in compliance with CLIA requirements, and that certification is an absolute pre-requisite under the express language of the CLIA to billing Medicare and Medicaid. Here, Relator alleges that Defendants fraudulently obtained this certification in 2009 and again in 2011. Among other things, she alleges that Defendants forged quality records in advance of certification audits and that they performed on-site "mock" inspections before CLIA certification audits that revealed numerous problems. Rather than disclosing the known problems or fixing them, Defendants concealed them and obtained CLIA re-certification. Meanwhile, the rampant CLIA violations persisted. Defendants made material misrepresentations to the CLIA inspectors, and promised to maintain CLIA compliance without any intention to do so. These allegations of fraudulent inducement set forth a clear and straightforward FCA claim.

3

Second, Relators have pleaded a false certification theory based on Defendants' false claims for payment submitted to Medicare and Medicaid for lab testimony that did not comply with CLIA. Defendants devote the vast majority of their brief to arguing that CLIA compliance is a condition of participation in the Medicare program, not a condition of payment under that program, and that this designation precludes Relators' false certification theory. This argument is nothing more than a contention that Relator cannot meet the materiality element of the FCA. But Relator has pleaded that CLIA compliance was material to payment. Among other things, she alleges that CLIA regulations allow for the cancellation or suspension of payments for even a single CLIA violation, and she provides particular citations in support of that allegation. This alone satisfies Tenth Circuit case law on materiality, which makes clear that materiality requires only a showing that under the regulations at issue the government *may* refuse to make payment. *See, e.g., United States ex rel. Lemmon v. Envirocare of Utah, Inc.,* 614 F.3d 1163, 1170 (10th Cir. 2010) ("[M]ateriality does not require a plaintiff to show conclusively that, were it aware of the falsity, the government would not have paid. Rather it requires only a showing that the government *may* not have paid.").

Defendants' argument is an improper attempt to challenge facts particularly pleaded by Relator at the motion-to-dismiss stage. At minimum, whether CLIA compliance is material to the government's payment decision – whether or not couched in terms of conditions of payment versus participation – is a fact-bound issue that must be resolved at a later stage of the case after discovery. Particularly where, as here, adopting Defendants' argument would in effect create a blanket immunity from FCA liability for all who commit CLIA violations – an immunity that is not found in any statute, regulation, or congressional statement.

Third, Relator has also pleaded factual allegations supporting FCA liability under the worthless services doctrine. Relator pleads that the rampant CLIA violations at Defendants' lab rendered the lab results so substandard and unreliable that they were medically worthless.

Finally, Relator has a straightforward claim under the FCA's anti-retaliation provision: she raised concerns at every level of the organization, about CLIA violations that put Defendants' CLIA certification and billing for lab tests at risk. In response, Relator was immediately placed on administrative leave and pushed out.

For all of these reasons, Defendants' motion to dismiss should be dismissed in its entirety.[1]

## FACTS

Relator sets out only a brief summary of the detailed allegations in her First Amended Complaint ("1AC"), discussing the relevant allegations in context in the Argument.

1. Relator Sally Hansen and Other Relevant Parties

Ms. Hansen has fourteen years of experience as a Medical Technologist, performing lab duties across many lab departments, and earned a Bachelor of Science degree in Medical Technology in 1997. 1AC ¶ 15. Hansen worked for Defendant Mimbres Memorial Hospital ("Mimbres") from May 2010 until her forced resignation in 2011. *Id.* ¶ 51, 176. She spent the last three years honing her skills in the specialty of microbiology, and while at Mimbres she worked in the Microbiology department while also assisting in general lab duties. *Id.* ¶ 15.

Hansen's background prepared her both to perform medical testing according to the high standards that federal law demands and to understand how public health and patient safety depend on medical laboratories' careful adherence to the law. She was therefore astonished to find, immediately upon joining Mimbres, that the lab used almost no quality controls for the array of tests the lab performed and was violating numerous CLIA provisions. *Id.* ¶ 51. Hansen informed the Lab Director, Defendant Jerry Bossell ("Bossell"), of these problems, and, getting nowhere with him, she also notified numerous other officials, including Mimbres' Chief Executive Officer, Corporate Compliance Officer and Human Resources Director. *Id.* ¶ 162-165, 169.

---

[1] Relator voluntary dismissed Community Health Systems, Inc. without prejudice pursuant to Fed. R. Civ. P. 41(a) (Dkt. No. 68), and so its separate motion to dismiss (Dkt. No. 61) is moot and is not addressed here.

Faced with an internal whistleblower who was acting in good faith to bring her employer into compliance with CLIA, Defendants could have remedied their errors. They could have informed the doctors that the tests they had ordered were unreliable and refunded Medicare and Medicaid for the worthless test results. Instead, Defendants put Hansen on administrative leave and ultimately forced her resignation. *Id.* ¶ 173-76.

Mimbres, incorporated as Deming Hospital Corporation, is an acute care hospital in Deming, New Mexico. Defendant Bossell was its Lab Director. Defendant Community Health Systems Professional Services Corporation provides management services for Mimbres, and is located at the Brentwood, Tennessee corporate headquarters of its affiliate Community Health Systems, Inc., the largest publicly-traded operator of hospitals in the United States.

2. <u>CLIA</u>

Congress enacted CLIA in 1988 because of growing concerns about the unreliability of lab test results. 1AC ¶ 25. CLIA required that all medical laboratories abide by the quality control procedures to be promulgated by the Division of Laboratory Services, part of the Survey and Certification Group under the authority of the Center for Medicaid and State Operations. 1AC ¶ 26.

The singular purpose of CLIA is to ensure consistently accurate lab results. The various requirements of the statute and its regulations – from general requirements to maintain manuals to specific directives governing the quantity of blood that must be drawn to test for infection – are all aimed at yielding *accurate* and *reliable* test results to ensure timely diagnosis and treatment of patients. *Id.* ¶¶ 3, 6. The link between accurate medical test results and public safety is direct and obvious. At best, inaccurate test results lead only to a loss of money: further tests and procedures that an accurate first test would have rendered unnecessary have to be performed and paid for. At worst, inaccurate test results lead to real injury and even death for patients and communities: illnesses are misdiagnosed and

go untreated, pathogens are left undiscovered and uncontained, and people suffer needlessly. *Id.* ¶¶ 3-6, 25.

Because the link between public safety and accurate test results is so strong, laboratories *must* be certified as CLIA-compliant. *Id.* ¶¶ 27-28. If they are not, CMS forbids them from billing Medicare or Medicaid for even a single test. *Id.* ¶¶ 27-28, 33-34; *e.g.*, 42 C.F.R. §§ 493.1807, 493.1842.

3. First Amended Complaint

The First Amended Complaint alleges that Defendants committed rampant violations of the Clinical Laboratory Improvement Amendments of 1988, that Defendants knew they were committing these violations, and that Defendants disguised these violations in order to continue billing the government for lab tests performed in violation of CLIA provisions.

a. *Knowingly False Statements to Fraudulently Induce The Joint Commission to Grant CLIA Certification*

Here, Defendants knowingly concealed the lab's violations of CLIA, falsified records, and made promises they had no intention of keeping, all to retain Mimbres' CLIA certification. *E.g.*, 1AC ¶¶ 144-45, 152, 179-80. They did so by fraudulently inducing a CMS-approved and accredited certifying body called the Joint Commission to grant the lab certification. *Id.* ¶ 36. Defendants falsified documents, manufacturing false quality control logs in order to pass inspection, and falsely represented to the Joint Commission that they had remedied the violations the Joint Commission had discovered. *Id.* ¶¶ 145, 149. In fact, Defendants had no intention of ever remedying the violations: they knew about the violations before the Joint Commission reviewed them, they knew about the violations afterward, and they never corrected them. *Id.* ¶¶ 141-160.

b. *Specific CLIA Non-Compliant Lab Testing*

CLIA requires that lab personnel have particular qualifications and credentials to conduct complex lab procedures, that they be given specific training on the quality testing and lab procedures they will perform, and that a lab maintain a Procedure Manual setting forth instructions for all testing

7

performed in the lab. 1AC ¶¶ 52-53, 55, 58. Defendants violated all of these most basic requirements. They did not verify that Mimbres lab technicians had proper credentials. 1AC ¶ 59. Meanwhile the lab's CLIA-required Procedure Manuals, which would presumably have been of some use to uncredentialed technicians, were outdated and said nothing about many tests that the lab performed. *Id.* ¶ 56. And while even uncredentialed technicians using out-of-date manuals may possibly be *trained* to perform accurate tests, Mimbres also failed to give its lab personnel competency training. *Id.* ¶ 59.

Secondly, Mimbres violated myriad CLIA provisions governing how specific medical tests are to be executed, as well as how testing equipment and testing media (such as petri dishes) are to be checked for defects. Relator identifies two main areas in which she observed Mimbres' violations of CLIA: in blood testing and in microbiology. 1AC ¶ 66.

Blood tests are among the most commonly performed tests, and thus Relator was familiar with the CLIA rules governing such lab procedures. *Id.* ¶ 112. Relator has identified three specific categories of lab testing on blood samples and explained the CLIA violates for each one: 1) tests performed using the BacT/Alert 3D Blood Culture Analyzer, 2) tests performed using the ACL Elite for blood coagulation studies, and 3) Rapid Plasma Reagin testing. For example, when it came to testing blood for pathogens using the Blood Culture Analyzer, Mimbres acted in total disregard for CLIA-mandated procedures, testing such small quantities of blood that pathogens were virtually guaranteed to go undetected, putting patients in grave and immediate danger. *Id.* ¶ 116. Mimbres billed Medicare and Medicaid for these worthless tests under CPT code 87040, among others. Using this code, it submitted 675 claims for payment to Medicare from 2009 to 2011 and 946 claims to Medicaid from 2008 to 2011. *Id.* ¶ 119.

To provide another example, Defendants failed to perform initial quality control tests and inadequately performed continuing quality control tests on the ACL Elite, a system used to measure a patient's blood coagulation, in direct violation of CLIA. *See* 1AC ¶¶ 123, 125, 130; 42 C.F.R. §

8

493.1253. Errors in measuring blood coagulation can lead to patient death through blood loss, stroke, and heart attack. *Id.* ¶ 120. Among other things, Defendants never performed initial "verification studies" to make sure that the ACL Elite was not defective and had been installed and calibrated properly, making it impossible to tell whether subsequent tests on patient blood were accurate. Id. ¶¶ 122-125, 133. To provide yet another example, Mimbres also failed to perform required initial quality control tests on needles used in syphilis testing. *Id.*¶ 137-38; 42 C.F.R. § 493.1252. Without initial quality verification, it is impossible to know whether the lab's syphilis tests were producing accurate results, posing an especially great risk to newborns born to parents carrying syphilis. 1AC ¶ 135. From 2008 to 2011, Mimbres submitted thousands of claims to Medicare and Medicaid for these dubious blood coagulation and syphilis tests, and Relator has provided precise details of these claims in the First Amended Complaint. *Id.* ¶¶ 134, 140.

Mimbres also failed to perform required quality control measures in the area of Microbiology. Microbiology testing is routinely used to identify pathogenic microorganisms and test their susceptibility to various antibiotics. *See, e.g.*, 1AC ¶ 68. As with blood testing, microbiology quality control involves verifying that new equipment is free of defects and properly calibrated, checking new batches of testing media (such as petri dishes) for defects, and reviewing test procedures to ensure that lab personnel are performing the tests properly. *Id.* ¶¶ 69-111.

Mimbres violated CLIA requirements governing all of these aspects of quality control. In the First Amended Complaint, Relator identified numerous specific violations of CLIA procedures: those involving the lab's Vitek 2 diagnostic device, which is used to identify pathogens and develop a proper treatment plan; those involving culture media and reagents, both essential for any tests involving the identification of pathogens; and those involving gram staining, a process used to determine what antimicrobial drug a patient should be treated with. 1AC ¶¶ 69-111. Thus, for example, Mimbres' failure to test culture media and reagents made it impossible to know whether its tests for such deadly

diseases as E. Coli and drug-resistant Staphylococcus were at all accurate. *Id.* ¶ 87. In the First

Amended Complaint, Relator has provided extensive, specific information on the Mimbres

microbiology lab's violations of CLIA, including the number of times Mimbres billed Medicaid and

Medicare for these questionable tests, the dates of these bills, and the precise regulations violated. *Id.* ¶¶

69-111.

The allegations in the First Amended Complaint support false claims arising out of Defendants'

rampant and knowing violations of CLIA quality control requirements. In particular: 1) fraudulent

inducement to obtain the CLIA certification that is a prerequisite to billing Medicare and Medicaid for

lab tests; 2) false certifications to obtain payment for lab tests performed in knowing violation of CLIA

requirements; and 3) the fraudulent provision of lab tests that were so substandard and unreliable that

they were medically worthless.  Each of these theories, and facts supporting them, are discussed in

detail below.

4. Employment Retaliation Against Relator

While Defendants portray Relator as a disgruntled former employee (Def. Br. at 21, n. 10), this

all-too-common line of personal attack intended to discredit a relator is belied by Relator's factual

allegations.  In fact, Ms. Hansen's credibility is almost unassailable: she was a conscientious employee

raising legitimate concerns about substantial risks to patient health and safety; and after tirelessly

lobbying Mimbres management at all levels, her allegations were substantiated and Defendants were

forced to close a portion of their lab. 1AC ¶¶ 161-169, 174.

Ms. Hansen could hardly have been more diligent in addressing problems. When she saw that

Defendants were operating the lab in patent disregard for federal requirements and patient safety, she

immediately informed the Lab Director, Defendant Bossell, and actively sought to identify and address

the source of the problems. 1AC ¶¶ 162-165.  Her concerns were ignored, and in some cases her efforts

to address CLIA violations were thwarted. *Id.* ¶¶ 164, 171-72.  Ms. Hansen was not dissuaded; she next

took her concerns to Mimbres Human Resources Director and Corporate Compliance Officer, presenting them with evidence of blatant CLIA violations and fraud. *Id.* ¶¶ 165-66. When that did not result in any changes, she wrote a letter to Mimbres' Chief Executive Officer, Bill Quitmeyer, who also did nothing. *Id.* ¶ 169. Bossell and Rene Rivero, the other Medical Technologist subjected Ms. Hansen to a campaign of harassment and threats in retaliation for raising complaints to the CEO and others; and, rather than address the serious health issues she raised, Defendants took steps to conceal their misconduct, including doctoring quality control logs. *Id.* ¶¶ 167-168, 171-172.

Relator's repeated efforts to bring attention to Defendants' brazen CLIA violations eventually resulted in Defendants sending Diane Blankenship, a Laboratory Services Manager from CHS's corporate headquarters in Tennessee, to Mimbres. *Id.* ¶¶ 142, 151, 174. Blankenship confirmed Relator's allegations of gross CLIA violations and forged quality logs, and immediately shut down the microbiology department. *Id.* ¶¶ 151-152, 174. But Defendants never informed the government, or any of the doctors relying on the lab's faulty testing, about the closure of a portion of the lab; instead, Defendants continued to perform and bill for lab testing in other departments with similarly serious CLIA violations. *Id.* ¶¶ 150-153, 156, 170, 174.

For her efforts, Ms. Hansen was placed on administrative leave. 1AC ¶ 173. Ms. Hansen was not allowed to return to work for more than six months, and then told she would be required to work an onerous new schedule upon her return. *Id.* ¶ 175. In light of the schedule change, and the treatment to which she had been subjected, Relator was forced to resign. *Id.* ¶ 176.

## ARGUMENT

I.    Relator Has Pled Detailed Allegations Supporting False Claims Act Liability That Far Surpass the Requirements of Rule 12(b)(6)

Relator has pleaded Defendants' CLIA violations and fraudulent conduct in the concealment of such violations in great detail and with ample particularity, setting forth the "who, what, when, where and how of the fraud," *see United States ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah,* 472 F.3d 702,

726–27 (10th Cir. 2006). Defendants correctly concede as much: they do not seek to dismiss Relator's First Amended Complaint based on Rule 9(b). These allegations plainly state a cognizable claim under the FCA.[2]

Relator has also pleaded the importance of CLIA compliance to the Medicare and Medicaid billing process. She alleges that CLIA compliance is a mandatory prerequisite to ever receiving payment, and the revocation or suspension of CLIA certification "always cancels a laboratory's approval to receive Medicare payment for its services." 1AC ¶¶ 27-28, 34; 42 C.F.R. §§ 493.1807, 1842. Moreover, the CLIA regulations make it abundantly clear that the principal sanction for even a single condition-level violation (of which Relator alleges many, 1AC ¶ 32, n.1) is the cancellation of Medicare payments. 1AC ¶¶ 32, 42 C.F.R. §§ 493.1807, 1842.

Although Relator has pleaded these detailed allegations of CLIA violations and the importance of CLIA compliance to a laboratory's ability to bill Medicare and Medicaid, Defendants argue that these facts do not support FCA liability because CLIA is a "condition of participation" rather than a "condition of payment." (Def. Br. at 8.) On the basis of this single argument, Defendants seek the dismissal of Relator's claims in their entirety.

But the claim that a particular government requirement is a condition of participation rather than of payment is hardly the immunity-granting panacea that Defendants say it is. On the contrary, to argue that a particular requirement is a condition of participation is merely to claim that the CLIA

---

[2] The importance of this concession cannot be overstated. Give the concession that Rule 9(b) is satisfied, the Defendants are essentially arguing that the 1AC, despite adequately pleading a wide range of fraud against the federal government, must be dismissed because no fraud committed under CLIA is ever actionable under the FCA. This is a startlingly broad and untenable contention. Particularly so because the blanket immunity from FCA liability for CLIA violations that Defendants ask this Court to create is a carve-out found nowhere in CLIA, nowhere in the FCA, and nowhere in any other legislative declaration. Further, Defendants' argument is that this immunity should apply no matter how egregious or blatant a lab's fraud in violation of CLIA may be. The courts of appeals have rejected such unwarranted grants of immunity for fraud. *See, e.g.*, *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1176 (9th Cir. 2006) ("[I]f we held that conditions of participation were not conditions of payment, there would be no conditions of payment at all—and thus, an educational institution could flout the law at will.").

violations Relator has alleged would not have impacted the government's decision to pay Defendants for noncompliant lab testing. *See, e.g.*, Def. Br. at 8-9. In other words, Defendants are simply arguing that Relator has failed to satisfy the materiality element of an FCA claim.[3] *See United States ex rel. Conner v. Salina Reg. Health Ctr., Inc.*, 543 F.3d 1211, 1220 (10th Cir. 2008) ("[N]umerous courts have observed that certification analysis is essentially a way to determine whether compliance was material to the government's decision to pay.").

Defendants go to great lengths to avoid characterizing their argument as one about materiality; indeed, they never refer to materiality as an element of the FCA or as the underpinning of their argument. This is not accidental. "Materiality is a mixed question of law and fact." *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 785 (4th Cir. 1999).[4] As such, it is almost never appropriate for resolution on a motion to dismiss. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 792 (4th Cir. 1999) (noting while denying a motion to dismiss in a FCA case that materiality is a "mixed question of law and fact" and finding that "[o]n the pleadings, it is difficult to say whether or not [defendant's] allegedly false statement was material to the [government agency's] funding decision . . . . At the very least, however, at this 12(b)(6) stage we can say that [defendant's] allegedly false statement . . . was capable of influencing agency action"); *United States ex rel. Bidani v. Lewis*, 2001 WL 1609377, *6 (N.D. Ill. Dec. 14, 2001) (stating in FCA case that "[a]bsent regulations or rules conclusively showing that the discounts were immaterial to the HCFA, materiality will be a factual

---

[3] The basic elements of a FCA claim are: 1) a false statement or fraudulent course of conduct, 2) that is knowing (as defined in the FCA), 3) that is material, and 4) that causes the government to pay out money. *See, e.g.*, *Hendow*, 461 F.3d at 1174; *Harrison*, 176 F.3d at 788; *United States ex rel. Sanchez-Smith v. AHS Tulsa Reg. Med. Ctr.*, 754 F.Supp.2d 1270, 1283-84 (N.D. Ok. 2010); *see also Shaw v. AAA Engineering and Drafting*, 213 F.3d 519, 533-34 (10th Cir. 2000).

[4] *See also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Wagnon v. State Farm Fire and Cas. Co.*, 1998 WL 199658, *4 (10th Cir. 1998); *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 Fed. Appx. 32, 37 (2d Cir. 2012).

question that cannot be resolved on a motion to dismiss.").[5] Putting aside that materiality is adequately

pleaded, *infra*, for this reason alone Defendants' motion to dismiss can be denied.

Finally, in turning to each of the theories of fraud supported by Relator's allegations,

Defendants' argument about conditions of participation versus payment has no applicability to

Relator's fraudulent inducement and worthless services claims. To the extent Defendants' argument

applies at all, it is to Relator's false certification theory, and is discussed in that context below.

A. Fraudulent Inducement

The fraudulent inducement theory flows from a principle articulated in the seminal case *United States ex rel. Marcus v. Hess*, 317 U.S. 537 (1943): where an initial course of fraudulent conduct is used to obtain an eligibility or enrollment for payment from the government, the fraud does not end there; rather, "its taint enter[s] into every swollen estimate which was the basic cause for payment of every dollar paid by the [government]. . . . The initial fraudulent action and every step thereafter taken, pressed ever to the ultimate goal—payment of government money to persons who had caused it to be defrauded." *Hess*, 317 U.S. at 543-44; s*ee also Hendow*, 461 F.3d at 1173 (The fraudulent inducement theory "holds that liability will attach to each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct.").

False statements in support of a fraudulent inducement claim include both present misstatements of fact (*i.e.*, misrepresentations about current capability or compliance), and false promises (*i.e.*, making promises about future performance without intending to perform). *Main*, 426 F.3d at 917 ("making a promise that one intends not to keep is fraud," triggering FCA liability);

---

[5] *See also United States ex rel. Loughren v. Unum Group*, 613 F.3d 300, 308 (1st Cir. 2010) ("[M]ateriality in the FCA context involves a factual determination of the weight that the decisionmaker would have given particular information."); *National Credit Union Admin. Bd. v. RBS Securities, Inc.*, 900 F.Supp.2d 1222, 1229 (D.Kan. 2012) ("Materiality is considered a mixed question of law and fact which is rarely decided upon a motion to dismiss.").

*Harrison*, 176 F.3d at 787-88; *see also* Restatement (2d) of Torts § 530(1) (1977) ("A representation of the maker's own intention to do or not to do a particular thing is fraudulent if he does not have that intention.").

Relator's fraudulent inducement theory centers on Defendants' use of false statements and material omissions to obtain CMS-required CLIA certification in October 2009 and October 2011, as well as Defendants' prior and subsequent false representations in interim disclosures that were used to retain CLIA certification. *See* 1AC ¶¶ 141-160. Defendants obtained CLIA certification for the Mimbres lab through an outside certification group called the Joint Commission; in 2004, they had sought and obtained CMS's permission to have the CLIA certification at Mimbres performed by the Joint Commission instead of CMS. As a practical matter, permission to seek certification through the Joint Commission did not reduce or lower the requirements for CLIA certification; to the contrary, the Joint Commission's certification requirements had to be "equal to, or more stringent than," the CLIA regulations. 42 C.F.R. § 493.551; 1AC ¶¶ 37-38. Defendants had to sign a certification attesting to the "accuracy and veracity" of all information provided to the Joint Commission; represent at the time of each biannual inspection that the lab was in compliance, and would maintain compliance with CLIA requirements; and affirm that it would provide accurate and truthful information to the Joint Commission throughout the accreditation process. *Id.* ¶¶ 39-40.[6]

The First Amended Complaint not only identifies applicable representations and obligations in the CLIA certification process, it also demonstrates in detail that those representations were knowingly

---

[6] To their credit, Defendants do not argue that they are not subject to FCA liability because Relator alleges that their misrepresentations were to The Joint Commission, and not the government directly. The false statements to the third party in order to obtain the required certification are still in support of, and material to, subsequent claims for payment submitted to the government. *See, e.g., United States v. Chapman Univ.*, No. SACV 04-1256, 2006 WL 1562231, at *5 (C.D. Cal. May 23, 2006) (FCA claim allowed based on false statements to a non-governmental entity to obtain an accreditation from the entity which was required for payment of government funds); *see also Main*, 426 F.3d at 916. ("If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork."); *Hendow*, 461 F.3d at 1177 (finding FCA liability where false statements to private lenders result in government payments).

false. Among them, Defendants knew they were non-compliant with CLIA based on mock surveys they conducted in June 2009 and June 2011 that revealed numerous quality violations (shortly before the Joint Commission's October certification audits), and based on Relator's complaints and subsequent internal and external audits. 1AC ¶¶ 141-160. In particular, prior to the Joint Commission's October 2009 audit, Relator alleges as follows:

- In June 2009, Diane Blankenship and another corporate compliance official conducted an on-site survey of Mimbres' lab that revealed numerous CLIA violations, general and specific, including an outdated Procedure Manual, untrained lab personnel, and violations of CLIA lab testing requirements in numerous areas including Microbiology, Serology, Hematology and Coagulation Studies. 1AC ¶¶ 142-143.

These violations just a few months prior to CLIA certification plausibly state present misstatements of fact in support of a fraudulent inducement claim; that is, that Defendants concealed known CLIA violations from the Joint Commission and instead falsely represented that they were presently in CLIA compliance. Indeed, Relator alleges that Defendants did not disclose the CLIA violations found in the self-survey to the government or the Joint Commission, fix the problems, or outsource testing to another lab until issues could be resolved. 1AC ¶¶ 144-146. But there is more. Shortly after the October 2009 certification, Relator alleges as follows:

- Despite Defendants' effort to conceal the lab's CLIA violations, the October 2009 audit by the Joint Commission nevertheless identified several such CLIA violations, including required quality control and lab procedures in the areas of Microbiology, Serology and Hematology. 1AC ¶147.

- Mimbres falsely certified in December 2009 (45 to 60 days after CLIA certification in October 2009) through the Joint Commission's Evidence of Standards Compliance, that it had made changes and achieved compliance in each of the areas identified in the Joint Commission's audit. 1AC ¶¶ 148-149.

- In May 2010, Relator joined Mimbres and observed many of the same and similar CLIA violations, first raised in the June 2009 on-site survey, including an outdated Procedure Manual, untrained lab personnel and violations of CLIA lab testing requirements in Microbiology, Serology, Hematology and Coagulation Studies. 1AC ¶¶150.

- In August 2010, Diane Blankenship, the corporate compliance official, finally surveyed Mimbres' lab again based on Relator's repeated concerns, and again found many of the

16

same CLIA violations. She also concluded that Mimbres' quality control logs were falsified. 1AC ¶¶ 151-152.

Taken as true, as they must be at this stage, these allegations demonstrate that the CLIA violations at Mimbres were persistent. The implications are two-fold. First, these allegations obviate any argument that the issues identified in the June 2009 mock survey had been fixed in the few months before the Joint Commission's October 2009 audit, bolstering that Defendants made misstatements of fact in that audit. *See, e.g., United States ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719 (N.D. Ill. 2007) (finding sufficient evidence of intent where relator established that the defendant was already violating regulatory rules when it entered into contract requiring adherence to those rules). Second, the allegations support a fraudulent inducement theory based on false promises because the repeated (and persistent) violations in the period shortly after the October 2009 promise to maintain CLIA compliance strongly suggest that Defendants had no intention of fulfilling that promise (*i.e.*, that it was knowingly false). *See United States ex rel. McArtor v. Rolls-Royce Corp.*, No. 1:08cv133 WTL/DML, Dkt. No. 63, at 10, n.3 (S.D. Ind. June 4, 2012) (refusing dismissal of fraudulent inducement claim where relator "alleged detailed and extensive nonconformance that occurred before, during, and after the [d]efendant's many representations that it was in compliance with [quality control requirements]").

As another example, in August and September 2010 Blankenship made findings as to numerous, recurring CLIA violations *and* the existence of forged quality records *and* the need to shut down the Microbiology portion of the lab. 1AC ¶¶ 151-154. Defendants concealed all of this and then *within a month* falsely represented in their Periodic Performance Review to the Joint Commission that they were in CLIA compliance, 1AC ¶ 155. This false representation was itself a further misstatement of fact employed to retain CLIA certification.

In sum, Defendants' pattern of discovering, concealing, and then lying about known CLIA violations, a pattern which began in June 2009 and continued into 2012, supports a fraudulent

inducement theory as to the Joint Commission biannual audits of October 2009 and October 2011, and as to the interim Evidence of Standards Compliance and Periodic Performance Reviews.

Relator's detailed allegations that Defendants engaged in fraud and concealment in order to obtain and retain CLIA certification, present a textbook fraudulent inducement claim. There is no doubt that CLIA certification is an absolute requirement in order to receive Medicare payments, *see* 1AC ¶¶ 27-28, 34, and so false statements made to obtain that certification present a viable fraudulent inducement theory because they are "integral to a causal chain leading to payment." *See Main*, 426 F.3d at 916; *accord Hendow,* 461 F.3d at 1174; *Tyson*, 488 F.Supp.2d at 725.

*Main* is instructive. It involved a two-"phase" process related to federal loan subsidies under the Higher Education Act. A university first submits an application for eligibility in phase one; if that application is granted, the university then submits additional applications for grants in phase two. Government payments are made only in relation to phase two, but the relator in *Main* alleged fraud only in phase one. *See* 426 F.3d at 916. Because payment in phase two "depended on the phase one finding" of eligibility, the court held that the relator had made out a valid FCA claim based on fraudulent inducement. *Id.* at 916-17; *see also Hendow*, 461 F.3d at 1174 (adopting reasoning and holding of *Main*). Judge Easterbrook, writing for the Seventh Circuit, characterized the case as follows:

> The False Claims Act covers anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government". 31 U.S.C. § 3729(a)(2). *The University "uses" its phase-one application (and the resulting certification of eligibility) when it makes (or "causes" a student to make or use) a phase-two application for payment. No more is required under the statute.*

426 F.3d at 916 (emphasis added).

The issues in this case and the process abused by Defendants here are perfectly analogous. Defendants must obtain CLIA certification in phase one to establish eligibility to receive payments for lab testing in phase two; in other words, phase two payments "depended on" phase one eligibility. The steps can be superimposed directly onto Easterbrook's language emphasized above: Mimbres *"uses" its*

18

*phase-one application (and the resulting* CLIA *certification of eligibility) when it makes a phase-two application for payment* from Medicare or Medicaid. *See also United States ex rel. Tyson v. Amerigroup Illinois, Inc.*, 488 F.Supp.2d 719, 725 (N.D. Ill. 2007) (in Medicare FCA case, expressly rejecting arguments based on conditions of payment versus participation, and instead affirming a judgment based on a fraudulent inducement theory involving "nondiscrimination provisions [that] were prerequisites to participation in the Medicaid HMO program under federal law"). In sum, Relator's allegations set forth a clear and detailed theory of fraudulent inducement: the Defendants used fraudulent means to gain the CLIA certification which was a prerequisite to obtaining Medicare and Medicaid payments from the United States and the State of New Mexico.

Defendants respond to Relators' fraudulent inducement theory hardly at all. To the extent they do, their argument takes the form of a half-hearted assertion made over approximately one page near the end of their brief in which they never refer to "fraudulent inducement" (or anything similar). (*See* Def. Br. at 19-20). Their argument is simply that Relator's fraudulent inducement theory fails for the same reason that her false certification theory (discussed below) supposedly fails – that is, that CLIA compliance is a condition of participation. Yet even if one presumed that CLIA certification and compliance were conditions of participation and not of payment, and also presumed that this was relevant for purposes of determining FCA liability on a *false certification* theory – both wrong, as set forth below – those presumptions are utterly irrelevant to a *fraudulent inducement* theory such as Relator's. *See Tyson*, 488 F.Supp.2d at 725 (in assessing fraudulent inducement claims, "[a] condition to participation is a condition to payment."). Indeed, FCA claims based on fraudulent inducement will lie for violations of so-called conditions of participation. *See, e.g.*, *United States ex rel. Upton v. Family Health Network, Inc,* 900 F. Supp. 2d 821, 834 (N.D. Ill. 2012) (stating that FCA claims based on conditions for participation are sufficient if the plaintiff asserts liability on a fraudulent inducement theory); *see also* 2009 WL 1544226, 155 Cong. Rec. E1295-03 (2009) (statement of Rep. Howard Berman) ("While we cannot

possibly predict the breadth of fraudulent schemes that can be used to target the public fisc, I take this opportunity to stress that, when done knowingly, the following conduct clearly violates the False Claims Act. . . . Submitting a claim for payment even though the defendant was violating the Government-funded program's conditions of participation or payment.").

Finally, because Defendants' single argument in this case is in essence a challenge to materiality, Relator addresses that element briefly here. Relator has amply pleaded materiality. The materiality of doctored quality logs and other concealed CLIA violations is self-evident. Indeed, Defendants certainly believed their violations were material and that CLIA certification would have been denied or revoked had the violations become known; after all, they deliberately hid them from CMS and the Joint Commission, and instead falsely represented that it did not know of CLIA violations and that those violations found by the Joint Commission's certifiers had been fixed. 1AC ¶¶142-160. Moreover, Relator alleges that CLIA certification is an *absolute pre-requisite* to obtaining Medicare reimbursements for lab testing. 1AC ¶¶ 27-28, 33-34; 42 C.F.R. § 493.1807, 1842. The regulations further state that CMS has authority to seek the revocation or suspension of a laboratory's CLIA certificate if it is "guilty of misrepresentation in obtaining a CLIA certificate," "[f]ailed to comply with the certificate requirements and performance standards," or "violated or aided and abetted in the violation of any provisions of CLIA and its implementing regulations," 1AC ¶ 33; 42 C.F.R. § 493.1840(a); and that such revocation or suspension of CLIA certification *requires* suspension of Medicare payments, 1AC ¶ 34; 42 C.F.R. § 493.1842.[7] These allegations are far more than is required under Tenth Circuit caselaw to satisfy materiality. *See, e.g., United States ex rel. Lemmon v. Envirocare of Utah, Inc.,* 614 F.3d 1163, 1170 (10th Cir. 2010) ("[M]ateriality does not require a plaintiff to show conclusively that, were it aware of the falsity,

---

[7] Defendants state if they had lost their CLIA certification, CMS could only "limit the laboratory's Medicare billing privileges . . . prospectively." Def. Br. at 19. Defendants do not explain why this would matter at all to Relator's fraudulent inducement claim or the particular issue of materiality.

the government would not have paid. Rather it requires only a showing that the government *may* not have paid.").[8]

For all of these reasons, Defendants' argument fails entirely with regard to Relator's fraudulent inducement theory.

### B. False Certification

Most of Defendants' argument is squarely focused on Relator's false certification theory, which takes two forms – implied and express false certifications. *See Lemmon*, 614 F.3d at 1168-69 (stating that both express and implied certification theories are permitted in the Tenth Circuit).[9] Defendants' arguments fail as to both forms. Relator's express certification theory is based on the following certification made in the CMS Form 1500s that Defendants submitted with each claim for payment:

> This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

1AC ¶ 48.

Defendants impliedly certified compliance with CLIA's requirements when they submitted claims for payment to Medicare and Medicaid for patient lab tests because the government had an expectation and understanding that providers such as Defendants would only seek payment for lab testing performed in compliance with CLIA's standards. Both the express and implied certifications

---

[8] Although Defendants do not challenge whether Relator satisfies any of the FCA elements other than materiality, out of an abundance of caution Relator also briefly addresses scienter here. Relator alleges specific, credible evidence that Mimbres officials knew of numerous CLIA violations as of at least June 2009 and were put on further notice on repeated occasions between then and 2012. All of this far surpasses the scienter requirement under the FCA, which includes deliberate ignorance and reckless disregard of the truth or falsity of the information. 31 U.S.C. § 3729(b).

[9] The Tenth Circuit has adopted the implied false certification theory in FCA cases. *See Lemmon*, 614 F.3d at 1168-69 (stating that both express and implied certification theories are permitted in the Tenth Circuit). "[T]he pertinent inquiry for [implied certification] claims . . . is whether, through the act of submitting a claim, a payee knowingly and falsely implied that it was entitled to payment." *Lemmon,* 614 F.3d at 1168-69.

were false because of Defendants' knowing concealment of falsified records and substantial CLIA non-compliance resulting in requests for reimbursement for faulty and unreliable lab testing.

These allegations state straightforward false certification theories. Indeed, Defendants do not challenge the validity of or support for these implied or express certifications. Rather, their argument is that these certifications were not material to any government payment decision, that is, that the government does not care about CLIA violations in its payment decisions because they are conditions of participation and not payment.[10]

Focusing, then, on materiality, the question is whether compliance with CLIA standards can be considered material to the government's decision about whether to pay. *See Conner*, 543 F.3d at 1220 ("[N]umerous courts have observed that certification analysis is essentially a way to determine whether compliance was material to the government's decision to pay."). The materiality of CLIA compliance to payment is supported by the simple fact that it is a prerequisite to ever receiving payment, and the revocation or suspension of CLIA certification "always cancels a laboratory's approval to receive Medicare payment for its services." 42 C.F.R. § 493.1842. Moreover, the CLIA regulations make it abundantly clear that the principal sanction for even a single condition-level violation (of which Relator alleges many, 1AC ¶ 32, n.1) is the cancellation of Medicare payments. 42 C.F.R. § 493.1807. In other words, a single condition-level CLIA violation brought to the government's attention can trigger the denial of payments for that and all future claims. It is therefore abundantly clear that CLIA regulations provide the government with ample authority to withhold payments, and therefore a "potential effect" of Defendants' CLIA violations is that that the government "may not have paid." The Tenth Circuit has said repeatedly that nothing more is required to establish materiality. *Lemmon,* 614 F.3d at 1170

---

[10] To be clear, although Defendants attack Relator's references to certifications that Mimbres made at the time of its enrollment in the Medicare and Medicaid programs generally, (Def. Br. at 18 (citing 1AC ¶¶ 44-46)), Relators acknowledge that those representations do not form the basis for an express false certification claim. They are alleged because they are relevant to materiality. Defendants reference CMS Form 1500 only once, in reiterating their conditions of payment argument. (Def. Br. at 18 (citing 1AC ¶ 48).

(materiality if government "may not have paid"); *U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1204 (10th Cir. 2006) (violation is material if it "might cause [government] to actually refuse payment") (internal citations and quotations omitted); *Conner*, 543 F.3d at 1221 (materiality if "might cause [government] to actually refuse payment"); *United States ex rel. Sanchez-Smith v. AHS Tulsa Reg. Med. Ctr.*, 754 F.Supp.2d 1270, 1297-98 (N.D. Ok. 2010).

Moreover, even applying the conditions of participation versus payment paradigm that Defendants rely on, Relator has alleged that CLIA compliance is a condition of payment. Indeed, the Medicare Provider Agreement requires a provider to certify unambiguously that it "understand[s] that *payment of a claim by Medicare is conditioned upon* the claim and the underlying transaction complying with [Medicare] laws, regulations and program instructions" and "all applicable *conditions of participation* in Medicare." *See* CMS Form 855A, Section 15, Certification Statement (emphasis added); 1AC ¶ 44.[11] In fact, even under *Conner*, the case upon which Defendants so heavily rely, much less is required to establish a condition of payment: "Conditions of payment are those which, if the government knew they were not being followed, *might* cause it to actually refuse payment." 543 F.3d at 1221 (emphasis added). CLIA regulations provide exactly such authority to CMS, based on even a single condition-level CLIA violation. 42 C.F.R. §§ 493.1807, 1842; 1AC ¶ 32.[12]

---

[11] In both *Lemmon* and *Shaw*, the Tenth Circuit found that contracts containing similar statements about regulatory compliance were sufficient to establish that violations of those regulations were material for purposes of false claims liability. *See Lemmon*, 614 F.3d at 1170 (the defendant's regulatory violations "also constituted material breaches of [its] contractual obligations" to act in accordance with "all applicable, relevant and appropriate federal, state and local regulations."); *Shaw*, 213 F.3d at 527, n.7, 533 (affirming that submission of invoices for payment was sufficient basis for false claims liability where operative contract contained requirement that the defendant act "in accordance with [Environmental Protection Agency] guidelines and standards").

[12] Defendants make much of the fact that CLIA regulations do not state that CMS may seek to recover payments retroactively, (Def. Br. at 12, 14), but this is merely one of a number of considerations, hardly dispositive on the issue. Defendants do not explain why it is more important than the ability to deny all payments going forward (even if subject to a short delay to provide notice), as the regulations clearly allow. The latter is more than sufficient to meet the requirements for FCA liability under well-settled Tenth Circuit law that a "potential effect" of Defendants' violations is that the government "may not have paid." *Lemmon*, 614 F.3d at 1170. And, importantly, an express statement that an administrative agency has authority to recover retroactively is not required in *Conner* or any other Tenth Circuit law.

So, Relator has provided detailed, supported allegations that CLIA compliance was a condition of payment and, more generally, material to the government's payment decision. Defendants brief simply disputes these allegations, and, in fact, asks the Court to not only disregard Relator's allegations, but to actually adopt their arguments and decide the issue in their favor as a matter of law. As such, Defendants spend pages engaged in an exercise that is improper under the standard applicable on this motion to dismiss – to take Relator's well-pleaded allegations as true and to draw reasonable inferences in her favor – and, in fact, turns that standard on its head.

Defendants' argument relies primarily on the Tenth Circuit's decision in *United States ex rel. Conner*, but *Conner* is easily distinguished from the facts here. As an initial matter, *Conner's* discussion of conditions of payment versus participation does not apply to implied certification theories, and *Conner* explicitly stated that the relator had limited his claim to an express certification theory, and the case was analyzed within those confines. *Id.* at 1218, 1219. In addition, in *Conner* the relator relied for his express certification theory on a single, general statement about compliance with Medicare rules in the hospital's annual cost report, from which the relator sought to pursue a FCA case for violations of ambiguous Medicare quality of care standards. *Id* at 1218-19. For that reason, the court expressly noted that its decision "does not preclude the possibility that certain Medicare statutes or regulations might expressly or implicitly condition payment on certification of compliance under a false claims theory." *Id.* at 1222. Moreover, the *Conner* court acknowledged that some regulations may be sufficiently integral to payment that they "make any divide between conditions of participation and conditions of payment a distinction without a difference." *Id.* at 1222 (quoting *Hendow*, 461 F.3d at 1177) (internal quotations omitted). CLIA requirements, for the reasons set forth above, are precisely such a requirement. In fact, Relator alleges CLIA violations of nearly every type, and involving personnel, equipment, materials, reagents, quality control testing and laboratory procedures. Indeed, the allegations go to the very heart of whether services of any value were provided at all. One cannot say with certainty what the

24

government's payment decision would have been, but that it had the authority to suspend payments and revoke certification and suspend payments is enough at the motion to dismiss stage. *See United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) (rejecting defendant's argument that FCA liability requires "that the government was sure to enforce the statute," and stating that the relevant question concerning materiality is whether the alleged violations "could have influenced the agency's decision").

Defendants also rely on a reference in the Medicare regulations to CLIA falling under the heading "Conditions of Participation for Hospitals," which, they claim "remov[es] any doubt." (Def. Br. at 13.) But that is hardly the case, because, in another place, CMS requires a provider to certify that it "understand[s] that *payment of a claim by Medicare is conditioned upon* the claim and the underlying transaction complying with [Medicare] laws, regulations and program instructions" and "all applicable *conditions of participation* in Medicare." 1AC ¶ 44. These contradictory passages merely highlight the factbound nature of deciding materiality.

Accordingly, whether CLIA compliance is material to the government's payment decision is at minimum a complex issue that cannot be decided as a matter of law on a motion to dismiss. *See United States v. HCA Health Servs. of Oklahoma, Inc.*, 3:09-CV-0992, 2011 WL 4590791 (N.D. Tex. Sept. 30, 2011) (holding that relator had sufficiently pled a false certification theory based on CLIA violations, and further stating that "[t]he issue of whether the government has conditioned Medicare payment on CLIA compliance is a complex one—requiring the Court to go outside the Complaint to extrinsic evidence, such as manuals, testimony, and administrative rulings. To consider such evidence at this time would effectively convert this 12(b)(6) motion to a summary judgment motion. Because this case is in the motion to dismiss stage, the Court will review the facts and allegations in the Complaint in the light most favorable to [relator]. In doing so, the Court concludes there is plausible ground on which [relator's] FCA claim rests. . . .Defendants' motion to dismiss [relator's] FCA claim is hereby denied."); *United States ex rel. Bidani v. Lewis*, 2001 WL 1609377, *6 (N.D. Ill. Dec. 14, 2001) (in FCA case, stating,

"Absent regulations or rules conclusively showing that the discounts were immaterial to the HCFA, materiality will be a factual question that cannot be resolved on a motion to dismiss."); *see also United States ex rel. Loughren v. Unum Group*, 613 F.3d 300, 308 (1st Cir. 2010) ("[M]ateriality in the FCA context involves a factual determination of the weight that the decisionmaker would have given particular information.").[13]

For all of these reasons, Relator has pled a legitimate false certification theory and discovery on this claim should proceed to discovery.

C.  Worthless Services

Finally, Relator's allegations also support FCA liability under the worthless services doctrine, in which a defendant "violate[s] the FCA by seeking and receiving payment for medically worthless tests." *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001); *see also Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468-69 (6th Cir. 2011) ("A test known to be of no medical value, that is billed to the government would constitute a claim for worthless services, because the test is so deficient that for all practical purposes it is the equivalent of no performance at all.") (internal citations and punctuation omitted); *In re Genesis Health Ventures, Inc.*, 112 F. App'x 140, 143 (3d Cir. 2004) (FCA liability allowed in instances in which "either services literally are not provided or the service is so substandard as to be tantamount to no service at all."); *Mikes v. Straus*, 274 F.3d 687, 702 (2d Cir. 2001) ("In a worthless services claim, the performance of the service is so deficient that for all practical

---

[13] The court in *HCA* rejected the relator's fraudulent inducement claim, but that finding has no bearing here. Indeed, the HCA court did not challenge the applicability of a fraudulent inducement theory to CLIA certifications.  Rather, the court held that the relator in that case had not sufficiently pled facts to support the claim. *Id.* at *7 ("[The relator] did not allege that Defendants made false statements to induce the government to allow them to participate in the Medicare program.").  Quite contrary to the relator in HCA, here Relator has pled in detail that Defendants made false statements to induce CLIA certification, including, *inter alia*, that Defendants forged quality control records in advance of CLIA inspections and concealed known CLIA violations in the period leading up to certification audits. *See, e.g.*, 1AC ¶¶ 145-147, 152-160, 167-168.

purposes it is the equivalent of no performance at all."); *United States ex rel. Sanchez-Smith v. AHS Tulsa Reg. Med. Ctr.*, 754 F.Supp.2d 1270, 1286-87 (N.D. Ok. 2010).[14]

FCA liability attaches on a worthless services claim "irrespective of any certification."*Mikes*, 274 F.3d at 702. As such, several otherwise applicable FCA elements are eliminated on a worthless services claim: "Neither false certification nor a showing of government reliance on false certification for payment need be proven if the fraud claim asserts fraud in the provision of goods and services." *Lee*, 245 F.3d at 1053; *see also Mikes*, 274 F.3d at 702*; Chesbrough*, 655 F.3d 468-69.

*Lee* is particularly instructive because it also involved a ruling on a motion to dismiss and related to allegations of fraud involving improper lab testing of human specimens (although there is no reference to CLIA violations). *Id.* at 245 F.3d 1050. The *Lee* court found it plausible that allegations of improper lab tests could be of no medical value – so much so that it ruled that the relator could proceed based on a worthless services theory that the relator had not even raised, but which the court inferred from a single allegation in the complaint: "[The defendant] knowingly, unlawfully and wrongfully allowed incorrect laboratory results to be reported to Medicare patients in return for payment by Medicare funds." *Id.* at 1053, n. 6.[15] Here, there is far more support for this claim at the motion to dismiss stage. Relator has alleged that Defendants had unqualified lab personnel, who had not been given proper training, using unverified lab equipment and using uninspected and expired lab

---

[14] *Lee* and *Chesbrough* were cases on appeal at the motion to dismiss stage, and in both cases the courts approved of the use of worthless services for claims related to improper medical tests (although *Chesbrough* was ultimately dismissed on other, distinguishable bases). *Lee*, 245 F.3d at 1053-54; *Chesbrough*, 655 F.3d at 469-70. *Mikes*, *Genesis Health* and *Sanchez-Smith* were cases on appeal at summary judgment, in which each court adopted and analyzed claims based on worthless services, but ultimately ruled that the relators had not presented evidence of disputed issues of material fact as to that issue. What is most relevant here is that those courts did not deny those worthless services claims at the motion to dismiss stage, but rather allowed the relators to conduct discovery on them. *Mikes*, 274 F.3d at 693-94, 702-03; *In re Genesis Health Ventures.*, 112 F. App'x at 141, 143-44; *Sanchez-Smith*, 754 F.Supp.2d at 1272, 1287-88.

[15] The *Lee* court dismissed the relator's other fraud theories, but the ruling as to those matters is inapplicable here. First, the relator in *Lee* did not present a fraudulent inducement theory at all, let alone one related to CLIA certification. Second, in *Lee* the court denied the relator's false certification theory on Rule 9(b) grounds, whereas here the Defendants here have not brought their motion to dismiss pursuant to Rule 9(b), no doubt because of the unusually detailed nature of Relators' allegations.

materials and reagents, performing complex lab testing with outdated Procedure Manuals that did not contain step-by-step instructions to guide them. *See, e.g.*, 1AC ¶¶ 52-62, 63-67. Relators allegations amply support a claim that the results reported from Mimbres' lab were completely unreliable and therefore of almost no value for purposes of diagnosis and treatment, rendering them effectively worthless.

Relator has therefore also pled factual allegations sufficient to support a FCA claim based on the provision of worthless services.[16]

II.     Relator's Allegations Easily Meet the Requirements of the FCA's Broad Anti-Retaliation Provision

Defendants argue that Ms. Hansen's retaliation claim should be dismissed because she has failed to plead conduct protected under the FCA, and, in turn that Defendants were not on notice of such protected conduct. (Def. Br. at 21.) Defendants fail to cite a single case since 2009 in support of their argument. (Def. Br. at 21-23.) This omission is telling: Congress passed amendments to the FCA's anti-retaliation provision, effective as of May 20, 2009, that significantly expanded the range of conduct protected under the statute. *See* 31 U.S.C. § 3730(h); Fraud Enforcement and Recovery Act of 2009, Pub.L. No. 111–21, § 4(d), 123 Stat 1617 (2009); *Layman v. MET Laboratories, Inc.*, 2013 WL 2237689, at *7 (D. Md., May 20, 2013) ("Congress stated that the language is intended to make clear that [§ 3730(h)] protects not only steps taken in furtherance of a potential or actual qui tam action, *but also ... taken to remedy ... misconduct through methods such as internal reporting to a supervisor or company compliance department. . . . This is in contrast with pre-FERA standards pursuant to which protected activity did not include reporting to one's supervisor*.") (emphasis added; internal citation omitted). These amendments to 31 U.S.C. § 3730(h)

---

[16] A claim based on the worthless services doctrine is not expressly pled in the 1AC. But factual allegations supporting such a theory are all that is required; a plaintiff need not plead legal theories in a complaint. *See In re Hernandez*, 2011 WL 3879496, at *10, n.14 (D.N.M. Sept. 1, 2011) ("The general rule is that a complaint need not set forth its legal theories." (citing *Zokari v. Gates*, 561 F.3d 1076, 1084 (10th Cir. 2009))). *Ibarra v. City of Tahlequah*, 2013 WL 1991546, at *2 (E.D. Ok. May 13, 2013) (citing *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008)). In the alternative, Relator requests leave to amend to expressly plead a worthless services theory. *See infra*, n.19.

certainly apply to Ms. Hansen's retaliation claims, since her original Complaint was filed June 27, 2011 and the protected activity alleged therein occurred in 2010. 1AC ¶¶ 161-176.

The operative version of the FCA states as follows:

> Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged . . . or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h) (2013) (effective July 22, 2010).

Under the plain language of the statute, Relator's allegations are more than sufficient. *Cf. United States ex rel. Provuncher v. Angioscore, Inc.*, 2012 WL 1514844, at *5 (D. Mass. May 1, 2012) ("Protected conduct in an FCA-retaliation context is interpreted broadly." (citing *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.*, 360 F.3d 220, 237 (1st Cir. 2004))); *United States ex rel. Gibson v. Colorado Student Loan Program*, 1996 WL 944285, at *11 (D. Colo. May 3, 1996) ("Whistle-blower protection statutes are remedial in nature and thus, are broadly construed." (internal citations omitted)). Relator alleges numerous efforts to investigate, bring attention to, and stop Defendants' fraudulent practices stemming from its knowing violations of CLIA. Among them, she made repeated efforts to stop conduct directly resulting in FCA liability, including warning multiple Mimbres officials that Defendants were committing gross violations of CLIA; providing supporting documentation to these officials that substantiated her claims; informing the Corporate Compliance Officer that the lab needed to be shut down because of CLIA violations; and communicating to the CEO that she had contacted the New Mexico Department of Health about testing procedures that were not being done properly. 1AC ¶¶ 162-69. Immediately after taking her concerns to the CEO, Relator began to be subjected to severe harassment and threats, and within a month she was placed on administrative leave and prevented from returning to work. 1AC ¶¶ 171-74.

These actions, individually and together, fall squarely within the protection of the FCA's post-amendment anti-retaliation provision. *See* 2009 WL 1544226, 155 Cong. Rec. E1295-03 (2009) (statement of Rep. Howard Berman) ("To address the need to widen the scope of protected activity, . . . Section 3730(h) protects all 'lawful acts done. . . in furtherance of . . . other efforts to stop 1 or more violations' of the False Claims Act. This language is intended to make clear that this subsection protects not only steps taken in furtherance of a potential or actual *qui tam* action, but also steps taken to remedy the misconduct *through methods such as internal reporting to a supervisor or company compliance department and refusals to participate in the misconduct that leads to the false claims*, whether or not such steps are clearly in furtherance of a potential or actual *qui tam* action.") (emphasis added); *Layman*, 2013 WL 2237689, at *7 ("When Congress enacted FERA, it did so to counter perceived restrictive judicial interpretations of the protected activity prong. . . . § 3730(h) protects not only steps taken in furtherance of a potential or actual *qui tam* action, but also taken to remedy misconduct *through methods such as internal reporting to a supervisor or company compliance department.*) (emphasis added).

To the extent Defendants assert that Relator was required to complain specifically about fraudulent billing of Medicare and Medicaid prior to Mimbres' adverse employment action in order to qualify for the FCA's anti-retaliation protections, that argument flies in the face of the very purpose of Congress' 2009 amendment, as well as well-settled law regarding FCA retaliation claims. Indeed, under the FCA's retaliation provision, a relator "need not have known that his actions could lead to a *qui tam* suit under the FCA, or even that a False Claims Act existed, in order to demonstrate that he engaged in protected conduct." *Provuncher,* 2012 WL 1514844, at *5 (stating the law as such without even considering the 2009 amendment's expansion of protected conduct) (citing *Karvelas*, 360 F.3d at 237); *see also United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1238 (D.C. Cir. 2012) (the "protected activity" prong sweeps broadly and " § 3730(h) does not require the employee to know that the

investigation [s]he was pursuing could lead to a False Claims Act suit") (citation and internal quotation marks omitted).[17]

Defendants' only other argument – that they were not on notice of protected activity – was based on their contention that Relator had not pled protected activity in the first place (and so they could not have been on notice of it). That initial contention is wrong, as set forth above. There can be no question that Defendants were on notice of Relator's protected activity as alleged. Relator informed Mimbres officials of her concerns and her actions at every turn, as alleged in the Complaint, including Mimbres' Lab Director, Human Resources Director, Corporate Compliance Officer, and Chief Executive Officer. *See* 1AC ¶¶ 162-169.[18]

For these reasons, Defendants' Relator's retaliation claim should not be dismissed.[19]

III.     Relator's Claims Under the New Mexico Medicaid False Claims Act and Fraud Against Taxpayers Act Are Well Pled and Should Not Be Dismissed

Defendants' motion to dismiss Counts II and IV of Relator's First Amended Complaint, alleging *qui tam* and retaliation claims under the New Mexico Medicaid False Claims Act, N.M.S.A. §§

---

[17] Moreover, protected activity itself is defined as only requiring a good faith basis to believe FCA violations may exist. *See Moore v. California Inst. of Tech. Jet Propulsion Laboratory*, 275 F.3d 838, 845 (9th Cir. 2002) (a person engages in protected activity under the anti-retaliation provision of the FCA when she in good faith believes that the defendant is possibly committing fraud against the government.).

[18] Defendants argue in a footnote that Relator also has not alleged protected activity because her allegations do not present a valid FCA claim since CLIA is merely a condition of participation. Def. Br. at 23, n.11. This argument is incorrect for the reasons set forth in the prior section. Such an argument is also incorrect because a relator need not prevail on her FCA claims, but rather need only have a good faith basis that she was investigating matters that could support FCA liability. *See United States ex rel. Moore v. Community Health Services, Inc.*, 2012 WL 1069474, at *8 (D.Conn. Mar. 29, 2012) ("To prove that she engaged in conduct protected under the statute, Ms. Moore need not prevail on her underlying FCA claims, but only demonstrate that she 'had been investigating matters that were calculated, or reasonably could have [led], to a viable FCA action. . . . She must be able to show a 'good faith basis,' or 'objectively reasonable basis,' for believing that she was investigating matters in support of a viable FCA case." (citing, *inter alia*, *Hoyte v. Am. Nat'l Red Cross*, 518 F.3d 61, 67 (D.C. Cir. 2008); *Lang v. Nw. Univ.*, 472 F.3d 493, 495 (7th Cir. 2006))). This is a point Defendants should know well, since *Moore* was a case against CHS in which CHS also filed a motion to dismiss an FCA retaliation claim involving Medicare and Medicaid fraud. That motion to dismiss was denied. *Id.* at *9.

[19] For all of the reasons above Relator's *qui tam* and retaliation claims should not be dismissed. However, out of an abundance of caution she requests leave to amend her complaint if the Court concludes that dismissal of any of her claims is appropriate. *See Hill v. Vanderbilt Capital Advisors, LLC*, 834 F.Supp.2d 1228, 1258-59 (D.N.M. 2011).

27-14-1, *et seq.* ("Medicaid FCA") and the Fraud Against Taxpayers Act, N.M.S.A. §§44-19-1, *et seq.* ("FATA"), should be dismissed for the same reasons set forth above.

Defendants present one new argument for dismissal regarding Relator's claims under New Mexico's Medicaid FCA: that Relator cannot proceed under that particular Act without a written statement from the Department of Human Services ("DHS") that there is substantial evidence of a violation. (Def. Br. at 24.) Under the Medicaid FCA, DHS may seek to dismiss a lawsuit even over the relator's objection. N.M.S.A. § 27-14-8(B). It did not do so here, and so by allowing Relator to proceed she should be deemed to have met the "substantial evidence" requirement. In addition, the Medicaid FCA mirrors FATA, which applies more broadly to any fraud against the State of New Mexico and contains no "substantial evidence" requirement. Relator's Medicaid FCA claim is therefore redundant with her FATA claim, which should proceed, so it would be moot to dismiss Relator's Medicaid FCA claim at this stage. In any event, Relator is trying to obtain from the State of New Mexico a written statement of substantial evidence and should be given an opportunity to do so. Relator will promptly submit this written statement upon receipt. Finally, this argument applies only to Relator's *qui tam* claim under the Medicaid FCA; the substantial evidence language is inapplicable to the Act's anti-retaliation provision. N.M.S.A. §§ 27-14-12.

## CONCLUSION

Defendants' motion to dismiss (Docs. 62 & 63) should be denied in its entirety for the preceding reasons.

Respectfully submitted,

LOEVY & LOEVY

/s/ Anand Swaminathan 7/10/2013
ARTHUR LOEVY
MICHAEL KANOVITZ
JON LOEVY
ANAND SWAMINATHAN
312 N. May St., Ste. 100
Chicago, IL 60607
(312) 243-5900


ROTHSTEIN, DONATELLI, HUGHES,
DAHLSTROM, SCHOENBURG &
BIENVENU, LLP

/s/ Brendan K. Egan 7/10/2013
CAROLYN M. "CAMMIE NICHOLS
BRENDAN K. EGAN
500 4th Street NW, Suite 400
Albuquerque, New Mexico 87102
(505) 243-1443

*Attorneys for Relator Sally Hansen*

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 10th day of July, 2013, I filed the foregoing pleading electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

Howard R. Thomas
U.S. Attorney's Office
howard.thomas@usdoj.gov

Jody R. Curran
Office of the Attorney General
jcurran@nmag.gov

Greg L. Gambill
ggambill@montand.com

William C. Madison
wcm@madisonlaw.com

Michael L. Waldman
Mark A. Hiller
mwaldman@robbinsrussell.com
mhiller@robbinsrussell.com

/s/ Brendan K. Egan 7/10/2013
ROTHSTEIN, DONATELLI, HUGHES,
DAHLSTROM, SCHOENBURG & BIENVENU, LLP