## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA, and
STATE OF NEW MEXICO, *ex rel.*

SALLY HANSEN, Relator,

      Plaintiffs,

v.                                   CV 11-0566 WPL/CG

DEMING HOSPITAL CORPORATION
d/b/a MIMBRES MEMORIAL HOSPITAL,
COMMUNITY HEALTH SYSTEMS, INC.,
COMMUNITY HEALTH SYSTEMS
PROFESSIONAL SERVICES CORPORATION,
and JERRY BOSSELL,

      Defendants.

### ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
### RELATOR'S FIRST AMENDED COMPLAINT

This matter is before me on the motion to dismiss Relator Sally Hansen's first amended complaint filed by Defendants Deming Hospital Corporation d/b/a Mimbres Memorial Hospital ("Mimbres"), Community Health Systems Professional Services Corporation, and Jerry Bossell.[1] (Doc. 62 (motion); Doc. 63 (memorandum).) Having reviewed the motion, the responsive filings, and the relevant law, I conclude that Hansen has failed to state viable claims under either the substantive provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3729(a)(1), or the FCA's anti-retaliation provision, *id.* § 3730(h), and I therefore decline to exercise supplemental

---

[1] Hansen has dismissed Defendant Community Health Systems, Inc., pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(i). (Doc. 68.) Accordingly, this Order uses the term "Defendants" to refer only to the remaining Defendants collectively.

jurisdiction over her analogous state law claims. Accordingly, I dismiss Hansen's FCA claims with prejudice, and I dismiss her state law claims without prejudice.

BACKGROUND

The following well-pleaded factual allegations are accepted as true for purposes of this motion. Mimbres operates a laboratory that is certified under the Clinical Laboratory Improvement Amendments of 1988 ("CLIA"), Pub. L. No. 100-578, § 2, 102 Stat. 2903 (1988), to perform a variety of specialized testing. (Doc. 50 at 8.) Since 2004, Mimbres has received its biannual CLIA certification through accreditation by the Joint Commission, an accrediting organization approved by the government.[2] (*Id.* at 10.) Mimbres renewed its CLIA certificate of accreditation in October 2009 and again in October 2011. (*Id.* at 4.)

Hansen, an experienced medical technologist, began working at Mimbres in May 2010. (*Id.* at 13.) Immediately upon starting at Mimbres, she observed "numerous CLIA violations" in the microbiology division of the hospital's laboratory. (*Id.*) Over the next two months, Hansen became aware of many other CLIA violations throughout the laboratory, including personnel and training deficiencies, inadequate quality control procedures, insufficient testing and calibration of equipment, and poor documentation practices. (*Id.* at 4, 13-14; *see also id.* at 14-38.) Hansen believed that these violations threatened the accuracy of the tests performed in the laboratory, which in turn led to an increased risk to patient health and safety. (*Id.* at 4; *see also id.* at 20, 23, 26, 34, 36.)

Hansen investigated these violations further and discovered a wide-ranging effort by Defendants to cover up or ignore the laboratory's deficiencies. She learned that a June 2009 self-

---

[2] The term "the government," when used to refer to government or agency interactions with Mimbres, generally refers to the Centers for Medicare & Medicaid Services unless context indicates otherwise.

survey at Mimbres revealed many of these violations but that Defendants failed to report these problems to the government or the Joint Commission during the October 2009 recertification process. (*Id.* at 38-40.) Instead, Defendants falsely represented to the Joint Commission that Mimbres was fully compliant with its regulatory obligations. (*Id.* at 40.) Moreover, on at least one occasion a fellow medical technologist falsified records to make it appear as though Mimbres's laboratory was CLIA-compliant. (*Id.* at 39.) After the Joint Commission discovered numerous CLIA violations anyway, Defendants later falsely represented to the organization that it had rectified these problems when in fact the violations continued. (*Id.* at 40.)

Hansen brought her concerns to her fellow medical technologist. (*Id.* at 44.) She also repeatedly notified Bossell, the lab director, of the problems she had learned about and observed, but Bossell refused to review her evidence, took no action, and told Hansen that she was being disruptive. (*Id.*) About a month after arriving at Mimbres, Hansen presented evidence of the violations she had discovered to the hospital's human resources director and spoke to her about her colleagues' refusal to address these problems. (*Id.*) Several weeks later, Hansen ran into Mimbres's corporate compliance officer at a restaurant and told her that the microbiology division of the laboratory should be shut down due to the many CLIA violations. (*Id.* at 45.) Although someone from another hospital later conducted an "inspection" of the laboratory and found no problems, Hansen says that this person, a friend of Bossell's, was not a certified inspector and that the inspection was "bogus." (*Id.*) Hansen later discovered that her fellow medical technologist had again falsified records so as to give the impression that Mimbres was in compliance with regulations. (*Id.*) Finally, in late June 2010, Hansen wrote a letter to Mimbres's chief executive officer laying out these problems and notifying him that she had contacted the state health department about the flawed testing procedures. (*Id.*)

After Hansen sent the letter, Bossell told her "on a daily basis" that he would fire her if she did not quit. (*Id.* at 46.) The medical technologist also "warned her about continuing to raise concerns with management" and at one point yelled at her, but Bossell did nothing to stop him. (*Id.*) In late July 2010, approximately two months after starting at Mimbres, Hansen was placed on administrative leave. (*Id.*) This leave extended for over six months until February 2011, at which point Defendants assigned Hansen to "a different, less desirable shift" without explaining why she had been put on leave or why she could not return to her previous schedule. (*Id.*) Hansen ultimately quit her job in light of Defendants' treatment. (*Id.* at 47.)

Even after Hansen was placed on leave, Defendants' CLIA violations and falsification efforts continued. In August and September 2010, Defendants sent in different inspectors who substantiated many of Hansen's allegations, discovered the falsified records, and shut down most of the laboratory's microbiology division. (*Id.* at 41-42.) However, despite an obligation to do so, Defendants did not report these issues to the Joint Commission. (*Id.*) Another self-survey in June 2011 uncovered additional problems, but Defendants again concealed the violations from the Joint Commission during the October 2011 recertification process. (*Id.* at 42-43.)

### PROCEDURAL POSTURE

In June 2011, Hansen filed the original complaint in this qui tam action on behalf of the United States and the State of New Mexico pursuant to 31 U.S.C. § 3730(b) and analogous state law. (Doc. 1.) The complaint was unsealed and served on Defendants (Doc. 22) after both state and federal governments declined to intervene (Doc. 20; Doc. 21). After Defendants timely filed a motion to dismiss pursuant to Rule 12(b)(6) (Doc. 44; Doc. 45), Hansen filed her first amended complaint under seal pursuant to Rule 15(a)(1)(B) and Court instructions (Doc. 50; *see also* Doc. 22). The United States and the State of New Mexico again declined to intervene in this case

(Doc. 55; Doc. 56), at which point I unsealed the first amended complaint (Doc. 58) and found Defendants' original motion to dismiss to be moot (Doc. 59).

Defendants next filed the instant motion (Doc. 62), in which they primarily argue that Hansen's substantive FCA claim must be dismissed for failure to plead the violation of a condition of payment under Medicare[3] regulations (Doc. 63 at 3-22 (memorandum)). Defendants also seek dismissal of Hansen's FCA anti-retaliation claim for failure to plead that she provided them with notice that she was engaged in protected activity. (*Id.* at 23-26.) Finally, Defendants contend that Hansen's state law claims should be dismissed for substantially the same reasons warranting dismissal of her federal claims. (*Id.* at 26.)

In her response brief, Hansen argues that she has adequately pleaded facts showing that Defendants violated conditions of payment, that Defendants sought government payment for worthless services, and that her actions constituted notice of protected activity within the meaning of the FCA's recently revised anti-retaliation provisions. (Doc. 69.) Defendants filed a reply brief that essentially reiterates their earlier arguments and asserts that Hansen's worthless services theory was not properly pleaded. (Doc. 74.)[4]

## STANDARD OF REVIEW

Rule 12(b)(6) authorizes a court to dismiss a complaint in whole or in part for failing to state a claim upon which relief is available. Without weighing the evidence, the court must evaluate whether it is plausible, and not merely possible, that the plaintiff is entitled to relief

---

[3] Hansen alleges improper billing under both Medicare and Medicaid. (*See* Doc. 50 at 4.) In their motion, Defendants use the term "Medicare" to refer to both programs "because hospitals participating in Medicaid must meet the standards of participation for Medicare." (Doc. 63 at 9 n.2 (citation omitted).) For purposes of this Memorandum Opinion and Order, I also adopt this practice.

[4] After briefing was complete, I granted Hansen's unopposed motion to file as an exhibit a letter from the New Mexico Department of Human Services stating that there was substantial evidence of a violation of the New Mexico False Claims Act. (Doc. 79; *see also* Doc. 78 & Ex. 1.) This letter is relevant to Hansen's state law claims, over which I decline to exercise supplemental jurisdiction. *See infra* Part IV.

under the relevant law. *Ashcroft v. Iqbal*, 556 U.S. 662, 679-80 (2009); *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quotations omitted). In considering Rule 12(b)(6) motions, courts must look within the four corners of the complaint, accept all well-pleaded factual allegations as true, and determine if the plaintiff is plausibly entitled to relief. *Id.* at 678-79 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1191 (10th Cir. 2009) (citations omitted); *Issa v. Comp USA*, 354 F.3d 1174, 1177 (10th Cir. 2003) (citation omitted).

While the complaint need not include "detailed factual allegations," the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). The factual allegations must also suffice to "inform the defendants of the actual grounds of the claim against them," with the degree of specificity required depending on the nature of the complaint. *Robbins*, 519 F.3d at 1248 (citations omitted).

### DISCUSSION

Hansen has alleged wrongdoing by Defendants under the FCA, 31 U.S.C. § 3729 *et seq.*, as well as under analogous provisions of state law. (Doc. 50 at 49-52.) For purposes of this Order, I have organized Hansen's claims as follows: (I) false claims, false statements, and fraudulent conduct used to procure government payments; (II) "reverse" false claims; (III) violations of the FCA's anti-retaliation provision; and (IV) state law claims.

### I.      False or Fraudulent Claims

The FCA "covers all fraudulent attempts to cause the government to pay out sums of money." *U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1217 (10th Cir.

2008) (quotation omitted). While the government may bring a civil action against persons suspected of engaging in such fraudulent activity, 31 U.S.C. § 3730(a), the FCA is relatively unique in that its qui tam provisions allow a private individual (termed a "relator") to bring such an action on the government's behalf, *id.* § 3730(b). Although the government may elect to intervene and take over the relator's case, it is not required to do so. *Id.* § 3730(b)(2), (c)(3). When a relator proceeds with litigation after the government declines to intervene, he or she must share any recovery with the government. *Id.* § 3730(d).

Although there are numerous ways to trigger civil liability under the FCA, Hansen brings the bulk of her claims under the provisions creating liability for

any person who—

(A)   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; [or]
(B)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim.

*Id.* § 3729(a)(1). Several appellate courts, including the Tenth Circuit, have interpreted both of these provisions to include a materiality requirement—in other words, a "false [claim] must be material to the government's decision to pay out moneys to the claimant." *Conner*, 543 F.3d at 1219 (quoting *U.S. ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir. 2006)). As such, the elements for a false claim under these provisions are "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." *See Hendow*, 461 F.3d at 1174.

How these elements are applied to a claim depends, in part, on the theory of liability asserted by an FCA plaintiff. The Tenth Circuit, like other appellate courts, distinguishes between "factually false" claims and "legally false" claims under the FCA. *See Conner*, 543 F.3d at 1217 (citing *Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)). For a claim of factual falsity

to stand under the FCA, "[a] relator must generally show that the government payee has submitted an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided." *Id.* (citation and internal quotation marks omitted). A claim of legal falsehood, on the other hand, is generally premised on an allegation that the defendant "certifie[d] compliance with a statute or regulation *as a condition* to government payment, yet knowingly failed to comply with such statute or regulation." *Id.* (citation and internal quotation marks omitted).

Here, Hansen argues that her claim may proceed under four theories of liability—that Defendants impliedly falsely certified compliance with CLIA regulations; that Defendants expressly falsely certified such compliance; that Defendants obtained the renewal of Mimbres's CLIA certification through fraudulent conduct and false statements; and that Defendants sought payment for services that were effectively worthless. (*See* Doc. 69 at 3-4.) The first three are claims of legal falsehood, while the fourth is derived from a claim of factual falsehood.

A. Implied False Certification

Plaintiffs alleging FCA claims of legal falsehood based on failure to follow Medicare regulations typically bring these claims under a theory of legally false certification. *See, e.g.*, *Conner*, 543 F.3d at 1217. The Tenth Circuit recognizes two forms of legally false certification claims: implied false certification and express false certification. *Id.* (citation omitted). Under the implied false certification theory, a contractor has not expressly certified compliance with any statute, regulation, or contractual term as a condition for receiving government payment. Instead, if the underlying contracts, statutes, or regulations governing the contractor's activities themselves make compliance a prerequisite to government payment, and the contractor knowingly violated this condition but submitted a claim for payment anyway, then its claim is

considered to be impliedly false. *Id.* at 1218. Claims of implied false certification arise only under § 3729(a)(1)(A). *See U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1168 (10th Cir. 2010) (citing *Shaw v. AAA Eng'g & Drafting, Inc.*, 213 F.3d 519, 531-32 (10th Cir. 2000)).

Hansen alleges that Defendants impliedly falsely certified compliance with CLIA regulations every time they submitted claims for Medicare payments to the government, since Mimbres's laboratory was not in compliance with CLIA regulations and the government required such compliance as a prerequisite to seeking payments. (*See* Doc. 69 at 21.) Defendants counter that CLIA compliance is not a condition for requesting or receiving Medicare payments; instead, it is simply a condition of continued participation in Medicare. (*See* Doc. 63 *passim*.) Hansen disputes this, and she further argues that the distinction between conditions of participation and conditions of payment is not relevant to her implied false certification theory. (*See* Doc. 69 at 21-26.) A brief review of the Tenth Circuit's statements on this distinction, followed by a discussion of the statutes and regulations at issue here, will show why Defendants have the better of the argument.

     i.  *Conditions of Participation Versus Conditions of Payment*

As with any FCA claim, an action under any false certification theory must show that a false claim or fraudulent course of action was material to the government's decision to pay out moneys to the claimant. *See Conner*, 543 F.3d at 1219 & n.6. For such materiality to exist in this context requires a "knowingly false certification of compliance with a regulation or contractual provision *as a condition of payment*." *See Lemmon*, 614 F.3d at 1168 (citation omitted) (emphasis added). "Conditions of payment are those which, if the government knew they were not being followed, might cause it to actually refuse payment." *Conner*, 543 F.3d at 1220. By

contrast, mere conditions of participation in a program, as well as a claimant's certifications that it has complied with the program's conditions, "are enforced through administrative mechanisms, and the ultimate sanction for violation of such conditions is removal from the government program." *Id.* A claimant's certification that simply provides "assurances that [it] continues to comply with the conditions of participation originally agreed upon" cannot form the basis of an FCA claim of false certification, whereas a false certification of compliance with a condition of payment may do so. *See id.*

The Tenth Circuit has spoken most clearly on the difference between conditions of participation and conditions of payment in *Conner*, an express false certification case. The relator there, a disgruntled ophthalmologist, alleged that his former employer had violated numerous regulations and statutes establishing Medicare conditions of participation. *See id.* at 1214-16. As required by regulation, the employer submitted annual cost reports that included a certification "that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations." *See id.* at 1218-19 (quoting 42 C.F.R. § 413.24(f)(4)(iv)). It was this certification that the relator used as a vehicle for his FCA claim of express false certification, essentially arguing "that *any* failure by [the employer] to comply with *any* underlying Medicare statute or regulation during the provision of *any* Medicare-reimbursable service render[ed] this certification false, and the resulting payments fraudulent." *Id.* at 1219.

The Tenth Circuit was not convinced. The certification in question, the court observed, "contain[ed] only general sweeping language and d[id] not contain language stating that payment is conditioned on perfect compliance with any particular law or regulation. Nor does any underlying Medicare statute or regulation provide that payment is so conditioned." *Id.* The court

went on to examine the regulations governing participation in Medicare, noting that noncompliance was addressed by "a detailed administrative mechanism." *Id.* at 1221. Although the revocation of billing privileges was a conceivable consequence of noncompliance under this regulatory scheme, that sanction was only imposed after healthcare providers were granted an opportunity to correct such noncompliance, and participation in Medicare was only terminated following a finding that the provider had not "substantially" complied. *Id.* at 1220-21 (citations omitted). Even in such cases, the court pointed out, there was no indication "that the government normally seeks retroactive recovery of Medicare payments for services actually performed on the basis that the noncompliance rendered them fraudulent." *Id.* at 1221.

In circumstances where "the government has . . . created a complex monitoring and remedial scheme that ends Medicare payments only as a last resort," the Tenth Circuit concluded, it would be "curious to read the FCA, a statute intended to protect the government's fiscal interests, to undermine the government's own regulatory procedures" by allowing a lawsuit to circumvent that process. *Id.* at 1222. Still, the court did not foreclose the possibility that some Medicare regulations "might expressly or implicitly condition payment on certification of compliance under a false certification theory." *See id.*; *see also Mikes*, 274 F.3d at 698 (finding certification that services for which payment was sought were "medically indicated and necessary" was a condition of payment, where both the certifying form and Medicare regulations identified the certification as such). In *Conner*, however, that standard had not been met, and thus the Tenth Circuit affirmed the dismissal of the relator's claim. *See id.* at 1226.

### ii. CLIA Enforcement Regulations

As in *Conner*, the regulations at issue here are tied to participation in Medicare—indeed, it is a stated "condition of participation" in Medicare that a hospital maintain a CLIA-compliant

11

laboratory. *See* 42 C.F.R. § 482.27(a); *see also* 42 U.S.C. § 263a(b). Each CLIA-certified laboratory must follow certain standards and requirements, known as "condition level requirements," for each test conducted by the laboratory. *See* 42 C.F.R. § 493.2. If at any time the government or an accrediting program finds that a CLIA-certified laboratory has failed to comply with even a single applicable condition level requirement, it must provide the laboratory with written notice of the noncompliance identified and provide at least ten days for the laboratory to respond. *Id.* § 493.1810(a)-(b).

After considering the laboratory's response, the government may impose any appropriate "principal" or "alternative" sanction specified by the regulations. For any CLIA-certified laboratory, principal sanctions include the suspension, limitation, or revocation of CLIA certification, and alternative sanctions include monetary penalties, state onsite monitoring of the laboratory, and the imposition of a plan of correction lasting up to twelve months. *Id.* § 493.1806(b)-(c); *see also id.* § 493.1832(c). For laboratories participating in Medicare, "additional sanctions" that are "available" include the principal sanction of cancellation of approval to receive Medicare payments for services, plus alternative sanctions including suspension of Medicare payments for future tests in one or more specialties or subspecialties "performed on or after the effective date of sanction." *Id.* § 493.1807(a)-(b). If a laboratory's CLIA certificate is suspended or revoked and the laboratory is a Medicare participant, the government "always" cancels its approval to receive Medicare payments. *Id.* § 1842(a)(1).

The category of sanction imposed is determined by the type of deficiency discovered. If a condition level deficiency posing an immediate jeopardy is discovered, the government imposes one or more alternative sanctions and requires the laboratory to take immediate action; failure to eliminate the jeopardy may lead to suspension or revocation of CLIA certification. *Id.*

§ 493.1812(a)-(b). For other condition level deficiencies, the government may impose any alternative or principal sanction, or it may simply impose training and technical assistance requirements in limited cases. *Id.* § 493.1814(a). Although the government may impose a principal sanction at this point, it is only required to do so if the laboratory does not correct its condition level deficiencies within twelve months. *Id.* § 493.1814(b). If a deficiency is not at the condition level, the laboratory must create a plan of correction and must remedy the problems within twelve months; if corrections are not timely made, the government may impose a principal sanction. *Id.* § 493.1816.

Although the regulations call for specific categories of sanctions in certain situations, the actual choice of which principal or alternative sanction to impose on a laboratory is governed by a host of factors. *See id.* § 493.1804(d). Such factors include whether the deficiencies pose an "immediate jeopardy"; the nature, incidence, severity, and duration of deficiencies or noncompliance; the relationship of any deficiencies to each other; the laboratory's "overall compliance history"; the compliance outcomes the government hopes to achieve; the progress made by the laboratory after being given "a reasonable opportunity to correct deficiencies"; and input from state agencies. *Id.* These factors make it apparent that the government is afforded much discretion to tailor sanctions to fit any noncompliance or deficiencies discovered. *See id.* § 493.1800(a)(2)(iii) (granting the government "broad enforcement authority," including the use of intermediate sanctions).

Even if, after considering these factors, the government elects to levy a principal sanction against a laboratory, that sanction is not imposed immediately. Before the government suspends, limits, or cancels CLIA certification, it provides an opportunity for a hearing as long as no immediate jeopardy is present and the laboratory has not refused inspections or requests for

information. *Id.* §§ 493.49(e), 493.1840(d)-(e). The government only needs to give the laboratory written notice and an opportunity to respond before cancelling approval of Medicare payments; although the laboratory may also request a hearing on the matter, the government can impose this sanction prior to the hearing. *Id.* §§ 493.49(f); 493.1842(b). In any case, the regulation governing the revocation of Medicare billing privileges grants "[a]ll providers and suppliers . . . an opportunity to correct [any] deficient compliance . . . before a final determination to revoke billing privileges." *See id.* § 424.535(a)(1); *see also Conner*, 543 F.3d at 1221. Moreover, any termination from Medicare itself remains dependent on "substantial[]" compliance, rather than full compliance, with a Medicare participation agreement. *See* 42 U.S.C. § 1395cc(b)(2)(A).

### iii.    *CLIA Regulations Are Conditions of Participation in Medicare*

Hansen, like the relator in *Conner*, alleges numerous regulatory violations by the Defendants here. Unlike that relator, however, Hansen does not concede that the violated regulations constitute mere conditions of participation in Medicare. Rather, "[s]he alleges that [because] CLIA compliance is a mandatory prerequisite to ever receiving payment" (*see* Doc. 69 at 12), CLIA compliance should itself be considered a condition of Medicare payment, since these regulations "provide the government with ample authority to withhold payments" upon their violation (*see id.* at 22; *see also id.* at 23-24). In other words, Hansen argues, any claim for government funds constituted an impliedly false certification due to the alleged regulatory violations.

Like the regulations at issue in *Conner*, CLIA regulations set forth a detailed administrative mechanism for addressing noncompliance. Although the regulations in both cases provide for the possible suspension or revocation of billing privileges or participation in Medicare, they do not do so immediately. Instead, the government may choose to institute a plan

of correction or other alternative sanctions before addressing the provider's participation in the program and billing privileges. As in *Conner*, continued CLIA certification (and therefore continued participation in Medicare) need not rely on perfect compliance; here, the government considers the laboratory's "overall compliance history," the progress it has made after any deficiencies are observed, the nature of those deficiencies, and the government's own goals for compliance outcomes, among many other factors, in determining whether to terminate billing privileges or to impose a less onerous sanction. *See* 42 C.F.R. § 1804(d); *cf. Conner*, 543 F.3d at 1220 (citation omitted). In other words, "although the government considers substantial compliance [with CLIA regulations] a condition of ongoing Medicare *participation*, it does not require perfect compliance as an absolute condition to receiving Medicare *payments* for services rendered." *Cf. Conner*, 543 F.3d at 1221. Finally, just as in *Conner*, nothing in these regulations "indicate[s] that the government normally seeks retroactive recovery of Medicare payments for services actually performed on the basis that the noncompliance rendered them fraudulent." *Cf. id.*

In *Conner*, the Tenth Circuit interpreted this type of regulatory framework as establishing that compliance with the relevant Medicare regulations was a condition for continued participation in that program. Here, the same sort of regulations make it clear that the government does not condition Medicare payments on perfect compliance with CLIA regulations, but instead that it is seeking to ensure that laboratories continue to abide by their CLIA obligations so that their continued participation in Medicare is appropriate. In fact, the case is even stronger here, as CLIA certification is expressly identified as a "condition of participation" under Medicare regulations. *See* 42 C.F.R. § 482.27(a). With this in mind, and

under the logic of *Conner*, the conclusion that compliance with CLIA regulations is a condition of Medicare participation instead of a condition of payment is inescapable.

Further, the concerns that the Tenth Circuit articulated in *Conner* remain just as applicable here. With both Medicare regulations and statutes generally and CLIA regulations in particular, the government has taken care to create a "detailed administrative mechanism," *see Conner*, 543 F.3d at 1221, that sets forth a "complex monitoring and remedial scheme," *see id.* at 1222, for addressing potential CLIA violations. The choice to do so suggests that the government did not intend "to condition payment on full regulatory compliance," *cf. id.*, since the government retains a great deal of discretion to determine which sanctions to impose and when and how to impose them. If CLIA regulations were interpreted to require full compliance as a condition of Medicare payment, this discretion would be severely undermined. Instead of allowing the government to tailor sanctions depending on the nature of any CLIA deficiencies, any single regulatory violation could potentially support an implied false certification FCA claim for every payment request made by a laboratory before the deficiency had been fully corrected. In other words, every regulatory violation could effectively commit the government to seeking monetary sanctions of three times the amount of every claim for payment featuring the allegedly false certification, on top of the statutory civil penalty for each claim. *See* 31 U.S.C. § 3729(a)(1); *see also Conner*, 543 F.3d at 1221 (noting that this reading of the FCA "could prevent the government from proceeding deliberately through the carefully crafted remedial process and could demand damages far in excess of the entire value of Medicare services performed by a hospital"). Nothing in the language of the CLIA regulations suggests that the government intended to curb its discretion in this manner. *Cf. Conner*, 543 F.3d at 1222.

Add to this the unease expressed by the Tenth Circuit at the thought of putting courts in the position of regulatory inspectors in the Medicare context. *See id.* at 1221. Here it is worth quoting *Conner* in full:

> [R]ather than relying on the experience of state agencies to survey compliance, such a broad reading of the FCA . . . would burden the federal courts with deciding whether medical services were performed in full compliance with a host of Medicare statutes and regulations. As the Second Circuit has cautioned, "courts are not the best forum to resolve medical issues concerning levels of care." It is therefore with good reason that the agencies of the federal government, rather than the courts, manage Medicare participation in the first instance in cooperation with the states and accreditation organizations.

*Id.* at 1221 (internal citations omitted). A reading of the regulations that conflates conditions of Medicare participation—in this case, CLIA certification—with conditions for receiving Medicare payments would put this Court in a position better left to the expertise of government inspectors, regulators, and their agents. I decline the invitation to read the FCA so broadly.

Hansen attempts by several means to avoid the inevitable conclusion that CLIA regulations, like the Medicare regulations discussed in *Conner*, are not conditions of payment. First, she argues that because the government may cancel approval to receive Medicare payments "for even a single condition-level violation," the regulations in question must set forth conditions of payment. (*See* Doc. 69 at 22.) Yet as the regulations show, such a sanction is not automatically imposed. Instead, the government may choose to cancel Medicare billing privileges only after considering a variety of factors, *see* 42 C.F.R. § 493.1804(d), and only after giving the laboratory notice and an opportunity to respond, *see id.* § 493.1842(b), as well as an opportunity to correct deficiencies, *see id.* § 424.535(a)(1). This "complex monitoring and remedial scheme" calls for an exercise of government discretion and constructs the sort of "detailed administrative mechanism" that the Tenth Circuit has previously recognized as the hallmark of conditions of participation.

Moreover, and key to both *Conner* and the instant case, the regulations do not permit the government to refuse to make payment on the allegedly false claims, or to seek a refund of payments made on such claims. Rather, the regulations only contemplate the cancellation of Medicare payments for future claims. *Cf.* 543 F.3d at 1221. This arrangement strongly suggests that the regulations are intended to set forth not conditions governing payment, but conditions governing CLIA certification and Medicare participation.

Undaunted, Hansen next states that I must consider CLIA compliance to be a condition of payment for purposes of this motion because she has pleaded as such. (Doc. 69 at 4, 23.) The crux of this argument is that the question of whether a regulation creates a condition of payment really goes to the element of materiality (*id.* at 12-13, 22), and "[m]ateriality is a mixed question of law and fact" that is "almost never appropriate for resolution on a motion to dismiss" (*id.* at 13 (citations omitted)). However, the determination of whether CLIA regulations condition Medicare payments on regulatory compliance is a question of law that requires no adjudication of the facts. It is for this reason that the Tenth Circuit was able to affirm the district court's grant of a motion to dismiss in *Conner* after determining that the certification in question was merely a condition of Medicare participation. The allegations in Hansen's first amended complaint, which simply summarize the regulations at issue here (*see* Doc. 50 at 8, 9), do not undermine the purely legal conclusion that CLIA certification is a condition of participation rather than one of payment.[5]

Finally, Hansen insists that the distinction between conditions of participation and conditions of payment is immaterial to her implied false certification claim, since the Tenth

---

[5] Even if Hansen had expressly alleged that CLIA compliance is a condition of payment, I would not be required to give that "allegation" any weight when considering Defendants' Rule 12(b)(6) motion. *See Twombly*, 550 U.S. at 555 ("[C]ourts are not bound to accept as true a legal conclusion couched as a factual allegation." (citation and internal quotation marks omitted)).

Circuit only adopted the distinction in an express false certification case. (*See* Doc. 69 at 24 (citing *Conner*, 543 F.3d at 1218-19).) There is no logical basis for distinguishing between conditions of payment and participation in the context of express false certification claims, yet not doing so for implied false certification claims. In either case, the court is examining whether a contractor's false certification was material to the government's payment decision. *See Conner*, 543 F.3d at 1220. It would be curious to find that the materiality element of a claim cannot be satisfied by an express false certification of compliance with a mere condition of participation, but that the element *can* be satisfied by an implied false certification of compliance with such a condition. Hansen does not articulate any reason why this would be the case; she simply argues that the distinction must be limited to express false certification claims because *Conner* was an express false certification case.

However, the Tenth Circuit has not been so limited in its pronouncements. In fact, the key aspect of any claim of legally false certification, express or implied, is that the contractor certifies compliance with laws, regulations, or contracts "as a condition of payment." *See Lemmon*, 614 F.3d at 1168. Indeed, other circuits that have adopted the implied false certification theory have also limited such claims to noncompliance with conditions of payment. *See, e.g.*, *U.S. ex rel. Hobbs v. MedQuest Assocs., Inc.*, 711 F.3d 707, 714 (6th Cir. 2013); *U.S. ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 309-10 (3d Cir. 2011); *Mikes*, 274 F.3d at 697 (requiring noncompliance with conditions of payment for all legally false claims). *Conner* itself is clear on this point: in assessing implied false certification claims, courts focus on the underlying laws or regulations "to ascertain whether they make compliance a prerequisite to the government's payment." *See* 543 F.3d at 1218 (citations omitted).

Even accepting her allegations as true, Hansen has failed to properly plead that Defendants impliedly falsely certified compliance with conditions of payment when seeking Medicare payments from the government. Therefore, Hansen's claims under Count I of the first amended complaint cannot stand on an implied false certification theory.

B.  <u>Express False Certification</u>

Hansen also claims that Defendants are liable under the FCA for their express certifications of CLIA compliance. (Doc. 50 at 48-49.) An express false certification claim exists when a government payee "falsely certifies compliance with a particular statute, regulation or contractual term, where compliance is a prerequisite to payment." *Conner*, 543 F.3d at 1217 (quoting *Mikes*, 247 F.3d at 698). The "certification" does not need to be a literal certification; rather, "[s]o long as the statement in question is knowingly false when made, it matters not whether it is a certification, assertion, statement, or secret handshake." *Id.* at 1217-18 (quoting *Hendow*, 461 F.3d at 1172). Such claims may arise under either § 3729(a)(1)(A) or § 3729(a)(1)(B). *See Lemmon*, 614 F.3d at 1168 (referring to former § 3729(a)(1)-(2)).

Here, Hansen alleges that Defendants expressly and falsely certified compliance with CLIA regulations when submitting CMS Form 1500 (Doc. 50 at 13), a form that Medicare providers are required to submit when seeking payment for services provided, *see* 42 C.F.R. § 424.32(b). According to the first amended complaint, that Form includes the following statement:

> This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

(Doc. 50 at 13.) Because Defendants were in violation of the CLIA every time they submitted claims for payment that included this certification, Hansen argues, each claim constituted an express false certification. (*Id.* at 48-49; *see* Doc. 69 at 21.)[6]

Despite the extensive briefing on the motion before me, the parties spend virtually no time examining the viability of Hansen's claims under the express false certification theory. (*See* Doc. 69 at 21, 24; Doc. 74 at 9-10.) As such, each party misses a crucial fact—even accepting Hansen's allegations as true, the CMS Form 1500 certification does not certify compliance with any statutes, regulations, or contractual terms. The statement quoted in the first amended complaint simply certifies that the "foregoing" information contained in CMS Form 1500 is "true, accurate and complete," and Hansen does not allege that the form contains any statements regarding compliance with CLIA regulations, Medicare laws and regulations, or even laws or regulations in general. Moreover, the certification of understanding that any false claims "may be prosecuted under applicable Federal or State laws" does not constitute a certification of compliance with Federal or State laws "as a condition to government payment," *see Conner*, 543 F.3d at 1217 (quotation and emphasis omitted). Without more, this alleged certification cannot serve as the basis for an FCA claim under the express false certification theory.

Even if I were to construe the statement as certifying compliance with CLIA regulations, those regulations only serve as conditions of participation in Medicare for the reasons discussed in the previous section. Hansen concedes that liability under the express false certification theory may only be premised on certifications of compliance with conditions of payment. (*See* Doc. 69 at 24.) Further, her arguments conflating CLIA's conditions of Medicare participation with

---

[6] Although Hansen also cites several other certifications allegedly made by Defendants in various documents (Doc. 50 at 12), she concedes in her response brief that her express certification theory hinges only on the CMS Form 1500 certification (Doc. 69 at 21, 22 n.10).

conditions of Medicare payment are equally unconvincing under both express and implied false certification theories. Therefore, because Hansen fails to allege that Defendants certified compliance with any laws or regulations, and because none of these underlying laws or regulations constitute a condition of payment in any event, she has failed to state an FCA claim under a theory of express false certification.

C.  Promissory Fraud

Hansen also insists that certain allegations support her FCA claim under a theory of promissory fraud.[7] (*See* Doc. 50 at 47-48; *see also Conner*, 543 F.3d at 1220 n.7.) As with theories of false certification, promissory fraud is a theory of legal falsehood—that is, it does not hinge on allegations that a contractor did not actually provide or accurately describe the services for which payment was sought. *Cf. Conner*, 543 F.3d at 1217. Instead, this theory "holds that liability will attach to each claim submitted to the government under a contract, when the contract or extension of government benefit was originally obtained through false statements or fraudulent conduct." *See Hendow*, 461 F.3d at 1173 (citations omitted).

As with the false certification theory, an allegation of mere regulatory violations after a contract is formed will not support an FCA claim brought under a theory of promissory fraud. Instead, the relator must demonstrate that a contractor, in seeking to obtain a contract or extension of government benefit, represented that it would do something that it planned not to do or that it otherwise engaged in fraud to secure the contract or benefit. As the Seventh Circuit has recognized, "failure to honor one's promise is (just) breach of contract, but making a promise

---

[7] Even though both parties use the term "fraudulent inducement" in their briefs, I will refer to the theory as "promissory fraud" in light of the Tenth Circuit's passing use of the phrase in *Conner*. *See* 543 F.3d at 1220 n.7; *see also Hendow*, 461 F.3d at 1173.

that one *intends* not to keep is fraud." *U.S. ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 917 (7th Cir. 2005).

i. *Promissory Fraud as Distinguished from False Certification*

The use of the promissory fraud theory of liability in the Medicare context does not appear to be common. The most prominent cases addressing this theory tend to revolve around claims of bid-rigging, *see, e.g.*, *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 543-45 (1943), or allegations of universities providing incentive compensation to recruiters in violation of the Higher Education Act, *see, e.g.*, *Hendow*, 461 F.3d at 1173-74. Even *Conner* refused to squarely address the theory, since the relator only raised it in his appellate brief. *See* 543 F.3d at 1220 n.7. False certification cases tend to be the norm when a relator alleges FCA liability for violations of Medicare regulations.

In truth, however, the promissory fraud theory of FCA liability sometimes differs from the false certification theory only in a temporal sense. While the false certification theory alleges that a contractor certified that it *did* comply with a statute, regulation, or contractual term when it knew at the time that it did not do so, the promissory fraud theory may allege that a contractor originally certified that it *would* comply with a law, regulation, or term when it knew at the time that it would not do so. *See U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F. Supp. 2d 1017, 1036 (S.D. Tex. 1998). Of course, a promissory fraud FCA claim may also lie if a contractor simply used any sort of false statements or fraudulent conduct to obtain a contract. *See Hendow*, 461 F.3d at 1173. Yet in any case, courts often focus less on the theory of liability and more on whether the general elements of an FCA claim have been satisfied. *See, e.g.*, *id.* at 1174 (noting that "under either the false certification theory or the promissory fraud theory, the essential elements of False Claims Act liability remain the same"); *see also Harrison v.*

23

*Westinghouse Savannah River Co.*, 176 F.3d 776, 790-91 (4th Cir. 1999) (examining the general elements of FCA liability where the relator relied on "a mixture of false certification and fraud-in-the-inducement cases" in bringing his claims).

On the face of their motion, Defendants appear to challenge only the materiality element of Hansen's promissory fraud FCA claim. Just as with Hansen's false certification theory, Defendants argue that her allegations only show violations of conditions of participation. (*See* Doc. 74 at 11, 12.) The question, then, is this: although an alleged false certification of *past* compliance with a condition of program participation cannot be considered material to a government's decision to pay a contractor, may a knowingly fraudulent action or statement designed to ensure *future* program participation be considered material to a payment decision?

Depending on the context, the answer may be *yes*. When a contractor is already participating in a government program, its failure to do something that program participants must do does not necessarily mean that the government would not have paid it for services already rendered. *See, e.g.*, *Conner*, 543 F.3d at 1219-22. However, when the issue is whether a contract or extension of benefits was originally premised on fraudulent actions or statements, the key question is whether the contractor should have become eligible as a program participant at all. Even if a contractor who participates in a program has satisfied every explicit condition of payment for its claims, it may still be liable under the FCA if it secured entry into the program (or an extension of the contract) through a false statement or fraudulent course of conduct. *See, e.g.*, *U.S. ex rel. Wilkins v. N. Am. Const. Corp.*, 173 F. Supp. 2d 601, 621 (S.D. Tex. 2001) ("The claims for payment may be accurate, but the antecedent fraud in obtaining the contract makes each claim submitted a false or fraudulent claim."), *overruled on other grounds by U.S. ex rel. Longhi v. United States*, 575 F.3d 458 (5th Cir. 2009).

24

Hansen points in particular to *Main*, a case involving the Higher Education Act ("HEA"), as apposite. To participate in a student assistance program authorized under the HEA, universities must enter into a program participation agreement in which they expressly agree to follow numerous conditions, including statutory and regulatory bans on payments of contingent fees to recruiters who enroll students. *See Main*, 426 F.3d at 916 (citing 20 U.S.C. § 1094(a)(20); 34 C.F.R. § 668.14(b)(22)(i)). After establishing eligibility for program subsidies in this manner, participating universities and their students then submit applications for specific grants, loans, or scholarships covered by the subsidies. *See id.* at 916 (citations omitted). The relator in *Main* alleged that the defendant university certified compliance with its participation agreements every year while knowing that it would continue to violate the rule against contingent fees. *Id.* Although the Seventh Circuit distinguished between "phase one" applications for program eligibility and "phase two" applications for payment, it found that this distinction did not amount to a difference for FCA liability purposes, since "[t]he University 'uses' its phase-one application (and the resulting certification of eligibility) when it makes . . . a phase-two application for payment. No more is required under the [FCA]." *Id.* Because the university allegedly made a promise that it intended from the beginning not to keep, then sought payment under the resulting agreement, the relator's FCA action could survive a motion to dismiss under the promissory fraud theory of liability. *See id.* at 917. The Ninth Circuit reached a similar conclusion on virtually the same facts in *Hendow*. *See* 461 F.3d at 1175-77.

An important implication of this reasoning is that the distinction between conditions of participation and conditions of payment becomes less relevant in the promissory fraud context. After all, for an aspiring contractor who has not yet obtained a government contract, program participation is itself a condition for procuring payment. Once that aspiring contractor actually

enters into the government program, of course, violations of a condition of participation might not cause the government to refuse payment. *See, e.g.*, *Conner*, 543 F.3d at 1220. Yet that organization undeniably cannot be paid if it is not allowed to enter or continue in the program at all. *See Main*, 426 F.3d at 916. To find otherwise would eliminate the promissory fraud theory altogether. The terms "condition of participation" and "condition of payment" are proxies for establishing materiality, and a contractor's eligibility for entry into a program may sometimes be material to the government's ultimate payment decisions.

That said, I do not accept Hansen's argument that the distinction between conditions of participation and conditions of payment is *always* immaterial to a promissory fraud FCA action. (*See* Doc. 69 at 19-20.) Although Hansen cites a Northern District of Illinois case for the proposition that "[a] condition to participation is a condition to payment" in all such cases, *see U.S. ex rel. Tyson v. Amerigroup Ill., Inc.*, 488 F. Supp. 2d 719, 725 (N.D. Ill. 2007), that conclusion appears to be based on an overbroad reading of *Hendow*, *cf.* 461 F.3d at 1176 (equating the two types of conditions only "[i]n the context of Title IV and the [HEA]"). Other courts continue to recognize the distinction in promissory fraud cases where the violation of a condition of participation was not material to a payment decision. *See, e.g.*, *U.S. ex rel. Woodruff v. Haw. Pac. Health*, Civ. No. 05-00521 JMS/LEK, 2007 WL 1500275, at *9-10 (D. Haw. May 21, 2007) (unpublished) (dismissing a promissory fraud FCA claim alleging violations of state and federal Medicare regulations), *aff'd*, 409 F. App'x 133 (9th Cir. 2010) (unpublished).

### ii.     *Hansen's Promissory Fraud FCA Claim*

Hansen alleges that Defendants knowingly and falsely certified that they were in compliance with CLIA conditions of participation when seeking recertification in 2009 and 2011. (Doc. 50 at 47.) She also states that Defendants submitted false information and falsified

records, certifying that this information was "complete and accurate," to fool the Joint Commission into believing that they were in compliance with the appropriate standards. (*See id.* at 47-48.) Hansen argues that this alleged fraudulent activity itself constituted fraudulent inducement of a government contract, as Mimbres was required to be in compliance with CLIA standards to receive its certificate of accreditation. (Doc. 69 at 16.) Further, Hansen claims, this fraudulent activity also "strongly suggest[s]" that Defendants never intended to adhere to CLIA standards. (*Id.* at 17.) According to Hansen, these falsifications and fraudulent activities were used to establish "phase one" eligibility for CLIA certification, and thus for participation in Medicare, thereby transforming Defendants' "phase two" claims for Medicare payment into false claims. (Doc. 50 at 18-19.)

Defendants essentially attack this argument from two angles. In the broader sense, they contend that the promissory fraud theory "cannot be imported into the health care context" at all, relying on a distinction made by the Ninth Circuit in *Hendow*. (Doc. 74 at 11.) More narrowly, Defendants argue that to recognize a promissory fraud FCA claim here while denying a false certification claim on essentially the same grounds would nullify the participation/payment distinction that the Tenth Circuit carefully crafted for false certification FCA cases. (*See id.* at 10-11.) If a relator could get around the restrictions on false certification cases by arguing that the same facts raise a promissory fraud FCA claim, they argue, then *Conner* would be rendered "a nullity." (*See id.*)

I am skeptical of Defendants' broader argument here. In *Hendow*, another HEA case, the Ninth Circuit took special care to distinguish its decision from a Second Circuit Medicare FCA opinion that affirmed a grant of summary judgment in part on grounds that the plaintiff had not shown any violation of a condition of payment. *See Hendow*, 461 F.3d at 1177 (citing *Mikes*, 274

F.3d at 700-02). However, the relevant passages in *Mikes* were solely concerned with FCA liability for Medicare violations under the false certification theory, *see* 274 F.3d at 696, 702, whereas *Hendow* was concerned with both false certification and promissory fraud theories of liability, *see* 461 F.3d at 1174.[8] *Hendow* thus distinguished itself from "Medicare cases" such as *Mikes* only to note that the Second Circuit had imposed on those cases certain additional requirements when a claim was brought under the false certification theory, not to insist that a promissory fraud FCA action could never succeed in the Medicare context. *See Hendow*, 461 F.3d at 1177 (citing 274 F.3d at 701-02). Moreover, other language in *Hendow* suggests the viability of promissory fraud FCA claims in at least some Medicare cases. *See id.* at 1177 (opining that "[i]f the allegation had been that the defendants in *Mikes* were not even trying to comply [with Medicare laws and regulations]—that they were not only failing to provide the appropriate standard of care, but also affirmatively and knowingly choosing not to—we imagine the *Mikes* case would have come out differently"). However, I see no need to reach this question, for even if a promissory fraud FCA claim can be brought in some Medicare cases, Hansen has failed to state a plausible claim under that theory.

To review the relevant framework: A laboratory may only participate in Medicare if it has a valid CLIA certificate. *See* 42 C.F.R. §§ 482.27(a), 493.3(a)(1), 493.5. In Mimbres's case, the appropriate CLIA certificate is a certificate of accreditation, for which it first applied in 2004. (*See* Doc. 50 at 10.) A certificate of accreditation is valid for two years. 42 C.F.R. § 493.61(d). Renewal of a certificate of accreditation is only approved if, *inter alia*, the laboratory is in compliance with the accreditation program's requirements. *See id.* § 493.61(b)(3), (h)(2). These

---

[8] Unlike the Ninth Circuit, the Tenth Circuit, and many other courts, the *Mikes* decision also refused to impose a materiality requirement on FCA claims and distinguished that concept from the conditions-of-payment requirement. *See Mikes*, 274 F.3d at 697.

requirements must be at least as strict as the condition level requirements outlined by CLIA regulations. *See id.* § 493.551(a)(1).

If the government decides that an application for renewal of certification should be denied or limited, the laboratory may appeal the limitation or denial of its certification renewal within sixty days and is entitled to a hearing, during which time the laboratory keeps its accreditation unless conditions pose an imminent and serious risk to patients' health. *See id.* §§ 493.61(i)(3), 493.1840(d)-(e); *see also id.* § 493.1844(b)(2), (d)(2)(i). Even an unsuccessful hearing is subject to written review by an appellate board. *See id.* § 493.1844(2). Although the government immediately notifies the laboratory that it is suspending Medicare payments upon the denial of certificate renewal, *see id.* § 493.61(i)(4), it must also first provide the laboratory with at least ten days to respond before doing so, *see, e.g.*, *id.* § 493.1810(a)(6), (b). Approval for Medicare payments is only canceled if the deficiencies are not corrected within twelve months. *Id.* § 493.1828(c). As always, complete removal from Medicare hinges on "substantial compliance" with regulations rather than full compliance. *See* 42 U.S.C. § 1395cc(b)(2)(A); *Conner*, 543 F.3d at 1221.

The facts alleged in the first amended complaint also make it clear that denial of a renewal application is discretionary rather than automatic. Hansen states that the Joint Commission found "numerous CLIA violations" at Mimbres's laboratory with respect to microbiology, serology, and hematology testing and calibration. (Doc. 50 at 40.) Rather than recommending denial or limitation of the renewal of Mimbres's CLIA certification and suspending payments, the Joint Commission required Mimbres to submit evidence of compliance in those areas within forty-five to sixty days. (*Id.*) The Joint Commission's approach is consistent with a CLIA regulation providing that payments are not suspended unless a laboratory has not

corrected deficiencies within three months of its last inspection or if the deficiencies persist over the course of three consecutive inspections. *See id.* § 493.1828(a)(2)(i).

In summary, the administrative mechanism for CLIA renewal applications differs very little from the overall CLIA enforcement provisions that foreclose Hansen's false certification claims. Rather than mandating a single approach to any and all condition level deficiencies, CLIA regulations afford the government—and, by extension, the accrediting organizations it approves—significant discretion as to how they approach such deficiencies. Any decisions to limit or suspend renewal of certification remain subject to appellate review, payment suspension decisions are imposed only after extended compliance opportunities are exhausted or ignored, and overall removal from Medicare is only allowed absent "substantial compliance." The existence of this complex enforcement mechanism shows that even if some conditions of participation can rise to the level of conditions of payment in the promissory fraud FCA context, the conditions described here do not do so, since violations of these conditions will not force the government to deny a contractor either continued participation in Medicare or continued payment. Further, as the Tenth Circuit observed in *Conner*, it would be "curious" to think that Congress intended to cabin the government's discretion by requiring FCA liability where such regulatory compliance may not be material to a payment decision. *See* 543 F.3d at 1222.

Hansen's attempts to analogize her allegations to those at issue in the HEA cases (Doc. 69 at 18-19) are unavailing. In both *Main* and *Hendow*, the only measure of HEA compliance was found in the universities' participation agreements with the government, where the universities acknowledged that HEA participation hinged on the contingent-fees ban and other conditions. *See Hendow*, 461 F.3d at 1176; *Main*, 426 F.3d at 916. Since no other enforcement mechanism was in place, the false assurance of future compliance in the participation agreement

was equivalent to the false assurance of compliance with a condition of payment, for if such "conditions of participation were not conditions of payment, there would be no conditions of payment at all—and thus, an educational institution could flout the law at will." *Hendow*, 461 F.3d at 1176. By contrast, the enforcement scheme governing CLIA certificate renewal, and CLIA participation in general, presents multiple ways to ensure continued laboratory compliance—and, importantly, multiple ways for the government to respond to noncompliance. Further, this situation differs from the phase one/phase two dynamic cited in *Main*; whereas it was the university's fraudulent representation of HEA eligibility at "phase one" that rendered false its "phase two" payment applications for payment in that case, Mimbres's eligibility for participation in Medicare was not foreclosed by its failure to fully comply with CLIA regulations.

Hansen also argues briefly that her allegations support a promissory fraud FCA claim because they suggest that Defendants never intended to keep their promise to maintain CLIA compliance at the time that they made the promise. (*See* Doc. 69 at 17.) Yet despite her detailed descriptions of Defendants' alleged regulatory violations and fraudulent activity, and despite her thorough discussion connecting these allegations to her various theories of FCA liability (*see* Doc. 50 at 47-49), Hansen does not claim in her first amended complaint that Defendants had no intention of abiding by their commitments at the time they were made. *See, e.g.*, *Zokari v. Gates*, 561 F.3d 1076, 1084 (10th Cir. 2009) (observing that a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests" (quoting *Twombly*, 550 U.S. at 555)).[9] Although Mimbres's purportedly active efforts to secure CLIA renewal despite its

_____

[9] Hansen alleges at one point in her first amended complaint that when she reported deficiencies while working at Mimbres between May and July 2010, Defendants "intended to continue ignoring" these deficiencies "as they had done in the past." (*See* Doc. 50 at 43) This isolated statement, made in the

regulatory violations could imply that it had no intention to follow through with its commitments, Hansen's late attempts to read this implication into her otherwise comprehensive first amended complaint do not raise this theory of relief above the speculative level. *See Twombly*, 550 U.S. at 555.[10]

Finally, Hansen points to language in *Lemmon* to argue that the materiality element is satisfied here because the government could have ultimately suspended or revoked Mimbres's CLIA certificate and Medicare payments. *See* 614 F.3d at 1170 (citing *Conner*, 543 F.3d at 1219-20). Yet the language in question relies on the Tenth Circuit's holding in *Conner*, a false certification case where FCA liability did not exist because payment was not conditioned on full regulatory compliance and a "complex monitoring and remedial scheme" could have ended Medicare payments "only as a last resort." *See Conner*, 543 F.3d at 1122. Here, in the promissory fraud context, neither participation nor payment are conditioned on full regulatory compliance, which in any case is measured by a complex monitoring and remedial scheme that usually ends certification and suspends Medicare payments only after an extended or repeated period of noncompliance and failure to address deficiencies. *See* 42 C.F.R. §§ 493.61(i), 493.1828(a)(2)(i). Thus, even though *Conner* did not address a promissory fraud FCA claim, its treatment of another sort of legally false claim weighs against a finding of materiality here.

---

context of Hansen's retaliation claim, does not suffice to allege that Defendants falsely assured that they would meet their CLIA obligations during recertification in October 2009 and October 2011.

[10] Hansen cites to an unpublished decision from another jurisdiction to argue that her allegations of noncompliance and fraud, standing alone, suffice to imply that Defendants never intended to be in compliance with CLIA requirements. (Doc. 69 at 17 (citing *U.S. ex rel. McArtor v. Rolls-Royce Corp.*, No. 1:08-cv-133-WTL-DML, Doc. 93, at 10 (S.D. Ill. June 4, 2012).) However, even if I were to find that decision to be persuasive, it is inapplicable here—unlike Hansen, the relator in that case specifically alleged in his complaint that the defendant never intended to comply with its contractual obligations. *See McArtor*, Doc. 41, at 42 (S.D. Ill. Mar. 30, 2011).

If Defendants' allegedly false statements and fraudulent conduct regarding its regulatory compliance were not material to the government's renewal of its CLIA certification, Hansen's promissory fraud FCA claim must fail. Here, the regulations governing CLIA renewal afford the government wide discretion as to how to deal with the sort of noncompliance alleged by Hansen during the recertification process. Accordingly, the conditions of participation that were allegedly violated by Defendants do not rise to the level of conditions of payment, and thus Hansen has failed to state an FCA claim under the promissory fraud theory.

D. <u>Worthless Services</u>

Hansen further argues that her allegations support a finding of FCA liability under the worthless services theory. This sort of claim alleges that a defendant "violated the FCA by seeking and receiving payment for medically worthless tests." *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1053 (9th Cir. 2001). Such an action "is effectively derivative of an allegation that a claim is factually false because it seeks reimbursement for a service not provided." *U.S. ex rel. Sanchez-Smith v. AHS Tulsa Reg'l Med. Ctr.*, 754 F. Supp. 2d 1270, 1287 (N.D. Okla. 2010) (quoting *Mikes*, 274 F.3d at 703). The Second, Sixth, and Ninth Circuits have adopted this theory of FCA liability. *See Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468-69 (6th Cir. 2011); *Mikes*, 274 F.3d at 702-03; *Lee*, 245 F.3d at 1052-54. The Tenth Circuit has not expressly adopted this theory, although at least one district court in the circuit has applied the theory to the facts before it. *See Sanchez-Smith*, 754 F. Supp. 2d at 1287.

Hansen concedes in a footnote that she did not actually plead a worthless services FCA claim in her first amended complaint. (*See* Doc. 69 at 28 n.16.) Still, she argues that "factual allegations supporting such a theory are all that is required," and she points to caselaw stating that "a complaint need not set forth its legal theories." (*See id.* (citing *Zokari*, 561 F.3d at 1084).)

Defendants, apparently unaware that Hansen might be pursuing FCA liability under the worthless services doctrine, did not attack the theory in their motion to dismiss, focusing almost entirely on the distinction between conditions of participation and conditions of payment. (Doc. 63.) However, in their reply brief, they argue that the first amended complaint does not give fair notice of a worthless services FCA claim, that any such claim would fail to meet Rule 9(b)'s requirements for allegations of fraud, and that Hansen has failed to sufficiently allege that Defendants' services were medically worthless. (Doc. 74 at 14-17.)

The first amended complaint only briefly addresses the quality of tests performed by Defendants. Hansen alleges that certain quality control standards for the Vitek 2 diagnostic device were disregarded, rendering its results "unverified and unreliable" (Doc. 50 at 23); that quality control and documentation of culture media and reagents was so deficient as to "call[] into doubt the results of every lab result generated" (*id.* at 26); and that the ACL Elite coagulation analyzer's results were "unreliable" due to failure to perform verification studies or meet other quality control standards (*id.* at 34). She also claims that some or all of these deficiencies "placed patients' lives at risk by failing to meet minimum quality standards." (*See, e.g.*, *id.* at 47.)

However, courts that have adopted the worthless services theory require something more than allegations that a service was of poor quality. Instead, an FCA claim exists when "the performance of the service is so deficient that for all practical purposes it is the equivalent of no performance at all." *Mikes*, 274 F.3d at 703. In other words, courts strictly interpret the term "worthless" in this context. *See, e.g.*, *Chesborough*, 655 F.3d at 468 (stating that liability exists when a medical contractor "[seeks] reimbursement for services that it knew were not just of poor quality but had *no* medical value").

*U.S. ex rel. Badr v. Triple Canopy, Inc.*, a recent FCA case out of the Eastern District of Virginia, is representative. *See* --- F. Supp. 2d ---, 2013 WL 3120204 (E.D. Va. 2013). There, a contractor charged with securing a military base in Iraq allegedly delivered a group of Ugandan guards who failed to meet even the most basic weapons qualifications, and the contractor subsequently created false training records for the guards to obtain payment and renew its contract. *Id.* at *2-4. On the contractor's motion to dismiss, the court rejected the government's worthless services FCA argument, finding that the complaint "fail[ed] to sufficiently allege that the guards' services were entirely devoid of value or that the noncompliance with the weapons qualification requirement caused any injury to the Government such that the guards effectively provided no service at all." *Id.* at *9. Although the poor training of security personnel undoubtedly could have endangered the base they had guarded, the government's complaint had not alleged that the guards completely failed to show up for work or that they had otherwise "utterly failed" to perform as guards. *See id.* (citation omitted).

Even more on point is *U.S. ex rel. Blundell v. Dialysis Clinic, Inc.*, which involved Medicare payments to a dialysis treatment center. *See* No. 5:09-CV-00710 (NAM/DEP), 2011 WL 167246, at *1 (N.D.N.Y. Jan. 19, 2011) (unpublished). The relator alleged that because the defendant failed to comply with a plethora of standards in violation of Medicare regulations, its services were of such low quality as to endanger the health of its patients. *See id.* at *2-3. The court dismissed the relator's worthless services claim because he had not alleged "that defendant failed to provide *any* services to their patients. Rather, plaintiff challenge[d] the quality of care arguing that defendant's services did not conform with [Medicare] guidelines . . . . This allegation is not the 'equivalent of no performance at all' . . . ." *Id.* at *20-21 (citations omitted).

The Ninth Circuit's decision in *Lee* does not deviate from this standard. *See* 245 F.3d at 1052-54. Hansen cites the case because the Ninth Circuit purportedly "ruled that the relator could proceed based on a worthless services theory that the relator had not even raised, but which the court inferred from a single allegation in the complaint." (Doc. 69 at 27.) In fact, the court merely granted the relator leave to amend her complaint because the brief, vague allegation in question showed that such amendment might not have been futile. *See* 245 F.3d at 1054.[11] By that point, the court had already affirmed the dismissal of the relator's complaint on other grounds, *see id.* 1051-52, and it observed that the complaint was too vague and poorly pleaded in its current state to allow the relator to proceed with a worthless services claim, *see id.* at 1053-54.

Hansen, like these other plaintiffs, has alleged that Defendants provided poor quality services that failed to meet certain required standards. However, also like these plaintiffs, she has not adequately alleged that the services provided were "entirely devoid of value" or that Defendants "utterly failed" to provide any services to their patients such that the laboratory's tests were "the equivalent of no performance at all." Indeed, she has not even expressly pleaded a worthless services FCA claim. *Cf. Blundell*, 2011 WL 167246, at *21 (limiting consideration to the complaint's factual allegations where relator first argued for a worthless services claim in opposition to a motion to dismiss). This is particularly striking in light of Hansen's detailed attempts to connect her allegations to the other theories of FCA liability addressed here. (*See* Doc. 47-49.) Accordingly, even if I were to adopt the worthless services theory of FCA liability, Hansen's first amended complaint does not give Defendants fair notice of a claim under this theory. *See Zokari*, 561 F.3d at 1084 (quoting *Twombly*, 550 U.S. at 555).

---

[11] Hansen has also requested leave to amend her complaint "to expressly plead a worthless services theory" if I find her claim here lacking. *See infra* Part V.

Hansen has failed to sufficiently state a substantive FCA claim under the false certification, promissory fraud, and worthless services theories of liability. As such, Hansen's FCA claims brought under 31 U.S.C. § 3729(a)(1)(A)-(B) must be dismissed.

## II.    Reverse False Claims

Hansen next claims that Defendants violated the FCA's prohibition on "reverse false claims" (*see* Doc. 50 at 49), a statutory provision that assigns liability to a person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government," 31 U.S.C. § 3729(a)(1)(G). Defendants challenge this claim on four grounds: (1) Hansen fails to plead any facts to support this claim, in violation of Rule 8(a); (2) Hansen fails to meet the heightened pleading requirements for claims of fraud under Rule 9(b); (3) Hansen fails to allege that Defendants owed any "obligation to pay or transmit money or property to the Government"; and (4) Hansen fails to establish the materiality of Defendants' purportedly fraudulent actions to any such obligation. (Doc. 63 at 22.) Hansen's brief in opposition does not address these arguments or even mention this claim.

I agree that Hansen has failed to state a claim under the FCA's reverse false claims provision. At no point does Hansen allege that Defendants were under any obligation to pay money to the United States, that Defendants failed to meet this obligation, or that any fraudulent actions or statements were material to this obligation.[12] The sole reference to anything remotely related to a claim under this provision is Hansen's rote recitation of the elements of a reverse false claims action and the brief statement that Defendants met these elements "[t]hrough the

---

[12] To the contrary, in the context of her false certification argument, Hansen acknowledges that CLIA regulations do not give the government power to seek the retroactive return of payments from noncompliant providers. (*See* Doc. 69 at 23 n.12.)

above-described conduct." (Doc. 50 at 49.) "A pleading that offers . . . a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *See Iqbal*, 556 U.S. at 678 (internal citations and punctuation omitted). For these reasons, Hansen's reverse false claims FCA action must be dismissed.

### III.   Retaliation Claim

As to Count III, Hansen alleges that her efforts to report Mimbres's noncompliance with CLIA regulations led Defendants to place her on administrative leave for over half a year and to assign her to a less desirable shift when she returned, all with the intention of pressuring her to quit. (Doc. 50 at 43-47.) Hansen claims that these actions constitute violations of the FCA's anti-retaliation provision, also known as the whistleblower provision, 31 U.S.C. § 3730(h). (*Id.* at 50-51.) Defendants have moved to dismiss, arguing that the first amended complaint fails to show that Hansen was engaged in protected activity or that Defendants had notice of any such activity. (Doc. 63 at 23-26.) Hansen responds that Defendants' understanding of § 3730(h) relies on an outdated, more restrictive version of this provision. (*See* Doc. 69 at 28-31.)

The current version of § 3730(h), which took effect as of May 2009, states as follows:

> Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1) (2012). Because the allegations at issue here cover the period after Hansen was hired by Mimbres in May 2010, this version of the statute applies to Hansen's claim.

This version of § 3730(h), enacted as part of the Fraud Enforcement and Recovery Act of 2009 ("FERA") and amended in 2010, represents a significant expansion of protection[13] for FCA whistleblowers. *See* Pub. L. No. 111-21, § 4(f), 131 Stat. 1617 (2009); *see also* Pub. L. No. 111-203, § 1079A(c)(1), 124 Stat. 1376 (2010). Still, in a general sense, the elements of an action under § 3730(h) remain the same as those in effect prior to 2009: to state a claim, a plaintiff must allege that (1) her employer had notice that she was engaged in activity protected under the FCA,[14] and (2) she was discharged or discriminated against because of her protected conduct. *See* 31 U.S.C. § 3730(h)(1); *U.S. ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1522 (10th Cir. 1996); *see also, e.g.*, *Jewell v. Lincare, Inc.*, 810 F. Supp. 2d 340, 343 (D. Me. 2011) (continuing to apply the pre-FERA elements to a post-FERA claim). Defendants challenge only the first element. (*See* Doc. 63 at 23.)

Under the previous version of the anti-retaliation provision, a plaintiff had been required to plead facts showing that she had given notice to her employer that she was engaged in "lawful acts done . . . in furtherance of an action under [the FCA]." *See Ramseyer*, 90 F.3d at 1522 (quoting 31 U.S.C. § 3730(h) (2006)); *see also id.* ("If defendants were not afforded such notice, then, *a fortiori*, their actions could not constitute retaliation."). An employee could provide such

---

[13] The earlier version of the provision, 31 U.S.C. § 3730(h) (2006), stated in relevant part:

Any employee who is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment by his or her employer because of lawful acts done by the employee on behalf of the employee or others in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section, shall be entitled to all relief necessary to make the employee whole.

[14] Although both parties cite to authority that treats "protected activity" and "notice" as separate elements, the Tenth Circuit considers these concepts together. *See, e.g.*, *Ramseyer*, 90 F.3d at 1522. This approach is common. *See, e.g.*, *Mann v. Heckler & Koch Defense, Inc.*, 630 F.3d 338, 344 (4th Cir. 2010) ("Combining the protected activity and notice elements is a perfectly reasonable approach when both elements are in dispute.").

notice "by warning the employer of regulatory noncompliance and false reporting of information to a government agency." *McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 704 (10th Cir. 2012) (citing *Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927 (8th Cir. 2002)). However, "merely informing the employer of regulatory violations, without more, [would] not provide sufficient notice, because doing so [gave] the employer 'no suggestion that [the plaintiff was] going to report such noncompliance to government officials' or bring 'her own qui tam action.'" *Id.* (quoting *Ramseyer*, 90 F.3d at 1523).

By contrast, the current version of the statute requires notice to the employer that the employee was engaged in "lawful acts done . . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations of [the FCA]." *See* 31 U.S.C. § 3730(h)(1) (2012). Although the Tenth Circuit has not expressly considered the effect of this new language on its jurisprudence, its pre-FERA precedent may be reconciled with the new statutory language by recognizing that an employee must give her employer sufficient notice that she is either pursuing an FCA action or otherwise attempting to stop FCA violations. *Cf. Ramseyer*, 90 F.3d at 1522-23. In a case alleging violations of § 3729(a)(1)(A)-(B), this means that activity was protected under § 3730(h)(1) only if it consisted of efforts to stop the employer from either presenting a false claim for payment or making a false record or statement material to a false claim. In other words, the employer must have been on notice that the employee was engaged in efforts to prevent fraud on the government. *See Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 186 (3d Cir. 2001) (holding that the "in furtherance of" language requires a nexus between protected activity and anti-fraud efforts); *McKenzie v. Bellsouth Telecomms., Inc.*, 219 F.3d 508, 515 (6th Cir. 2000) (same); *see also Guerrero v. Total Renal Care, Inc.*, No. EP-11-CV-449-KC, 2012 WL 899228, at *4-5 (W.D. Tex. Mar. 12, 2012) (unpublished) (finding that the "nexus"

requirement remains intact post-FERA and that "concerns about general misconduct" do not fall under "protected activity").

Hansen's arguments to the contrary are in vain. She points to legislative history stating that FERA was intended to expand FCA whistleblower protection to employees who refused to participate in fraudulent activities and who reported such activities to a supervisor, a position that not all courts accepted under the previous statute. (*See* Doc. 69 at 30.) She also cites to pre-FERA caselaw holding that a relator "need not have known that his actions could lead to a qui tam suit under the FCA, or even that a False Claims Act existed," to be protected under § 3730(h). (*Id.* (quoting *Karvelas v. Melrose-Wakefield Hospital*, 360 F.3d 220, 237 (1st Cir. 2004)).) Yet these principles, though accurate and well-taken, do not obviate the plain language of the statute requiring a nexus between protected activity and fraud that is actionable under the FCA. *See* 31 U.S.C. § 3730(h)(1). Nor does anything in the revised statute remove the requirement that Defendants must be on notice of this activity and its nexus to FCA violations. *See McBride*, 688 F.3d at 704.

Therefore, while an employee's warnings to her employer of regulatory noncompliance and false reporting to the government may serve in part to provide notice to the employer of protected activity, something more is still required. *See id.* (citations omitted). An employee's FCA whistleblower claim may only succeed if her actions suggested to the employer that she was seeking to prevent fraud on the government. *Cf. id.*; *Karvelas*, 360 F.3d at 237 (recognizing that activities are only "protected" for FCA whistleblower purposes if they "concern the employer's knowing submission of false or fraudulent claims for payment to the government"). Even allegations of document destruction that "suggest[] a cover-up of regulatory failures but

do[] not allege investigation or reporting of false or fraudulent claims knowingly submitted to the government" will not satisfy this requirement. *See Karvelas*, 360 F.3d at 237.

Hansen, who worked as a medical technologist at Mimbres, alleges that she "raised concerns" about CLIA violations to Bossell and a colleague and that she later "reiterated her concerns about the numerous CLIA violations" to Bossell. (Doc. 50 at 44.) She also spoke to Mimbres's human resources director "about the violations she had found" and her colleagues' "refusal to address the serious health and safety issues she had raised." (*Id.*) Later, she warned Mimbres's corporate compliance officer that the microbiology division "needed to be shut down because of all of the violations in that department." (*Id.* at 45.) She also warned superiors that a colleague was falsifying documents "to make it appear that Defendants had conducted quality control testing that had not been done." (*Id.*) Finally, she wrote a letter to Mimbres's chief executive officer "cit[ing] the inadequate Procedures Manual and lack of quality control testing" and notifying him that she had contacted the state health department "about testing procedures that were not being done properly." (*Id.*)

As described in her first amended complaint, Hansen's investigatory and reporting efforts were concerned exclusively with regulatory violations and patient care concerns. Moreover, nothing in Hansen's allegations suggests that she raised any concerns with Defendants regarding fraudulent billing, false claims, or any other activity that might be covered under the FCA. To the contrary, her statements to Defendants raised concerns about quality control, documentation, and CLIA violations; there is no reference to any statements regarding fraudulent claims or Medicare billing practices. Even Hansen's statement that she reported her colleague's falsification of quality control documentation "suggests a cover-up of regulatory failures" rather than alleging efforts to address false claims. *Cf. Karvelas*, 360 F.3d at 237.

While Hansen's allegations allow me to infer that Defendants were on notice that she was investigating and reporting on CLIA violations, these statements alone do not plausibly allege sufficient notice to Defendants that she was engaged in efforts to stop fraudulent conduct that would be actionable under the FCA. Accordingly, Hansen has failed to state a claim under § 3730(h), and her claim under that provision must be dismissed.

## IV.    State Law Claims

In addition to bringing the aforementioned claims under the FCA, Hansen has brought parallel claims under the New Mexico Medicaid False Claims Act, N.M. STAT. ANN. § 27-14-1 *et seq.*, and the New Mexico Fraud Against Taxpayers Act, *id.* § 44-9-1 *et seq.* (Doc. 50 at 50-51.) Plaintiff has asserted that jurisdiction exists over these claims pursuant to 28 U.S.C. § 1367 as well as under a provision of the FCA governing state law claims arising from the same transaction or occurrence as an FCA action, 31 U.S.C. § 3732(b). (*Id.* at 7.)

Section 3732(b), like § 1367, only confers supplemental jurisdiction over state law claims; it does not "federalize" those claims. *In re Pharm. Indus. Average Wholesale Price*, 509 F. Supp. 2d 82, 94 (D. Mass. 2007); *see also, e.g.*, *Wisconsin v. Amgen, Inc.*, 516 F.3d 530, 532 (7th Cir. 2008). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). I see no reason why this case would depart from "the usual case," and I note that the statute of limitations has not yet run on Hansen's claims. *See* N.M. STAT. ANN. § 27-14-13(A) (four-year statute of limitations on New Mexico Medicaid False Claims Act claims); *id.* § 44-9-12(A) (no statute of limitations on New Mexico Fraud Against Taxpayers Act claims). Because

all federal claims have been dismissed, I will decline to exercise jurisdiction over Hansen's remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *see also, e.g.*, *U.S. ex rel. Digital Healthcare, Inc. v. Affiliated Computer Servs., Inc.*, 778 F. Supp. 2d 37, 54-55 (D.D.C. 2011).

## V.     Leave to Amend FCA Claims

Finally, Hansen twice requests leave to amend her complaint a second time in footnotes near the end of her response brief. Her final footnote includes a cursory, blanket request for leave to amend "if the Court concludes that dismissal of any of her claims is appropriate." (Doc. 69 at 31 n.19.) However, this single-sentence contingent request for leave to amend, "lacking a statement for the grounds for amendment and dangling at the end of her memorandum, d[oes] not rise to the level of a motion for leave to amend." *Calderon v. Kan. Dep't of Soc. & Rehab. Servs.*, 181 F.3d 1180, 1187 (10th Cir. 1999). As there is no Rule 15(a)(2) motion before me, Hansen is not entitled to the leniency afforded to movants under that rule. Further, because Hansen gives no reason as to why I should afford her leave to amend and proposes no changes to her claims, I will decline to consider her blanket request. *See United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004) ("The court will not consider such issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation." (citation and internal punctuation omitted)).

Earlier in her brief, Hansen more specifically requests leave "to expressly plead a worthless services theory" of FCA liability. (Doc. 69 at 28 n.16.) Although Defendants' first motion to dismiss put her on notice that they were challenging the FCA claim in her original complaint under the false certification and promissory fraud theories of liability (*see* Doc. 45 at 8-15, 20), Hansen failed to include any alternative theories of liability in her first amended complaint, and she only raised the worthless services theory in opposition to the instant motion

44

(Doc. 69 at 26-28). Accordingly, the same principles discussed in the preceding paragraph apply to this particular request, with the added observation that Hansen's request may also be denied due to her "repeated failure to cure deficiencies by amendments previously allowed." *See Foman v. Davis*, 371 U.S. 178, 182 (1962).

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss Hansen's first amended complaint (Doc. 62) is GRANTED. Counts I and III of the first amended complaint, governing Hansen's claims of violations of the False Claims Act, 31 U.S.C. §§ 3729(a)(1)(A)-(B), (G) and 3730(h), are dismissed with prejudice. Counts II and IV, governing Hansen's claims of state law violations, are dismissed without prejudice.

IT IS SO ORDERED.

William P. Lynch
United States Magistrate Judge

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.