## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and STATE OF NEW MEXICO, *ex. rel.* | ) ) ) | |
| SALLY HANSEN, Relator; | ) ) | |
| Plaintiffs, | ) ) | **No. 2:11-cv-566-WPL-CG** |
| v. | ) ) ) | |
| DEMING HOSPITAL CORPORATION d/b/a MIMBRES MEMORIAL HOSPITAL, COMMUNITY HEALTH SYSTEMS, INC., COMMUNITY HEALTH SYSTEMS PROFESSIONAL SERVICES CORP., and JERRY BOSSELL, | ) ) ) ) ) | |
| Defendants. | | |

### PLAINTIFF-RELATOR FED.R.CIV.P. 59(E) MOTION FOR RECONSIDERATION

#### INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 59(e), Relator Sally Hansen respectfully requests that the Court reconsider its November 21, 2013 Order dismissing Relator's First Amended Complaint ("1AC") and, upon reconsideration, grant her leave to file a Second Amended Complaint ("2AC"). A motion seeking leave to file a Second Amended Complaint, along with a proposed Second Amended Complaint, is being filed concurrently with this motion.

#### ARGUMENT

A court has discretion to grant a Rule 59(e) motion to reconsider when it "has misapprehended the facts, a party's position, or the controlling law." *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1228 (10th Cir. 2009) (internal quotation marks omitted). "Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new

evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Relator respectfully submits that reconsideration is appropriate because: (1) new evidence that was not available when the Defendants moved to dismiss shows that the CLIA violations at issue here were material; and (2) the Court misapprehended the facts and the controlling law.

Relator moves that, upon reconsideration, the Court set aside the judgment and grant her leave to amend. In addition, Relator respectfully requests that the Court reconsider its dismissal of Relators' claim for retaliation and her *qui tam* claims under the federal False Claims Act.

I. The Court Should Set Aside the Judgment So that Relator May Amend the Operative Complaint to Address the Deficiencies Identified by the Court

Upon reconsideration, Relator requests that she be granted leave to amend to file a Second Amended Complaint. *Combs v. PriceWaterhouse Coopers LLP*, 382 F.3d 1196, 1205 (10th Cir. 2004) ("After a district court enters a final judgment, as occurred here, it may not entertain motions for leave to amend unless the court first sets aside or vacates the judgment pursuant to Fed. R. Civ. P. 59(e) or 60(b)".) The Federal Rules of Civil Procedure provide wide latitude for amending pleadings so that cases may be decided on the merits. *See Triplett v. LeFlore Cnty., Okl.*, 712 F.2d 444, 446-47 (10th Cir. 1983). "In the absence of an apparent reason to refuse leave to amend—such as undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, futility of an amendment, etc.—the leave sought should, as the rules require, be freely given." *Id.* (internal quotations omitted). No such reasons exist here. Although the Court generally cited the fact that repeated failure to cure deficiencies justified denying leave to amend here, Relator respectfully submits that is not the case. Relator had previously only amended her complaint once, as a matter of right. Relator has not acted in bad faith or caused delay, and there is no prejudice to the Defendants. Moreover, as described in detail below, Relator's

2

proposed Second Amended Complaint ("2AC"), attached as Exhibit 1 to her motion for leave, cures the deficiencies identified in the Court's dismissal order.

A. <u>Relator Pleads Additional Facts That Address the Court's Finding That The First Amended Complaint Did Not Meet the Materiality Element of a False Claims Act Case</u>

The Court held that Relator had not pled facts sufficient to establish the materiality element of a False Claims Act case. While the Court largely adopted the rubric of "conditions of payment" versus "conditions of participation," the Court acknowledged that those terms "are proxies for establishing materiality." (Court's November 21, 2013 Order Granting Defendants' Motion to Dismiss, Dkt. No. 87 ("Order"), at 26.)  According to the Court, Relator had failed to demonstrate that CLIA compliance and CLIA certification are material to the decision of the United States and/or the State of New Mexico to pay for lab services for Medicare and Medicaid patients. Relator now pleads additional facts that support a finding of materiality.

First, since filing her First Amended Complaint, Relator has become aware that the State of New Mexico determined that there was "substantial evidence" that Defendants had committed a violation of the New Mexico Medicaid False Claims Act. Further, Relator learned recently that the State of New Mexico is seeking to recover prior Medicaid payments of $296,567.36 for improper billing based on the CLIA violations it found after investigating Relator's claims. These additional facts are included in Relator's proposed amendment. *See* 2AC, ¶¶ 179-80. They demonstrate definitively that the government does, in fact, consider CLIA violations – at least those of the type and magnitude alleged herein – to be material to its payment decision.

Indeed, these new facts demonstrate the extent to which *United States ex rel. Conner v. Salina Regional Health Ctr.*, 543 F.3d 1211 (10th Cir. 2008), a case on which the Court relies heavily, is quite different from the circumstances at issue here. *Conner* involved allegations based on "the broader theory that a cost report certification could expressly condition all Medicare payments on compliance with the full host of technical Medicare requirements." *Id.* at 1223. Here, the claims stem from numerous, substantial violations of CLIA, a specific Medicare-required statute involving lab testing that expressly grants the government the authority

both to revoke the certification required to obtain Medicare payments and to cancel a lab's eligibility to receive Medicare payments based on violations of the statute. The *Conner* court, foreseeing exactly such a distinction, noted that its holding on the facts before it did "not preclude the possibility that certain Medicare statutes or regulations might expressly or implicitly condition payment on certification of compliance under a false certification theory." *Id.* at 1222. And further, the *Conner* court acknowledged that some regulations may be sufficiently integral to payment that they "make any divide between conditions of participation and conditions of payment a distinction without a difference." *Id.* at 1222 (quoting *Hendow*, 461 F.3d at 1177). CLIA is exactly such a regulation, as demonstrated by the State's effort to recoup Medicaid payments for Defendants' lab services that failed to meet CLIA's minimum requirements for reliable and accurate testing and therefore should not have been performed or billed to Medicaid.

Second, Relator's proposed Second Amended Complaint also sets forth additional allegations emphasizing that the CLIA violations alleged herein are Condition-level violations for which revocation or suspension of a lab's CLIA certification is the "principal sanction." *See, e.g.*, 2AC ¶¶ 181-83, 188. Relator further alleges based on a review of CMS data that it regularly revokes CLIA certification based on the failure to follow one or more Condition-level requirements, and that in some instances CMS seeks revocation or suspension of CLIA certification without affording a lab the opportunity to correct deficiencies. These actions are routinely upheld in administrative proceedings. 2AC ¶ 182-83. Relator additionally alleges detailed statistics showing that CMS routinely revokes or suspends CLIA certification or cancels a lab's approval to collect Medicare payments for lab testing; indeed, in total it did so more than 500 times in the last five years. *See* 2AC ¶ 185.

These additional allegations are aimed at addressing the Court's overarching conclusion that CLIA violations (without much more) do not result in the withholding of Medicare payments, and therefore are not material violations. (*See, e.g.*, Order at 32.)  While in some instances the government may choose an alternative sanction, it can and does choose to use its principal sanction. Nothing more is required to establish

4

materiality. *See, e.g.*, *United States ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1170 (10th Cir. 2010) ("[M]ateriality does not require a plaintiff to show conclusively that, were it aware of the falsity, the government would not have paid. Rather it requires only a showing that the government may not have paid.").[1]

Third, Relator's proposed amendment includes additional allegations about Mimbres' effort to obtain re-certification in October 2011. In particular, Mimbres was required to submit an application to renew its certificate of accreditation in or around October to December 2010, nine to twelve months before its two-year certification was set to expire in October 2011. See 42 CFR 493.61(h)(1); 2AC ¶ 157. In that application, it expressly certified that "*such laboratory identified herein will be operated in accordance with applicable standards found necessary . . . to carry out the purposes of [CLIA]."* Defendants knew that statement was false when it was made. Mimbres had not been in compliance with CLIA for more than a year, was not in compliance at the time of the certification, and continued to remain out of compliance for at least another year. These additional allegations, 2AC ¶ 156, bolster Relators' detailed allegations that, at the time of Defendants' representations to obtain CLIA certification, it was actively concealing information and misrepresenting its compliance with CLIA, as well as falsifying records to deceive the certifying body. 2AC ¶¶142-162. For example, in the fall of 2010, Defendants' corporate compliance representatives came to Mimbres and found numerous violations, including that quality control logs had been falsified. 2AC ¶ 153. Many of the violations were long-standing, recurring problems, and remained unresolved when corporate representatives conducted another survey in June 2011. 2AC ¶ 158. Yet, in late 2010, Defendants were certifying to the Joint Commission that they had

---

[1] The Court suggests that *Lemmon's* holding regarding materiality is taken from *Conner* and can be distinguished on its facts. (Order at 32.) But *Conner* is not the first case to cite this standard, nor are *Conner* and *Lemmon* outliers for the point that materiality requires only that the government might or may not have paid. To the contrary, this point is repeated in another, earlier Tenth Circuit case, and a number of other cases as well. *U.S. ex rel. Bahrani v. Conagra, Inc.*, 465 F.3d 1189, 1204 (10th Cir. 2006) (violation is material if it "might cause [government] to actually refuse payment'" and further stating in false claims case that materiality inquiry "focuses on the *potential effect* of the false statement when it is made, not on the actual effect of the false statement when it is discovered" (quoting *United States ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Group, Inc.*, 400 F.3d 428, 445 (6th Cir. 2005)) (emphasis in original)); *Conner*, 543 F.3d at 1221 (materiality if "might cause [government] to actually refuse payment"); *see also United States v. Rogan*, 517 F.3d 449, 452 (7th Cir. 2008) (rejecting defendant's argument that FCA liability requires "that the government was sure to enforce the statute," and stating that the relevant question concerning materiality is whether the alleged violations "could have influenced the agency's decision"); *United States ex rel. Sanchez-Smith v. AHS Tulsa Reg. Med. Ctr.*, 754 F.Supp.2d 1270, 1297-98 (N.D. Ok. 2010).

resolved CLIA violations and were CLIA compliant, all the while concealing that the Microbiology department had been shut down and that numerous other CLIA violations persisted. 2AC ¶¶ 156-59.

And a lab that has been guilty of misrepresentations in obtaining a CLIA certificate may have its CLIA certification revoked on this sole, independent basis. *See* 2AC ¶¶ 34 (authorizing CMS to seek the revocation or suspension of a laboratory's CLIA certificate if it is "guilty of misrepresentation in obtaining a CLIA certificate," 42 C.F.R. § 1840(a)), 41 (under the Joint Commission's accreditation rules, "[a]ny hospital that fails to participate in good faith by falsifying information or by failing to exercise due care and diligence to ensure the accuracy of such information may have its accreditation denied or removed by The Joint Commission."). Moreover, as Relators further allege in the Second Amended Complaint, CMS uses this authority. *See* 2AC ¶ 185.

These additional allegations show that, in fact, the government can and does revoke CLIA certification, and both in conjunction with that and independently will also suspend eligibility for Medicare and Medicaid payments for improperly-performed lab tests. The violations here – not trivial efforts to enforce perfect compliance but rather detailed allegations of pervasive violations of Condition level requirements and fraudulent concealment of CLIA noncompliance – clearly authorize the government to take these steps. Because such steps necessarily preclude the payment of Medicare or Medicaid funds for lab testing, the violations directly implicate, and are therefore material to, government payments. In addition, the State of New Mexico is seeking to recoup past Medicaid payments for some of the alleged CLIA violations, further demonstrating that the substantial CLIA violations alleged herein are in fact material to government payors. In so alleging, Relators have addressed the materiality concerns raised in the Court's Order.

B.   Relator Pleads Additional Facts That Bolster Her Worthless Services Claim

The Court also held that Relator had not presented sufficient allegations to support FCA liability under the worthless services doctrine. Relator's proposed Second Amended Complaint cures this by putting forth specific allegations that the lab testing at issue was so unreliable as to be utterly devoid of value. Indeed, Relator alleges that the failure to meet the "minimum standards" promulgated under CLIA results in lab testing that is not only worthless, but harmful.

Relator's additional allegations begin with the very purpose of CLIA: to ensure "valid and reliable laboratory examinations and other procedures. 42 U.S.C. 263a(f)(1); 2AC ¶ 186. Testing that fails to meet CLIA's minimum standards is considered unreliable and cannot be used for purposes of diagnosis and treatment. In other words, testing not done in compliance with CLIA is, by definition, unusable, and therefore worthless. 2AC ¶ 186. Moreover, CLIA was enacted in part on the understanding that inaccurate, unreliable lab testing is not only worthless, but harmful. 2AC ¶ 187. CLIA came in the wake of reports that shoddy lab testing involving Pap Smears resulted in the failure to timely diagnose and treat cervical cancer, resulting in preventable deaths. *Id.*

Relator further alleges that CLIA regulations themselves reinforce that for certain types of quality control and testing, CLIA minimum standards must be met before those lab tests can even be reported for use in patient diagnosis and treatment. In other words, CLIA regulations themselves deem the failure to meet certain minimum standards to cause the improperly-performed lab tests to be so unreliable that they cannot be reported, and are therefore worthless. 2AC ¶ 187. Relator then provides a number of specific examples of CLIA requirements that mandate the performance of particular quality control testing before any lab results can be reported (these requirements apply to many of the improper lab testing at issue in this case). *Id.* Relator additionally alleges that tests found to be erroneous are considered useless and must be re-done. Indeed, in such instances CLIA requires the lab to promptly inform the physician that ordered the test, and "issue corrected reports promptly to the authorized person ordering the test and, if applicable, the individual using the test results." 42 C.F.R. § 493.1291(k); 2AC ¶ 188-89.

Relator also expressly alleges that the violations here are not minute technicalities but Condition-level violations. "Since each 'condition' represents a major division of laboratory services to be offered by the laboratory or an important safety requirement, failure by a laboratory to comply with even a single applicable condition can represent a critical breakdown in one of the major health

care delivery or safety systems of the laboratory justifying revocation of the laboratory's CLIA certificate. 42 C.F.R. § 493.1804(b)." 2AC ¶ 181.

In addition to statutory and regulatory support, Relator also alleges that CLIA violations at Mimbres resulted in false negatives that placed patients and the community in danger. Relator alleges, for example, an instance in 2011 when Defendants' faulty testing resulted in the failure to identify an instance of Tuberculosis, as a result of which an infected and contagious patient was allowed back into the community without treatment. The sample that Mimbres found to be a false negative was later found by the state laboratory to be positive for Tuberculosis. Relator cites a similar instance in 2012, and other evidence of misdiagnosis resulting from erroneous lab testing. 2AC ¶ 190.

Finally, Relator alleges other examples of serious ramifications resulting from the failure to meet CLIA's minimum standards; further demonstrating that improper testing is not only worthless but harmful. For example, Relator refers to studies that indicate that 26% or more of mistakes in labs negatively affect patient outcomes; and further alleges that a test which will result in misdiagnosis and mistreatment resulting in harm to the patient one out of every four times is inherently unreliable and cannot be used by physicians in diagnosing and treating patients. 2AC ¶ 192. Relator further alleges a view in the health care community that improperly-performed lab testing is "spurious." 2AC ¶¶ 193-194.

These additional allegations, independently and collectively, demonstrate that the serious and substantial CLIA violations at issue here render the associated lab tests "so deficient that for all practical purposes it is the equivalent of no performance at all." (Order, at 34.)  Indeed, the allegations here are of pervasive violations touching nearly aspect of the testing process: an incompetent Lab Director, untrained lab personnel, incomplete and outdated Procedure Manuals, missing and made up quality logs and other documentation, the initial failure to conduct verification

studies before using new equipment, and the ongoing failure to perform quality control testing and testing on control organisms to ensure the accuracy and reliability of test equipment and procedures. In this way, the additional allegations address the shortcomings found by the Court.[2]

II.     Newly Available Evidence And the Court's Misapprehension of the Facts and Law Warrant Reconsideration of the Dismissal of Relator's Case with Prejudice

A.  Reconsideration of the Denial of Leave to Amend

Relator seeks to amend to include newly available information. In addition, under controlling law leave to amend should be freely given where, as here, there is no claim of bad faith or dilatory conduct. For the reasons set forth in Part I, *supra*, Relator respectfully requests that the Court reconsider its denial of leave to amend, and instead set aside the judgment and grant Relator leave to file the proposed Second Amended Complaint.

B.  Newly Available Evidence Demonstrates That the CLIA Violations Alleged Here Are Material to the Government's Payment Decision

As discussed above, since filing the First Amended Complaint, Relators have learned of new evidence that the State of New Mexico found "substantial evidence" that Defendants committed violations of the New Mexico Medicaid False Claims Act; and only very recently did Relators learn that the State is seeking to recover Medicaid payments of $296,567.36 for improper billing based on the CLIA violations it found. This additional information demonstrates definitively that, in fact, the CLIA violations alleged here are sufficiently serious that the government can and has sought reimbursement for lab services that should have never been reported for patient diagnosis and treatment and should have never been billed.

---

[2] Relators' worthless services claim is viable regardless of how the Court rules on Relators' motions for reconsideration and to amend regarding claims based on a false certification and promissory fraud theories. This is because FCA liability attaches on a worthless services claim "irrespective of any certification."Mikes v. Straus, 274 F.3d 687, 702 (2nd Cir. 2001). As such, several otherwise applicable FCA elements are eliminated on a worthless services claim: "Neither false certification nor a showing of government reliance on false certification for payment need be proven if the fraud claim asserts fraud in the provision of goods and services." *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d, 1048, 1053 (9th Cir. 2001); *see also Mikes*, 274 F.3d at 702; *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 468-69 (6th Cir. 2011).

As the Court acknowledges, "the court is examining whether a contractor's false certification was material to the government's payment decision." Put differently, would the government seek reimbursement of Medicare or Medicaid funds for the violations of CLIA alleged in this case? The State of New Mexico has made clear that the answer is yes – the CLIA violations here are material to the government, and the government has sought reimbursement for the payments it made. With the benefit of this newly-available information, Relator respectfully submits that it would be improper to find that, as a matter of law, the CLIA violations alleged here are not material to the government's payment decision.[3] As a result, the Court should reconsider its prior ruling dismissing Relator's claims under the false certification and promissory fraud theories.

C.   The Court Misapprehends the Facts and Law Related to Relator's Promissory Fraud and False Certification Theories

The Court's ruling on Relator's promissory fraud theory should be reconsidered for three independent reasons. First, in analyzing Relator's promissory fraud claim, the Court failed to consider the detailed factual allegations in the First Amended Complaint that Defendants concealed CLIA violations, falsified records, and submitted a fraudulent application for CLIA certification; all of which authorize the government and/or the Joint Commission to revoke Defendants' CLIA certification (and therefore automatically cancels their eligibility for Medicare and Medicaid payments). Second, the Court committed an error of law by granting immunity from FCA liability for any statute or regulation that contains remedies short of denial of payment (even if it also authorizes the government to deny payment or revoke a certification required for payment), in contravention of Tenth Circuit caselaw and numerous cases allowing False Claims Act liability for

---

[3] The money the State is seeking is for a portion of the CLIA violations alleged in the First Amended Complaint. The State has decided that it is in its best interests to allow Relator to pursue claims on its behalf through the NM FCA and FATA, while the State also pursues administrative remedies against Defendants for a portion of the CLIA violations alleged in Relator's First Amended Complaint. Therefore, Relator's claims under the FCA, NM FCA and FATA do not interfere with the State's administrative enforcement procedures, but rather complement them.

violations of regulations and statutes that contain a remedial scheme. Third, the Court misapplies the law to the facts of this case by discounting the thrust of Relator's allegations: that Defendants were engaged in rampant and recurring CLIA violations, nearly any one of which would independently authorize the government to suspend Medicare and Medicaid payments, and which in the aggregate would result in revocation of CLIA certification even if the government were to initially choose to apply an alternative sanction.

1. *The Court Failed to Consider Factual Allegations of Doctored and Falsified Records in Considering Relator's Promissory Fraud Claim*

Relator alleges that Defendants concealed information, doctored quality records, misrepresented successful corrective actions, and submitted false and fraudulent certification of ongoing compliance with CLIA requirements. All of these falsehoods were presented to the Joint Commission, as a result of which Defendants were able to avoid having their CLIA certificate of accreditation revoked or suspended, and to instead get their certificate of accreditation renewed in October 2011. 1AC ¶¶ 141-160.

Separate and apart from Condition-level CLIA violations, these falsehoods independently authorize the government and the Joint Commission to seek the revocation, suspension or denial of CLIA certification. Accordingly, these allegations are sufficient to establish materiality under Tenth Circuit caselaw. *See, Lemmon*, 614 F.3d at 1170 ("[M]ateriality does not require a plaintiff to show conclusively that, were it aware of the falsity, the government would not have paid. Rather it requires only a showing that the government may not have paid."); *Conner*, 543 F.3d at 1221; *Bahrani*, 465 F.3d at 1204.

Relator respectfully submits that in considering Relator's promissory fraud claim, the Court failed to consider these factual allegations, including the CLIA regulations authorizing the government to revoke certification and suspend approval for payments. Those regulations are set forth in the First Amended Complaint as follows:

> Relators also allege that CMS has the authority to seek the revocation or suspension of a laboratory's CLIA certificate if it is "guilty of misrepresentation in obtaining a CLIA

11

certificate," "[f]ailed to comply with the certificate requirements and performance standards," or "violated or aided and abetted in the violation of any provisions of CLIA and its implementing regulations," 42 C.F.R. § 493.1840(a). 1AC ¶ 33.

The Joint Commission standards also set forth specific Accreditation Participation Requirements. Among them, Mimbres represents that it will provide accurate and truthful information to the Joint Commission throughout the accreditation process. Under its accreditation rules, "[a]ny hospital that fails to participate in good faith by falsifying information or by failing to exercise due care and diligence to ensure the accuracy of such information may have its accreditation denied or removed by The Joint Commission." 1AC ¶ 40.

The Court's Order does not address Relators' factual allegations in its discussion of Relator's promissory fraud claim; and it does not address Relators' citation to these fraud/falsification provisions. But what these allegations demonstrate is that the conduct Relator alleges – providing false and misleading information, and doctoring records – grants the government the authority to revoke CLIA certification, and to do so without any requirement that the wrongdoer be given opportunity to correct deficiencies. The government can and does exercise its authority to revoke certification on this basis. And, because under CMS rules "it always cancels a laboratory's approval to receive Medicare payment for its services if CMS suspends or revokes the laboratory's CLIA certificate," 42 C.F.R. § 493.1842, 1AC ¶ 34, there is a clear and direct nexus between the fraudulent conduct Relators alleges and the submission of false claims. The misconduct related to these factual allegations, and the associated CLIA violations, are therefore material.

2. *The Court Misapplied Controlling Law By Granting Blanket Immunity From FCA Liability for Violations of Statutes or Regulations With a Remedial Scheme That Contains Sanctions Short of Denying Payment*

The Court's ruling, taken to its logical conclusion, would grant immunity from FCA liability – under a fraudulent inducement theory, or any other theory – for violations of any statute or regulation that grants the government the authority to suspend payments or expel someone from a government program, but happens to also grant it the opportunity to choose some penalty short of

12

expulsion from the government program. This massive carve-out from FCA liability is in error for several reasons.

First, it is contained nowhere in the FCA's remedial scheme, and instead is contrary to its purpose. The statute's prohibitions are broad, and include both false claims *and statements made in support of false claims*. 31 U.S.C. § 3729(a)(1) (emphasis added). The theories of fraud available to pursue these prohibitions are equally broad. As the Supreme Court has explained, in enacting the FCA, "Congress wrote expansively, meaning 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *Cook County, Illinois v. United States ex rel. Chandler*, 538 U.S. 119, 129 (2003), *aff'd*, 538 U.S. 119 (2003) (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 233 (1968)); *accord United States ex rel. Koch v. Koch Industries, Inc.*, 1995 WL 812134, at *14 (N.D. Ok. Oct. 6, 1995) (same, and further stating that "the Court has refused to accept a rigid, restrictive reading of the statute." (quoting *United States v. Douglas*, 626 F.Supp. 621 (E.D. Va. 1985))). Broad, prospective exemptions from FCA liability are anathema to the FCA's very purpose. *See, e.g.*, *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 541 n. 5 ("The FCA is a remedial statute. It is intended to protect the treasury against the hungry and unscrupulous host that encompass it on every side, and should be construed accordingly."); *Shaw v. AAA Engineering & Drafting, Inc.*, 213 F.3d 519, 531 (10th Cir. 2000) ("The Senate Committee on the Judiciary noted a false claim under the FCA may take many forms, the most common being a claim for goods or services not provided, *or provided in violation of contract terms, specification, statute, or regulation*." (quoting S.Rep. No. 99-345 at 9, *reprinted in* 1986 U.S.C.C.A.N. at 5274) (emphasis added)).

Second, such blanket immunity is contrary to the holding of Tenth Circuit cases such as *Lemmon*, *Conner*, and *Bahrani*, all of which explain that the materiality prong necessary for FCA liability requires showing only that the government *might* not pay. The holding of these cases makes perfect sense, because one cannot look back and know with any certainty whether the government,

13

had it known of the misconduct, would have chosen one available remedy or another (here, the "principal sanction" is revocation of certification and suspension of Medicare payments). The Court, however, takes the opposite view: that Relator's promissory fraud claim fails because she fails to show that the violations alleged would "*force* the government to deny a contractor either continued participation in Medicare or continued payment." (Order, at 30.) This is contrary to controlling Tenth Circuit caselaw. *See, Lemmon*, 614 F.3d at 1170 ("[M]ateriality does not require a plaintiff to show conclusively that, were it aware of the falsity, the government would not have paid."); *Bahrani*, 465 F.3d at 1204 (holding in false claims case that materiality inquiry "focuses on the *potential effect* of the false statement when it is made, not on the actual effect of the false statement when it is discovered"); *see also Rogan*, 517 F.3d at 452 (rejecting defendant's argument that FCA liability requires "that the government was sure to enforce the statute," and stating that the relevant question concerning materiality is whether the alleged violations "could have influenced the agency's decision").

Third, the Court adopts Defendants' argument that the mere possibility of interference with agency enforcement procedures warrants blanket, prospective relief from FCA liability for violations of certain statutes or regulations, regardless of the severity of the conduct alleged or the magnitude of the fraud. (Order, at 16-17, 30.)  This holding contravenes ample caselaw regarding the False Claims Act.

FCA liability does not interfere with agency enforcement procedures; to the contrary, it complements them. Congress intended the FCA to be a parallel enforcement mechanism. *See, e.g.*, *U.S. ex rel. Onnen v. Sioux Falls Independent School Dist. No. 49-5*, 688 F.3d 410, 415 (8th Cir. 2012) ("Congress intended to allow the government to choose among a variety of remedies, both statutory and administrative, to combat fraud.").[4] Thus, courts routinely reiterate the FCA's role as a parallel

---

[4] The *Onnen* Court even acknowledged cases delving into the "fact-intensive" and "complex" issue of whether particular regulatory requirements were conditions of payment or participation, but noted that "none of these cases has held that a complex regime of regulatory sanctions precludes the Attorney General from suing

mechanism of enforcement. *See, e.g.*, *United States ex rel. Sobek v. Educ. Mgmt. LLC*, No. 10-cv-131, 2013 WL 2404082, at *4 (W.D. Pa. May 31, 2013) ("The existence of an administrative enforcement mechanism does not preclude the possibility of an FCA claim.") (citation omitted).

And in decisions approving relators' FCA claims specifically in the Medicare context, courts have expressly referenced these parallel remedies. *See, e.g.*, *United States v. MedQuest Assocs., Inc.*, 812 F. Supp. 2d 821, 867 (M.D. Tenn. 2011) ("There are several remedies for violations of Medicare regulations and policies. In addition to administrative sanctions, the remedies include the enforcement of the FCA that is committed to the Attorney General. The Court lacks the authority to require a choice of those remedies." (internal citation omitted)); *United States ex rel. Schuhardt v. Washington Univ.*, 228 F.Supp.2d 1018, 1024 (E.D. Mo.2002) ("[P]articipa[nts] in the Medicare program are subject to a variety of sanctions if they receive payments based on false statements," including "prosecut[ion] for criminal violations," "a civil action for damages and penalties pursuant to the FCA," "administrative penalties and sanctions," and an "administrative recoupment proceeding.") (internal citations omitted)).

This structure of parallel liability under the FCA and administrative procedures has served the government well. The FCA has been used in a number of areas where there is a comprehensive set of regulations that include agency enforcement procedures. For example, the Food and Drug Administration ("FDA") has issued detailed regulations surrounding the off-label marketing of pharmaceutical drugs. 21 C.F.R. §§ 202, 203, 312. Those regulations set forth detailed enforcement procedures available to the FDA. *See, e.g.*, 21 C.F.R. §§ 16 (regulatory hearings before the FDA, including provisions regarding initiation of proceedings, hearing procedures, records and decisions, reconsideration, and judicial review), 7 (enforcement policy), 17 (civil money penalty hearings); *see also, e.g.*, 202.1(j) (provisions applicable to off-label marketing and referring to Part 16 hearing

---

under the FCA when the government has been damaged by a materially false or fraudulent claim for payment or by use of a record or statement in a materially false claim." 688 F.3d at 414-15.

process), 312.40-48. Despite this comprehensive set of regulations and enforcement procedures, the United States has used the FCA to recover over one billion dollars for violations of the FDA's off-label marketing restrictions. In fact, some of the largest *qui tam* recoveries in history have occurred in this area.[5]

There are many other examples where FCA liability has been imposed amidst regulations with specific enforcement procedures. They include Title VI of the Higher Education Act, which has an expansive set of regulations governing the administration of the federal student aid programs and containing enforcement procedures that span multiple parts of the Code of Federal Regulations. *Compare, e.g.*, 33 C.F.R. §§ 99.60-67, 600.41, 668.81-98, 668.111-124 *with Onnen*, 688 F.3d at 414-15 (holding that the relator's FCA claim was not precluded by the comprehensive administrative remedies and sanctions available to the government under Title IV of the Higher Education Act). Another example is the Service Contract Act ("SCA"), consisting of regulations setting forth specific labor and safety requirements for service contracts with the United States, and vesting exclusively authority in the Secretary of Labor to pursue violations of those rules through only administrative channels. *Compare* 48 C.F.R. § 22.1000, *et seq. with United States ex rel. Sutton v. Double Day Office Servs., Inc.*, 121 F.3d 531, 534 (9th Cir. 1997) (FCA claim based on SCA violations). Yet another example is the Fair Housing Act, which prohibits discrimination in housing-related transactions and has an extensive set of regulations that include multiple layers of enforcement options and procedures. *Compare, e.g.*, 24 C.F.R. § 103 (setting forth Complaint Processing procedures including investigation, conciliation, charges, judicial action, and even referral to state and local agencies for enforcement)

---

[5] *See* Government Accountability Office Report, "FDA's Oversight of the Promotion of Drugs for Off-Label Uses," July 2008, at p. 28 (Table 4), available at http://www.gao.gov/assets/280/278832.pdf (listing DOJ settlements of FCA cases involving off-label marketing violations from 2003-2007, including $704 million for Serono's Serostim, $635 million for Purdue's OxyContin, $515 million for Bristol-Myers Squibb's Abilify, and $430 million for Pfizer's Neurontin); *see also* Department of Justice Press Release, Dec. 4, 2012, available at http://www.justice.gov/opa/pr/2012/December/12-ag-1439.html (referencing recent FCA settlements involving off-label marketing of $1.5 billion with Glaxo Smith Kline, $561 million with Abott Laboratories, and $441 million with Merck).

*with United States ex rel. Anti-Discrimination Ctr. of Metro New York. v. Westchester County*, 668 F.Supp.2d 548 (S.D.N.Y. 2009) (granting summary judgment for relator in FCA case alleging violations of FHA regulatory requirements, and resulting ultimately in a $30 million settlement and consent decree: *United States ex rel. Anti-Discrimination Ctr. of Metro New York v. Westchester County*, 712 F.3d 761, 765 (2nd Cir. 2013)).

The Court's ruling contravenes these prior False Claims Act rulings; rulings that demonstrate that the FCA is a powerful implement in the government's toolbox to prevent and remedy fraud, just as Congress intended. They also reflect a practical reality: government agencies cannot initiate enforcement procedures against every entity engaged in wrongdoing that fraudulently receives government funds. The gap in enforcement created by this practical reality can be alleviated by private relators able to pursue such wrongdoing on behalf of the government through the FCA.[6]

Finally, if unique circumstances arise in which the pursuit of an FCA claim would interfere with agency enforcement efforts, those instances are properly addressed on a case-by-case basis. And the FCA statute provides myriad ways for the government to alleviate such a concern. *See, e.g, Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 753 (5th Cir. 2001) ("[E]ven in cases where the government does not intervene, there are a number of control mechanisms present in the *qui tam* provisions of the FCA so that the Executive nonetheless retains a significant amount of control over the litigation."). For example, if a private relator intended to continue to pursue litigation that the government thought would interfere with an agency enforcement action, the government could: (a)

---

[6] Among other things, federal agencies suffer from budgetary constraints, and often have limited resources available for enforcement. Such resource constraints can require agencies to set narrow enforcement priorities (as can political considerations, lack of institutional awareness, and other factors). Likewise, agencies have strategic reasons for leaving enforcement of certain violations to the FCA, including, *inter alia*, the standard of proof and other applicable legal standards. Moreover, these resource-based and strategic reasons will often merge: for example, because the FCA is not concerned with regulatory violations unless they implicate government funds, agencies may choose to focus their limited enforcement dollars on pursuing those regulatory violations that do not amount to fraud or have direct fiscal impact, as those cases cannot be policed by the Department of Justice and private relators.

seek to dismiss the relator's claims entirely, 31 U.S.C. § 3730(c)(2)(A); (b) seek to keep the case under seal as long as necessary to complete its enforcement procedures, 31 U.S.C. § 3730(b)(3); or (c) seek to stay the case or limit the relators' participation pending completion of the agency enforcement procedures, 31. U.S.C. § 3730(c)(2)(C), (c)(4).

For all of these reasons, to the extent the Court based its dismissal with prejudice on the ground that Relator's pursuit of CLIA violations through the False Claims Act would interfere with the government's discretionary enforcement powers, that holding is contrary to law. It is also contrary to the facts of this case: here, the United States and the State of New Mexico investigated Relator's claims and have allowed her to proceed on FCA claims on the government's behalf. In doing so, the government has at least implicitly determined that Relator's claims, including both the CLIA violations alleged and the theories of fraud under which she pursues such violations, do not interfere with CMS's or the New Mexico Department of Health's enforcement of CLIA regulations. Moreover, the State further approved Relator's claims by providing a letter of "substantial evidence" necessary to go forward with the state-law claim. Moreover, the State is currently pursuing administrative remedies as to a portion of the damages related to the CLIA violations Relator brought to its attention, and has chosen to allow Relator to pursue the other portions of Defendants' CLIA violations through the FCA.

3.  *The Court Misapplied the Law to the Facts In this Case*

In attempting to apply the law to the facts of this case, the Court commits further error by ignoring the thrust of Relators' allegations, and instead construing Relator's allegations to be a claim that FCA liability attaches because Defendants failed to maintain perfect compliance with CLIA requirements; and further, by assuming facts not contained in the First Amended Complaint. The Court states as follows:

> Here, in the promissory fraud context, neither participation nor payment are
> conditioned on full regulatory compliance, which in any case is measured by a complex

18

> monitoring and remedial scheme that usually ends certification and suspends Medicare payments only after an extended or repeated period of noncompliance and failure to address deficiencies.

(Order at 32.) This statement is contrary to the allegations. Relators do not claim that Defendants were required to maintain "full regulatory compliance," and there is no allegation that the remedial scheme "usually" only ends certification and suspends Medicare payments after numerous opportunities for correction.

Taking a step back, Relator does not allege picayune, technical violations of CLIA, or claim that the failure to maintain perfect compliance satisfies the FCA's materiality and scienter requirements. It does not, because picayune violations cannot result in revocation of CLIA certification. Relator instead alleges numerous, rampant, Condition- level CLIA violations; violations sufficiently serious that Defendants themselves, after finally realizing the predicament created by Relator's dogged efforts at reform, shut down a portion of their lab. Any one of these Condition level violations grants the government the authority to invoke its "principal sanctions": to revoke CLIA certification, and to cancel the lab's approval to receive Medicare payments. 42 CFR § 493.1806, 1807. This application of the law to the factual allegations in this case cannot be disputed under the plain language of the statute. That is all that is needed to establish materiality and allow for FCA liability on a promissory fraud theory.

The Court deviates from controlling law when it concludes that the Condition-level violations here are not material because the government can choose to pursue a lesser penalty. Likewise, that a government decision to revoke CLIA certification or suspend Medicare payments might not go into effect until the lab is granted some due process does not defeat materiality. Neither of these possibilities allowed for within the remedial scheme change the fact that the government can, and does, revoke CLIA certification and suspend Medicare payments based on the types of Condition-level violations at issue here. And, while a lab might have an opportunity to be

heard on whether such Condition-level violations warranting revocation or suspension actually exist, the Court does not have any obligation to grant an opportunity to correct deficiencies. *See, e.g.*, 42 CFR 493.1828(a)(1). The Court should not, at the motion to dismiss stage, simply reject such allegations rooted in a plain reading of the statute.

Finally, even under the Court's interpretation of what it would take to revoke CLIA certification and suspend Medicare payments, Relators' allegations call for revoking CLIA certification and suspending Medicare payments. The Court focuses on 42 CFR 493.1828(a)(2)(i) for the proposition that deficiencies found during CLIA certification merely result in opportunities for follow up, and only result in revocation after months of noncompliance. As an initial matter, the antecedent provision, 42 CFR 493.1828(a)(1), states that "CMS may suspend payment for all Medicare-approved laboratory services when the laboratory has condition level deficiencies." Putting that aside, Relator's allegations satisfy the sub-provision that the Court cites, 42 C.F.R. § 493.1828(a)(2)(i): Relator alleges that Mimbres "ha[d] not corrected its condition level deficiencies included in the plan of correction within 3 months from the last date of inspection." *Id.*  Indeed, Relator alleges much more: that the violations continued knowingly and repeatedly for several years, and that Defendants simply made false representations of corrective action and compliance in order to retain certification. Such violations would have resulted in the suspension of Medicare payments had the government known of them, and are therefore clearly material.[7]

---

[7] The Order also states that Relator "does not claim . . . that Defendants had no intention of abiding by their commitments at the time they were made." (Order at 31.). Relator submits that statement misconstrues her First Amended Complaint. 1AC ¶¶ 161 ("Relator raised concerns about CLIA violations promptly and repeatedly to Mimbres management . . . . However, because Defendants intended to continue ignoring problems so long as they could get away with it, as they had done in the past, rather than permanently fix the problems, they decided to get rid of Relator."); *see also, e.g.*, 141-44, 146. Intent is often inferred based on circumstantial evidence, especially at the motion to dismiss stage. And noncompliance in the period immediately before or after a promise provides a strong inference that the promise was made without an intent to follow through. *See United States ex rel. McArtor v. Rolls-Royce Corp.*, No. 1:08cv133 WTL/DML, Dkt. No. 63, at 10, n.3 (S.D. Ind. June 4, 2012) (refusing dismissal of fraudulent inducement claim where relator

For all of these reasons, the Court should reconsider Relator's FCA claim based on a promissory fraud theory, and deny Defendants' motion to dismiss that claim.

III.   <u>Relator Respectfully Submits that the Order Dismissing Her Anti-Retaliation Claim Should Be Reconsidered Because It Misapprehends the Law</u>

The operative version of the FCA's retaliation provision provides:

> Any employee . . . shall be entitled to all relief necessary to make that employee . . . whole, if that employee . . . is discharged . . . or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h) (2013) (effective July 22, 2010). Employees satisfy this standard when they take steps to prevent fraud on the government, but there is no requirement that they use the word "fraud" when informing their employers of the relevant problems. *E.g.*, *U.S. ex rel. George v. Boston Scientific Corp.*, 864 F. Supp. 2d 597, 607 (S.D. Tex. 2012) (employee engaged in protected activity when she questioned legality of "off-label marketing practices" despite not calling those practices fraudulent).

Hansen's activity met this standard when, among other things, she raised concerns with management that: (1) other employees were falsifying quality control documents; (2) problems in the microbiology department were so severe that it should be shut down. Although the Court acknowledges that Relator raised those issues, it appears to have dismissed the claim because Relator's "investigatory and reporting efforts were concerned exclusively with regulatory violations

---

"alleged detailed and extensive nonconformance that occurred before, during, and after the [d]efendant's many representations that it was in compliance with [quality control requirements]"). The Court acknowledges this (Order at 31-32): "Mimbres's purportedly active efforts to secure CLIA renewal despite its regulatory violations could imply that it had no intention to follow through with its commitments." Yet, it then rejects Relator's "late attempt" to read this implication into the complaint. Relator, however, pled detailed allegations about the timing of Defendants' misrepresentations in relation to its promises, 1AC ¶¶ 141-160, and described them again with great pains in her response to Defendants' motion to dismiss (Dkt. No. 69, at 15-17.).

and patient care concerns" rather than actions that violated the FCA. *See* Order at 42. As described above in this Motion, the actions of which Relator complained did violate the FCA, so her complaints about those activities were protected activity, and they do not lose that protection merely because she never specifically used the word "fraud" with her superiors.

Similarly, Relator's refusal to participate in the company's FCA violations was protected. *See* 2009 WL 1544226, 155 Cong. Rec. E1295-03 (2009) (statement of Rep. Howard Berman) ("To address the need to widen the scope of protected activity, . . . Section 3730(h) protects all 'lawful acts done. . . in furtherance of . . . other efforts to stop 1 or more violations' of the False Claims Act. This language is intended to make clear that this subsection protects not only steps taken in furtherance of a potential or actual *qui tam* action, but also steps taken to remedy the misconduct *through methods such as internal reporting to a supervisor or company compliance department and refusals to participate in the misconduct that leads to the false claims*, whether or not such steps are clearly in furtherance of a potential or actual *qui tam* action.") (emphasis added); *Layman v. MET Laboratories, Inc.*, 2013 WL 2237689, at *7 (D. Md. May 20, 2013) ("When Congress enacted FERA, it did so to counter perceived restrictive judicial interpretations of the protected activity prong. . . . § 3730(h) protects not only steps taken in furtherance of a potential or actual *qui tam* action, but also taken to remedy misconduct *through methods such as internal reporting to a supervisor or company compliance department.*) (emphasis added). Here, Relator did exactly what the amended retaliation provision plainly protects, refusing to participate in the misconduct that led to the false claims, and by reporting that activity to her supervisors and the company compliance department. *See, e.g.*, 1AC ¶¶ 164-169, 174. Moreover, Relator has alleged that Defendants shut down the Microbiology lab and concealed other violations from CMS and the Joint Commission; this is sufficient evidence at the motion to dismiss stage to find that the Defendants were on notice of the fraud-related implications of Relator's actions.

As FERA's legislative history and caselaw interpreting it show, the activity is protected even if it is not taken in furtherance of a potential or actual FCA case. *See* 2009 WL 1544226, 155 Cong. Rec. E1295-03 (2009); *Layman*, 2013 WL 2237689, at *7 Although the Court acknowledged the 2009 amendments, it then relied on the pre-FERA ruling in *Karvelas v. Melrose-Wakefiled Hosp.*, 360 F.3d 220 (1st Cir. 2004) for the proposition that a relator is entitled to protection only if she puts her employer "on notice of [the protected] activity and its nexus to FCA violations," Order at 41. Relator respectfully submits that in relying on *Karvelas*, the Court misconstrued the current state of the law.

For these reasons, the Court should reconsider its dismissal of Relator's retaliation claim. Relator Sally Hansen was unable to obtain Defendants' position on this motion. Given its nature, however, Relator Hansen assumes that Defendants oppose this motion.

## CONCLUSION

For the reasons stated above, Relator's Motion to Reconsider and her Motion for Leave to Amend, filed concurrently herewith, should be granted in full.

Respectfully submitted,

/s/ Anand Swaminathan
Michael Kanovitz
Anand Swaminathan
LOEVY & LOEVY
312 N. May St., Ste. 100
Chicago, IL 60607
(312) 243-5900

CAROLYN M. NICHOLS
BRENDAN K. EGAN
500 4th Street NW, Suite 400
Albuquerque, New Mexico 87102
(505) 243-1443

*Attorneys for Relator Sally Hansen*

23

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 19th day of December, 2013, a copy of the foregoing was filed electronically. Notice of this filing will be sent to counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Howard R. Thomas
U.S. Attorney's Office
howard.thomas@usdoj.gov

Jody R. Curran
Office of the Attorney General
jcurran@nmag.gov

Greg L. Gambill
ggambill@montand.com

William C. Madison
wcm@madisonlaw.com

Michael L. Waldman
Mark A. Hiller
mwaldman@robbinsrussell.com
mhiller@robbinsrussell.com

*/s/  Anand Swaminathan*
LOEVY & LOEVY